1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

KORONE ROBINSON,                )
                                )
            Plaintiff,          )
                                )
      vs.                       )        CIVIL ACTION
                                )        FILE NO. 2:17-CV-99
CITY OF DARIEN, DARIEN          )
POLICE DEPARTMENT, DONNIE       )
HOWARD, RYAN ALEXANDER and      )
JOSEPH CRESWELL,                )
                                )
            Defendants.         )
_____ )



DEPOSITION OF

ROBERT GAULT

February 23, 2018

12:39 p.m.

Brown, Readdick, Bumgartner, Carter
Strickland & Watkins
5 Glynn Avenue
Brunswick, Georgia

Suzanne R. Robinson, RPR, CCR 5026-1420-3354-3168

## Gilbert & Jones
— Certified Court Reporters —

*gilbertandjones1@bellsouth.net*

P.O. Box 1894 (31521)
1607 Norwich Street
Brunswick, GA 31520
912.264.1670

P.O. Box 14515 (31416)
7505 Waters Ave. F3
Savannah, GA 31406
912.355.0320

2

<u>APPEARANCES OF COUNSEL</u>

On behalf of the Plaintiff:

    KATIE S. MITCHELL, Esq.
    SCOTT REDDOCK, Esq.
    Mitchell & Reddock, LLC
    111 West Court Street
    Hinesville, Georgia  31313
    (912) 332-7077
    mandrlawoffice@gmail.com

On behalf of the Defendants:

    EMILY R. HANCOCK, Esq.
    Brown, Readdick, Bumgartner, Carter,
    Strickland & Watkins
    P. O. Box 220 (31521)
    5 Glynn Avenue
    Brunswick, Georgia  31520
    (912)264-8544
    ehancock@brbcsw.com

Also Present:

    Korone Robinson

                    - - -

3

<u>INDEX TO EXAMINATIONS</u>

<u>Examination</u>                                    <u>Page</u>


By Ms. Mitchell                                    4

By Ms. Hancock                                    43

By Ms. Mitchell                                    50

By Ms. Hancock                                    54

By Ms. Mitchell                                    56

By Ms. Hancock                                    59

- - -


<u>INDEX TO EXHIBITS</u>

Plaintiff's
 <u>Exhibit </u>              <u>Description</u>              <u>Page</u>


   Exhibit 1    Diagram                            60

     (Original Exhibit 1 has been attached to the
original transcript.)

4

1              (Reporter disclosure made pursuant to

2         Article 10.B. of the Rules and Regulations of

3         the Board of Court Reporting of the Judicial

4         Council of Georgia.)

5                        ROBERT GAULT,

6    having been first duly sworn, testified as follows:

7                        EXAMINATION

8    BY MS. MITCHELL:

9         Q.    Can you please state your name for the

10   record.

11        A.    Robert Gault.

12        Q.    All right.  Mr. Gault, have you ever had

13   your deposition taken before?

14        A.    Yes.

15        Q.    Oh, good.  Then I'll just refresh your

16   memory as far as some of the rules.  The court

17   reporter is taking down your testimony --

18        A.    Okay.

19        Q.    -- so it has to be verbal.  Does that make

20   sense?

21        A.    Right.

22        Q.    Answers need to be verbal.  And I try to

23   have a laid back environment, so if we end up talking

24   over each other, we need to make sure to make an

25   effort to stop, or I'm sure the court reporter will

1    let us know we're doing it.

2          A.    Okay.

3          Q.    And the testimony you're giving is under

4    oath.

5          A.    Okay.

6          Q.    And it's to be used in conjunction with a

7    Federal suit that's pending right now from Officer

8    Robinson against the City of Darien.

9          A.    Correct.

10          Q.    And it can be used for any purposes

11    allowable under the Federal Rules of Evidence or the

12    Federal Civil Practice Act.

13          A.    Yes.

14          Q.    You have the chance to do what's called

15    read and sign later, which is you can read the

16    deposition and check for typos in the way the

17    testimony was done, or you can just say, No, I'm fine

18    with it, when I'm done.  Okay?

19          A.    No, I'm good.

20          Q.    And the only other thing to remember, when

21    I ask a question, if it's a confusing question or

22    convoluted, you can always ask me to rephrase it or

23    just tell me it doesn't make sense.

24          A.    Okay.

25          Q.    All right.  With that, we'll get started.

6

1      A.    All right.

2      Q.    Are you currently employed?

3      A.    I am.

4      Q.    And do you work in law enforcement as

5  well?

6      A.    I do.

7      Q.    All right.  I'll call you Officer Gault.

8  Is that acceptable?

9      A.    Deputy.

10      Q.    Deputy Gault.  And your rank at the moment

11  is sergeant major?

12      A.    Yes, ma'am.

13      Q.    And that would be easier to say, Sergeant

14  Major.

15      A.    Yes, ma'am.

16      Q.    All right.  When you first get into law

17  enforcement?

18      A.    In 2012.

19      Q.    And where did you start?

20      A.    Darien PD.

21      Q.    Did you go to the academy?

22      A.    I did.

23      Q.    Did Darien send you?

24      A.    No.  They hired me like a month before I

25  graduated.

7

1      Q.      So you got hired while in the --

2      A.      I was pre-service.

3      Q.      In -- oh.

4      A.      I was pre-service.  I put myself through.

5      Q.      All right.  And what position did you

6   start in with Darien PD?

7      A.      Officer.

8      Q.      And were you in Patrol?

9      A.      I was.

10     Q.      And how long did you stay at Darien PD?

11     A.      I gave them a two-year verbal commitment,

12   and I worked my two years, and then I left and went

13   to the County.

14     Q.      So 2014, does that sound right?

15     A.      Yes.  It should be July 2014, I think I

16   left the City and went with the County.

17     Q.      And you went to the County -- when you say

18   the County, do you mean McIntosh?

19     A.      Yes, sir -- yes, McIntosh County.

20     Q.      And are you still with McIntosh County?

21     A.      I am.

22     Q.      All right.  When you first went to

23   McIntosh, what division did you start in?

24     A.      Patrol.

25     Q.      Did you receive any promotions, or have

8

1    you received any promotions?

2         A.    I started in July of '14 in Patrol.

3    January of '15, I was moved to Investigations, and I

4    worked in Investigations for two years.  In January

5    of '17, I was moved back out to Patrol as a

6    sergeant.

7              I was promoted to corporal while I was in

8    Investigations.  And then, like I said, January of

9    '17, I moved to Patrol as a sergeant.  Then in June

10   or July of last year, I got promoted to sergeant

11   major.

12        Q.    Okay.  And you're now a sergeant major

13   over Patrol?

14        A.    Yes, ma'am.

15        Q.    And who do you report to?

16        A.    Major Mitchell.

17        Q.    Major.  Okay.

18              And are you the only sergeant major over

19   Patrol?

20        A.    Yes.

21        Q.    And when you were in Investigations, would

22   you actually work any Narcotics cases?

23        A.    Yes.  I was actually assigned to the

24   Narcotics division --

25        Q.    Okay.

9

1     A.     -- I think April of '16 -- or, yeah, '16

2     -- '15, sometime around there.

3     Q.     Now, going what back to your time at

4     Darien Police Department, do you recall writing an

5     affidavit that was provided to the EEOC in response

6     to Officer Robinson?

7     A.     Yes.

8     Q.     And it's already been submitted in another

9     deposition, so rather than sitting here and reading

10    through it, we'll just go ahead and go through some

11    of the categories that were in it, if that's okay.

12    A.     Okay.

13    Q.     Do you recall in your affidavit stating

14    about riding in a vehicle with other officers?

15    A.     Yes.

16    Q.     Can you elaborate on other officers you

17    would ride with?

18    A.     I rode with Stacy Miller.  I rode with

19    Mike Johns.  I rode with Terrence Holmes.

20    Q.     Okay.

21    A.     I rode with Brad Marat, Anthony Brown.

22    Q.     And at the same time, would you ever see

23    any of the other officers riding together?

24    A.     Yeah.

25    Q.     I mean, did you guys have working patrol

10

1   cars?

2        A.    We had working patrol cars, but sometimes

3   they would go down and need service or whatever, so

4   we would jump in a car with another officer if they

5   were out.

6        Q.    Okay.  Are there times when you would jump

7   in a car that officer -- even if your car wasn't

8   there, carpool to a location?

9        A.    Maybe to training, something like that,

10  you know.  I rode with Stacy one time to our -- it

11  was a special response team PT test, so the test we

12  had to do to be on the team.  Of course, everybody

13  with the City didn't have an option.  We had to be on

14  the team at the time.  That was part of the rule.

15           So we left the PD, where the PD was

16  located there on 17 in Darien, and went over to

17  Butler Island where we did our PT test.

18       Q.    PT test?

19       A.    Yes.

20       Q.    When you were with Darien PD, would

21  officers have significant others, their wives or

22  girlfriends ride along with them?

23       A.    Yes, I've had mine ride with me on

24  numerous occasions.

25       Q.    And did you have to go and ask for

1    permission from the chief?

2         A.    No.   It was pretty much common knowledge

3    that if you wanted to have a ride-along or whatever

4    -- only until right before I left -- I think it was

5    Lieutenant Lightsey at the time -- he started -- the

6    best I can remember, he started a thing where you

7    had to fill out a paper if you wanted to ride, and

8    that would cover anybody, you know, riding in the

9    vehicles, the City vehicles.

10        Q.    When you say --

11        A.    Whereas before -- whereas before, like

12   Anthony would -- he'd be out, and I'd say, Hey, you

13   know, so-and-so is going to come ride with me.   He

14   would say, Okay.   That's cool.   No problem.

15        Q.    When you say a form, you mean for

16   civilians to ride along?

17        A.    Yes.   Yeah.

18        Q.    Would it surprise you to learn that that

19   form disappeared the minute Lightsey disappeared from

20   the PD?

21        A.    Well, I -- when I seen them, they were

22   threw into the drawer.   I mean, they weren't put in a

23   file.   From what I seen, they were just filled out

24   and put in a drawer, and I don't know what happened

25   to them.

12

1    Q.    Let me rephrase that.  I mean that the

2    form itself wasn't even a used form anymore, like it

3    is not a form that anyone has testified to still

4    using after Lieutenant Lightsey was gone.

5    A.    That really doesn't surprise me, no.

6    Q.    And so while you were there, it was common

7    knowledge that you could have your significant

8    others ride with you?

9    A.    Yes.

10    Q.    And while you were there, did you observe

11    individuals that would take their vehicles to run

12    errands?

13    A.    Yes.  I've stopped on the way home and

14    picked up groceries and stuff at the store.

15    Q.    Would you have to ask for individual

16    permission to do that?

17    A.    Huh-uh.

18    Q.    Was it common knowledge you could do it?

19    A.    Yeah.  Chief Howard, he said, "Hey, if you

20    need to stop by the store or whatever on the way

21    home," he said, "you know, just go on in and do what

22    you got to do."

23    Q.    And for the unmarked vehicles the

24    investigators had, to your knowledge, were they

25    driving even further distances for private reasons?

13

1       A.    I knew -- at the time, he was my sergeant,

2   but Sergeant Davis, Archie Davis, he would take his

3   car to Rome to visit his girlfriend.  His reasoning

4   for that was he was -- of course, he was the SRT

5   leader, commander, whatever, and he had to -- if he

6   needed to get back to the county, to the city in an

7   emergency, that was the reason why he drove that

8   car.

9       Q.    And he at some point went on a part-time

10  kind of reserve hiatus.  Do you recall that or --

11      A.    Yeah, he did.

12      Q.    And during that time, he would still take

13  his vehicle?

14      A.    No, because his vehicle -- Lieutenant

15  Lightsey had his vehicle at the time.

16      Q.    Okay.

17      A.    Yeah.

18      Q.    And when he -- the girlfriend you're

19  mentioning, that's the woman he ended up marrying

20  eventually; correct?

21      A.    Yes.

22      Q.    Okay.

23      A.    Yeah.

24      Q.    And do you recall ever seeing Lieutenant

25  Roundtree drive his vehicle?

1       A.      Yeah, I've seen him drive it, but me and

2   Lieutenant Roundtree never really -- we weren't

3   really close, so I didn't keep up with what he did.

4       Q.      Was he in your chain of command?

5       A.      Yeah, he was.

6       Q.      Was he your immediate supervisor?

7       A.      No, he wasn't.

8       Q.      So you didn't have a daily interaction?

9       A.      I didn't have daily interaction, no.

10      Q.      Okay.  And while you were at Darien, did

11  you ever see officers being written up for riding

12  together in cars?

13      A.      No.

14      Q.      Did you ever see officers that were told

15  that there was a particular officer they couldn't

16  ride with?

17      A.      No.

18      Q.      While you were there, was there anyone

19  writing up officers for failing to go 10-41 or 10-42

20  with dispatch?

21      A.      No.

22      Q.      Have you ever heard of anyone being

23  terminated for that?

24      A.      No.  I've done it myself.  I've forgotten

25  to go 10-7 on the radio or, you know --

15

1      Q.     And that means the same thing as the 10-41

2   and 10-42; correct?

3      A.     10-7 just means you're out of service,

4   yeah.

5      Q.     Okay.  And while you were at Darien --

6   employed with Darien PD, do you recall ever hearing

7   Chief Howard express an opinion about interracial

8   dating?

9      A.     The only thing I heard in context that I

10  took for, you know, his opinion of interracial dating

11  was I was sitting in the parking lot of B&J's one

12  evening.  And I was in a vehicle, and he was talking

13  to another person, and he made the statement that

14  when he found out Carly was dating Barry Deverger,

15  which is a black male, that he went over to Butler

16  Island to one of those -- Massman or one of those

17  roads over there and he vomited.  He puked.  And it

18  was along those lines of -- you know, he became ill

19  when he learned that his daughter was dating him.

20  So, I mean, that's --

21     Q.     Would you have taken it -- is it possible

22  that it would have been the same sentence if it --

23  when I learned Carly was dating a white man?

24            MS. HANCOCK:  Object to form.

25            Go ahead and answer.

16

1              THE WITNESS:  No, no.  I mean, I -- the

2       way I -- the way I took it was he was

3       specifically talking about the black male

4       because that was kind of the conversation, you

5       know --

6       Q.     (By Ms. Mitchell)  That was --

7       A.     -- he was having.

8       Q.     Okay.  That was in the context of the

9  conversation?

10      A.     Right, yeah.

11      Q.     The conversation itself was about --

12      A.     Yeah.

13      Q.     -- white women dating black men?

14      A.     Yes.

15      Q.     And then he provided an example?

16      A.     Right.

17      Q.     That made him physically ill?

18      A.     Yes.

19      Q.     So you can't see any way to reframe that

20  sentence that would make it about any man?

21      A.     I do not.

22             MS. HANCOCK:  Object to form.

23      Q.     (By Ms. Mitchell)  Okay.  And so now, in

24  terms of people dating at the PD, did Joe and Carly

25  start dating before you left?

17

1      A.      I don't know, to be honest with you.  I

2   can't really --

3      Q.      Okay.

4      A.      -- remember.

5      Q.      All right.  Now, the PD, while you were

6   there, were there occasions when you would respond

7   to a call, but an incident report wasn't necessary?

8      A.      Yeah.  That was -- that's just -- that was

9   the way things were done.  You can go to a call.  If

10   it didn't involve a criminal incident, you wouldn't

11   document it.

12      Q.      What if you responded to a call and

13   learned that the complainant, the alleged perp, and

14   the alleged incident all occurred in another county?

15      A.      No, that's a -- we wouldn't have

16   jurisdiction to even do a report on it, so --

17      Q.      So there wouldn't even be a way to do the

18   report?

19      A.      No.

20      Q.      Okay.

21      A.      Now, let me -- I will explain, since being

22   at the Sheriff's Office, we do reports on everything.

23   So even if that situation were to arise, we would do

24   a miscellaneous report to cover ourselves, that we

25   did speak with these people, however the incident

18

1    occurred in another county, so they were instructed

2    to go to that jurisdiction and file the complaint.

3         Q.    And you just identified a miscellaneous

4    report.

5         A.    Right.

6         Q.    Is that separate from an incident report?

7         A.    Yeah, a miscellaneous report, that --

8    because we don't have any grounds to do anything.

9         Q.    So the incident report itself would still

10   be not -- well, inappropriate because you don't have

11   jurisdiction?

12        A.    It's a C -- it's what they call CYA, cover

13   your ass.

14        Q.    Okay.  But that is not the practice that

15   was at Darien PD?

16        A.    No.

17        Q.    And have you ever heard Darien PD officers

18   on the radio say STAT3?

19        A.    Yeah.

20        Q.    What does that mean?

21        A.    It's unfounded and no action taken.

22        Q.    And if they're STAT3, is that something

23   that you were taught when you were at Darien PD?

24        A.    Yeah.  It's part of the radio.

25        Q.    And when you would go STAT3, does that

19

1   indicate you would not be doing any report?

2       A.    Yeah, I wouldn't do a report.  We don't do

3   it now with the County.  When I STAT3, like if we

4   respond to an alarm call and to a church and we

5   speak to the pastor and he says, Hey, I'm sorry.  I

6   set it off by accident, I would STAT3 it.

7       Q.    So just because you actually had

8   interaction with a human doesn't mean you then write

9   a report about it?

10      A.    Right.

11      Q.    So when you would be going STAT3, I mean,

12  was there anyone coming behind you to determine if

13  you had messed up and that's one you should have

14  written a report on?

15      A.    Not that I can remember.  I mean, we

16  pretty much governed ourselves.

17      Q.    And you weren't the only one that -- you

18  just said governed yourselves.  I mean, that was

19  pretty much how the entire department operated?

20      A.    Yeah.

21      Q.    And, to your knowledge, do the officers

22  still use STAT3 for Darien PD?

23      A.    They do.

24      Q.    When's the most recent time you heard it?

25      A.    Well, Wednesday, I think Officer Marat or

20

1    Sergeant Marat, whatever he is now, he responded

2    to a domestic that was given out, that the male

3    subject had struck the female in the head.  They

4    determined that there was no violence, and he came

5    over the radio and said that there was no violence,

6    and he STAT3'd it, you know.

7         Q.    Did the Sheriff's Office respond to that

8    call?

9         A.    We did.

10        Q.    Who got there first?

11        A.    We did.

12        Q.    Where was Officer -- and for them to be

13   coming, it was in City limits?

14        A.    Yeah.  Well, we have a Zone 2 deputy that

15   stays, and part of his zone is the City of Darien.

16        Q.    But the responding officer, his zone

17   wasn't the city limits?

18        A.    Yeah.

19        Q.    I guess I'm confused.  The zone is the

20   city limits, but --

21        A.    Yeah, his --

22        Q.    -- but he wasn't --

23        A.    Yeah, he's --

24        Q.    -- in it?  He was coming from somewhere in

25   the county?

21

1      A.     No, the deputy --

2      Q.     No, no.  I'm talking about Marat.

3      A.     Oh, Marat.  Well, his jurisdiction is just

4  the city.

5      Q.     Is the city?

6      A.     Right.

7      Q.     Okay.  And the call was for in the city?

8      A.     Yeah.  It was Black Road.

9      Q.     But, meanwhile, the SO beat him there

10  because the City officer was not even in the city

11  limits?

12             MS. HANCOCK:  Object to form.

13             THE WITNESS:  Oh, yes.  Yeah.  He wasn't

14      in the city limits.

15      Q.     (By Ms. Mitchell)  I guess I understand.

16  Okay.  So where was he coming from?

17      A.     He was coming from the county.

18      Q.     And the SO, did you guys go STAT3?

19      A.     We turned it over to the City because it's

20  their -- we -- we do not take over -- we allow the

21  City to do their job, so my deputies would turn it

22  over to the City.  We'd STAT9 it to the City because

23  STAT9 means turn over to.

24      Q.     And so in that situation he came out --

25      A.     He -- based on what where I seen him at on

22

```
 1    the map, he came from Carnaghan, which is out in our
 2    Zone 3, which is a good ways out of city limits.
 3         Q.    Approximately how far drivewise is it from
 4    the city limits?
 5         A.    It's about 10 miles.
 6         Q.    About 10 miles out?
 7         A.    (Nods head.)
 8         Q.    Okay.  And you said he came, and then he
 9    went STAT3?
10         A.    Yeah.
11         Q.    So --
12         A.    Once he conducted his investigation of it,
13    he determined there was no violence that had taken
14    place, and he just STAT3'd it.  Now, if --
15         Q.    Is it -- I apologize.
16         A.    If it was us and it was our call, solely
17    our call, my people would do what is called a
18    miscellaneous report.
19              If there is no evidence of physical
20    violence, then you would notate it in a report.  That
21    way, in case something happened later on, that they
22    did get in a fight or one party killed the other,
23    there was a record that, you know, we've been there
24    for this, you know.
25         Q.    Okay.  And would it change at all if when
```

23

1    you arrived you learned that everything is from a

2    different jurisdiction, that there is no witness,

3    there is no perp, there is no claim that involves

4    anything in the county, so it's got to be STAT9 to

5    another county?

6         A.    Yeah.  I mean, we'd -- like I said

7    earlier, if it -- if we determined that it happened

8    in a different county or a different city or

9    whatever, we would tell them to go to that place

10   where the actual offense took place --

11        Q.    Would you --

12        A.    -- and --

13        Q.    Sorry.

14        A.    -- and they would -- they would handle the

15   situation at that point.

16        Q.    Would you write up your officer for not

17   doing an incident report in that scenario?  An

18   incident report.

19        A.    And incident report?

20        Q.    Uh-huh.

21        A.    No.

22        Q.    Okay.

23        A.    Because there's no incident.

24        Q.    And, now, in terms of at Darien, when you

25   would be working on reports, would the time period

24

1    that you tell citizens, would it be three to five

2    business days and their reports would be available?

3         A.    That was standard, yeah.

4         Q.    And was it common that it would take an

5    officer for some types of reports a couple of days as

6    opposed to the same day?

7         A.    Yeah, depending on -- yeah, depending on

8    what the call was and, you know, how -- how severe it

9    was or whatever.  But --

10        Q.    Is that actually -- sorry.

11        A.    But we are instructed to get our reports

12   done before we go on our off days, that they need to

13   be done and in the system for approval before we go

14   off.  Like we work like Wednesday and Thursday;

15   we're off today, Saturday, and Sunday.  Anything we

16   had Wednesday and Thursday need to be in the system,

17   loaded to be approved before we left yesterday.

18        Q.    Oh, because today's Friday?

19        A.    Right.

20        Q.    I apologize.

21        A.    That's okay.

22        Q.    And is that kind of common across

23   agencies?

24        A.    Yeah, as far as I know.  Every agency I've

25   ever had any dealings with, that's what their

25

1  officers say they -- that's the way it was with

2  Darien.

3      Q.    Okay.

4      A.    Archie, he always, you know, harped on it,

5  that the reports need to be completed.

6      Q.    If one of your officers now underneath

7  your command on patrol was late with taking a full

8  four days on a report but wasn't off, would you write

9  him up for it?

10     A.    I would try to figure out what's going on

11 with it.  You know, unless CID got involved with it

12 or something, you know, I would look into it and

13 determine --

14     Q.    So you're saying you might have questions?

15     A.    Yeah, I would have questions, like, Why is

16 this report not done?  If you had four days, you

17 know, and the call volume is low -- we have mobile

18 units -- we have mobile laptops in the car, so it's

19 not like you can't work on them --

20     Q.    And if call volume was high, that would be

21 a factor you --

22     A.    Yeah.

23     Q.    -- would consider?

24           So you would actually analyze the

25 situation to determine why?

26

1      A.      Right, yeah.  I don't just to go in and

2   start raising hell for -- yeah, I look into all the

3   -- what's causing the delay, and then I make my

4   decision at that point.

5      Q.      Now, Officer Robinson was -- did his

6   employment with Darien PD -- while you were there,

7   did he come on, working with Darien PD?

8      A.      Yeah.

9      Q.      And while you were still at Darien PD, I

10  mean, did you hear any complaints regarding Officer

11  Robinson and his work ethic?

12     A.      No.  No, I didn't hear anything.

13     Q.      Did you hear any complaints about Officer

14  Miller's work ethic, like her investigations being

15  shabby or missing court or --

16     A.      I --

17     Q.      Actually she was still Patrol at the time,

18  wasn't she?

19     A.      Yeah, she was in Patrol.  Yeah.

20     Q.      I apologize.  Scratch that entirely.

21          Now, when you were leaving Darien PD at

22  that time, right before you left, was it a structured

23  department, where officers were each being held to

24  the same standard for their conduct and behavior?

25          MS. HANCOCK:  Object to form.

27

1          THE WITNESS:  Not really.  I mean, it was

2      pretty much, you know, go out and do your job,

3      but, you know, there wasn't a -- like a set form

4      of how we do certain things, you know.

5          Q.     (By Ms. Mitchell)  Have you ever heard the

6  phrase -- when people are talking about law

7  enforcement, have you ever heard the phrase "being a

8  cowboy"?

9          A.     Yeah.

10          Q.     Have you ever heard that phrase applied to

11  the PD?

12          A.     Several times.

13          Q.     Have you heard that phrase applied lately

14  to the PD?

15          A.     Yes.

16          Q.     In fact, there's a current excessive force

17  investigation underway with GBI right now; correct?

18  For Darien PD?

19          A.     Yes, there is.

20          Q.     Has that phrase been used for that

21  situation as well?

22          A.     Yes, it has.

23          Q.     Have you ever heard the phrase being used

24  for -- have you ever heard it used for Officer

25  Creswell?

28

1      A.    Yes.

2      Q.    Officer Creswell, wasn't he originally

3  sworn in as a Sheriff's Deputy?

4      A.    No.  He was -- he worked at BPD, Brunswick

5  Police Department.  He left Brunswick Police

6  Department, came to work at Darien Police Department.

7  He was sworn in as a deputy for special purposes.

8      Q.    Yes.  I apologize.

9      A.    Yeah.

10      Q.    I worded it wrong.  He was deputized.

11      A.    He was deputized --

12      Q.    He wasn't --

13      A.    -- for special purposes because he was --

14  because we had a joint County/City SRT, Special

15  Response Team.  And we had so many members from the

16  city, so many members from the County.  And they

17  served high-risk search warrants, high-risk arrest

18  warrants, things like that, responding to active

19  shooters.

20      Q.    Did the Sheriff end up dedeputizing Joseph

21  Creswell?

22      A.    Yes.

23      Q.    Was it after multiple warnings of driving

24  through the county at 100 miles an hour?

25      A.    Yes.

1      Q.    And these incidents of him driving this

2  recklessly, were they told to the chief?

3             MS. HANCOCK:  Object to form.

4             THE WITNESS:  Yes.

5      Q.    (By Ms. Mitchell)  And to your knowledge,

6  was Officer Creswell ever punished for his excessive

7  speed or reckless driving?

8      A.    With the times that he's been caught doing

9  it, no, I don't guess so.

10      Q.    And even after being deputized, have you

11  still seen or heard of the situations where he

12  drives excessive speeds?

13      A.    I haven't seen much of him because he has

14  been reassigned to Narcotics investigator.  So I

15  don't -- I don't see much of him.

16      Q.    Okay.  And when you were in Patrol, I

17  mean, would you drive recklessly to catch up to

18  chases that were already outside the county?

19      A.    When I was with the City?

20      Q.    Yes.

21      A.    No, because I would like to go home and

22  end my shift, so I --

23      Q.    If you had, is that an idea of what makes

24  you a cowboy, when they say that?

25             MS. HANCOCK:  Object to form.

1        THE WITNESS:  I don't understand what --

2        Q.    (By Ms. Mitchell)  Well, help me out.

3  What do you generally mean, when law enforcement

4  refers to another one as a cowboy, a bunch of

5  cowboys?  What does that generally mean?  Like so is

6  it -- believe me, it's not like there's going to be a

7  Webster's Dictionary for that.

8        A.    Oh, yeah.  I mean --

9        Q.    I just mean like some of -- you've heard

10  it in conversation, one police --

11        A.    Pretty much just do --

12        Q.    -- officer says it --

13        A.    -- do however you want to; there's no

14  structure, no repercussions for your actions.

15        Q.    And since your time with the Sheriff's

16  Office, have you still had multiple occasions where

17  you interacted with guys from the PD?

18        A.    Yeah.

19        Q.    Have you had calls where both departments

20  have responded?

21        A.    Yes.

22        Q.    Have you had, when SRT was in place,

23  warrants being served with both departments?

24        A.    There were warrants being served with both

25  departments; however, whenever I left the City, I

31

1    didn't rejoin the SRT when I came with the County.

2         Q.    Okay.  Will -- would you see officers ever

3    in non duty-related ways, like lunch -- like would

4    you be -- would there be any interaction at B&J's or

5    --

6         A.    Yeah.

7         Q.    Okay.  Now, so in your years since leaving

8    the PD, do you still see the same structure that you

9    saw when you left, that it --

10        A.    It's ran the same way.

11        Q.    Ran the same way?

12             And, now, can you recall a situation where

13   -- well, when stuff happens at the PD involving an

14   officer getting in trouble or at the Sheriff's

15   Office, does it spread?

16        A.    Yeah, of course.

17        Q.    And you said "of course."  I mean, like

18   wildfire --

19        A.    Yeah, I mean, it's --

20        Q.    -- correct?

21        A.    Well, it's -- a law enforcement community

22   is no different than any other little community.  We

23   have -- you know, stuff get's around, you know.

24        Q.    Yep.  So when Officer Robinson first got

25   in trouble with Darien PD -- let me rephrase that

1    strike it.

2           Can you remember when you first heard of

3    Robinson starting to be in trouble at Darien PD,

4    getting in trouble?

5      A.    I noticed shortly before he was fired I

6    kept on hearing things about, you know, he would get

7    in trouble for this, and then I found out he was

8    suspended on a certain occasion for assisting us

9    with an investigation which he had nothing to do

10   with.

11          He showed up after everything was done to

12   the meeting location.  We did use Stacy Miller as a

13   UC for those buys.  It was our drug -- our PE-PI

14   money, I have PE-PI receipts for that.  As a matter

15   of fact, I just sent the guy to 12 years in prison.

16     Q.    What's PE-PI?

17     A.    That is just funds set aside for

18   purchasing drugs and things that, you know --

19     Q.    Uh-huh.

20     A.    No, I know there was some

21   misunderstanding.  I think the chief may have thought

22   that that money came from the City, but we have never

23   borrowed money from the City to buy drugs.  We don't

24   need their money?

25     Q.    That's never been a practice before?

33

1   A.  No.

2   Q.  Did you have permission to use Stacy?

3   A.  Yes.

4   Q.  But that was Stacy?

5   A.  That was Stacy.

6   Q.  So help me understand.  To your knowledge,

7 if that was Stacy, why --

8   A.  I had a --

9   Q.  -- was Robinson --

10   A.  I had a phone --

11   Q.  -- punished?

12   A.  I have had a phone call from Chief Howard

13 that said that they were not to work together

14 because they could not get things done, that their

15 cases were falling behind, their work performance

16 was poor, and that they wouldn't -- that we

17 weren't -- I'm trying to remember how he put it now.

18   Basically, those two were not to be

19 working together.  If we wanted use Stacy, that was

20 fine.  But the two of them together, working

21 together, because they wasn't getting things done ...

22   Q.  Okay.  And then was he able to actually

23 provide an example of anything he said wasn't

24 getting done?

25   A.  I didn't ask for one.  I just told him --

34

1    I said, "Okay," you know.

2         Q.    Well, until the chief said that, had you

3    heard that come out of anybody else's mouth?

4         A.    No.

5         Q.    Now, the way the departments talk, if an

6    officer was actually starting to slack off on all of

7    their cases, isn't that the kind of thing that gets

8    gossiped about?

9              MS. HANCOCK:  Object to form.

10             THE WITNESS:  Yes.

11        Q.    (By Ms. Mitchell)  Have you heard it

12   before when it's happened that way?

13        A.    Yeah.

14        Q.    Is it common that if an officer is

15   starting to slack on his or her work that is gossiped

16   about?

17        A.    It's no different than working in a

18   factory or whatever.  I mean, when somebody starts

19   slacking, you know, somebody's got to pick up the

20   work.  And when they start bitching --

21        Q.    Would it be rare if an officer was

22   slacking off on his caseloads and investigations

23   weren't getting done and nobody else knew about it?

24   Would that be rare?

25        A.    Yeah, because, I mean, once a case gets

35

1    turned over to Investigations, the investigator

2    deals with the victim at that point or the -- you

3    know, whatever -- whatever the case may encompass.

4    And they're responsible for that case from then

5    forward, you know.

6              And if cases aren't getting prosecuted

7    and, you know, something's -- you know, there's got

8    to be evidence of it.  Either the narratives aren't

9    getting done, the supplements aren't getting done,

10   interviews aren't getting done.  There's all kinds

11   of proof for it, so ...

12        Q.    And when you talk about the proof, you

13   mean all kinds of ways -- all kinds of ways people

14   would notice it wasn't being done?

15        A.    Yeah.

16        Q.    So the idea that it would be not being

17   done but nobody else knows about it, how would that

18   even happen?

19        A.    I don't know.  I don't --

20        Q.    And, populationwise, is Darien a smaller

21   town?

22        A.    Darien is like 3 square miles, so ...

23        Q.    So the victims of crimes in Darien, they

24   would notice if law enforcement investigators

25   weren't contacting them?

36

1    A.    Yeah.

2         MS. HANCOCK:  Object to form.

3    Q.    (By Ms. Mitchell)  Do the locals gossip?

4    A.    Well, even when I was with the City, I was

5    stopped by citizens every now and then saying that

6    we spent too much time on the interstate and we

7    didn't spend enough time patrolling the city, so ...

8    Q.    So do you think it would be -- well, in

9    your experience, would it be rare if a local wasn't

10   complaining if their case was not being addressed?

11        MS. HANCOCK:  Form.

12        THE WITNESS:  If I had a case, I would

13        complain, too, you know.  I mean, that's --

14        everybody, when they have a situation like that

15        and it involves an investigation, that's -- you

16        know, they have a right to be upset if it's not

17        getting taken care of.

18   Q.    (By Ms. Mitchell)  Do you remember Jason

19   Register?

20   A.    I do.  He was my sergeant at one point.

21   Q.    And Officer Register, Sergeant Register,

22   did he have a drinking problem?

23   A.    He -- yeah, he had an issue with alcohol.

24   Q.    When he was on the wagon, when he was

25   sober, was he an attentive sergeant?

37

1      A.     Oh, yeah.  You couldn't -- you'd ask him

2  any -- you could ask him anything to do with law

3  enforcement, he had -- he was like an encyclopedia.

4      Q.     If Officer -- if Sergeant Register was

5  starting to experience symptoms of his alcoholism,

6  would you be able to see it in his work performance?

7      A.     Yeah.

8      Q.     When that would happen, would everybody be

9  able to see it?

10     A.     Yeah.  It was evident.

11     Q.     Would everybody then start talking about

12 it?

13     A.     Yes.

14     Q.     Would it spread like wildfire?

15     A.     Yes.

16     Q.     So guys at the SO would know it about it,

17 too, wouldn't they?

18     A.     Yes.

19     Q.     Can you think of anyone that you have ever

20 actually interacted with in a law enforcement

21 capacity that you found out after the fact was

22 having significant work performance decline that

23 nobody knew about?

24     A.     No.

25     Q.     Can you think of anyone you've now ever

38

1    interacted with that it turns -- that after the fact

2    you find out that they were allegedly having

3    overwhelming emotional instability problems?

4         A.    No.

5         Q.    Have you ever found out after the fact

6    that there was an officer that was, for instance, not

7    turning in reports, not finishing investigations,

8    not getting warrants signed, just a couple of months

9    worth of piled up information that you had never

10   heard of until after the fact?  I mean, is that

11   something you've ever experienced before?

12             MS. HANCOCK:  Object to form.

13             THE WITNESS:  No, because a warrant -- I

14        mean, I could tell you what would happen in this

15        situation in the SO.  Somebody would be giving

16        some answers, you know, but it wouldn't go two

17        months because it's -- well, I mean, you have a

18        -- you have a certain structure in the

19        Investigations Department at the SO, whereas the

20        City was always one investigator.  And I don't

21        know if the chief ever even know what -- half of

22        the stuff that was going on.  I mean, I don't

23        know.  I didn't know, honestly.  I just --

24        patrol was my thing, and I left it at that.  I

25        didn't --

39

1      Q.     (By Ms. Mitchell)  But if individuals were

2   actually being complained about, you would have heard

3   it?

4      A.     Oh, yeah, of course.  Yeah.

5      Q.     Okay.  And did the suspension for Officer

6   Robinson, did that -- well, did you have any

7   questions about why it was he was suspended?

8      A.     Well, I believe Melton was -- Mike Melton

9   was the one who told me about it.  He told me -- he

10  said that Korone was suspended and the reason for his

11  suspension was that he needed to rethink his

12  loyalty.

13         And my response to that was, "What the

14  hell?"  You know, that's -- and I told him.  I said,

15  "That's bullshit."

16      Q.     Did you ever --

17      A.     That he didn't do anything -- he didn't do

18  anything at the -- during the investigation at all.

19  He showed up after -- after everything was done.  We

20  were filling out paperwork.  I think he was talking

21  to Doug Shire at the time.  Doug Shire was on duty,

22  and he had pulled up out there.

23      Q.     After Donnie had said he didn't want

24  Korone and Stacy helping with any of the narcotics

25  cases, did Korone ever violate that order from the

40

1    chief?

2        A.    No, I didn't see Korone again.  No.  The

3    last -- the next time I saw Korone, he was in a

4    Patrol uniform in a Patrol car.

5        Q.    No.  No, I'm not talking about after the

6    suspension.  I mean once Korone was told to quit

7    working with you, did he -- with the City --

8        A.    That's what I'm saying.

9        Q.    I'm not saying it in reverse?

10       A.    That's what I'm saying.  I didn't see him

11    again.  The next time I seen him, he was in a Patrol

12    uniform.

13       Q.    Patrol uniform?

14       A.    Yeah.

15       Q.    Okay.  And did Chief Howard ever call you

16    back to actually ask what, if anything, Korone had

17    actually done with that investigation that he got

18    suspended for?

19       A.    No.

20       Q.    Did Ryan Alexander ever call you to ask if

21    Robinson had actually done any work with the SO?

22       A.    No.

23       Q.    And when he was transferred to Patrol, did

24    you find that odd?

25       A.    Well, I mean, after I found out that he

41

1    was suspended and they -- and the reason given was

2    that, I -- it didn't surprise me with Ryan.

3          Q.    And when -- did you ever hear that he was

4    going to be terminated?

5          A.    I'm trying to think.  He -- I did not hear

6    anything about him being -- going to be terminated,

7    but then I found out he was terminated, you know,

8    after the fact.

9          Q.    Okay.  And when he was terminated from the

10   PD, did you make any recommendations to the

11   Sheriff's Office about his being hired?

12         A.    Yeah.  I went to the Sheriff and advocated

13   for him to be hired.

14         Q.    Why?

15         A.    I didn't see a problem with him.  You

16   know, his -- Korone always kept to himself, and he

17   did his thing, and that was -- you know, in my

18   personal opinion, he was screwed over.

19         Q.    So your interactions with him would have

20   been mostly professional interactions?

21         A.    Yeah.

22         Q.    I mean, are you and Korone -- I keep

23   saying personal and close together -- are you and

24   Korone close personal friends?

25         A.    We are now, yeah.

42

1   Q. Were you at the time?

2   A. No.

3   Q. And --

4   A. I didn't know much about Korone and his

5 personal life.  I just knew about his work.  You

6 know, I had been around things that he had been

7 involved in, you know, and I seen what he was capable

8 of doing.  And I told the Sheriff, I said he would be

9 a great asset for the Department.  He just needs

10 somebody to give him a chance.

11   Q. Did you have any reservations about making

12 that recommendation in light of the fact he had just

13 been fired?

14   A. If I did, I wouldn't have never went to

15 the Sheriff's Office.

16   Q. All right.  And you said in your personal

17 opinion he had been screwed over?

18   A. Yeah.

19   Q. What of your observances go into that

20 opinion?  Like what all --

21   A. I think they just wanted him fired, and

22 they found a reason to get rid of him.

23   MS. MITCHELL:  Okay.  I don't have any

24  further questions.

25   MS. HANCOCK:  Okay.  I have a couple of

43

1      follow-ups.

2                          EXAMINATION

3    BY MS. HANCOCK:

4         Q.    Officer Gault, when did you -- or Deputy

5    Gault -- I'm sorry -- when did you learn that Korone

6    Robinson and Stacy Miller were romantically

7    involved?

8         A.    It was after I went to the County.  I

9    don't even know whenever they started really dating.

10   I knew they hung out and everything a lot, but I

11   don't get into people's business.  I don't ask

12   questions about, you know, who is he seeing or --

13        Q.    Okay.  And that's -- were you and he not

14   personal friends at that point?

15        A.    We weren't.  We didn't talk.

16        Q.    Okay.

17        A.    Yeah.

18        Q.    So I assume you just heard through the

19   rumor mill at some point --

20        A.    Yeah.

21        Q.    -- that they were dating?

22        A.    Yeah, it came out, you know, that Korone

23   and Stacy are dating.

24        Q.    And that would have been sometime after

25   July of 2014?

44

1     A.     Oh, yeah.

2     Q.     Any idea how long after that?

3     A.     No.

4     Q.     All right.

5     A.     I don't know, honestly.

6     Q.     Have you ever had any romantic or sexual

7  involvement with Stacy Miller?

8     A.     No.

9     Q.     Before you talked to Chief Howard about

10 him saying, "I don't want Korone and Stacy working

11 together," if Stacy's helping you, had Korone been

12 helping with drug raids or other investigations the

13 Sheriff's Office was performing?

14    A.     No, because at the time -- at the time,

15 Korone didn't really -- he didn't really like the

16 Sheriff.  He had a personal opinion of the Sheriff

17 at the time, that, you know, he thought the Sheriff

18 was not who he really is.

19           So he didn't associate with the Sheriff's

20 Office.  He didn't really associate with any of the

21 deputies.  He hung close with Ryan.  He was very

22 close with Ryan at the time at the PD.

23           And so when he came up that night, I was

24 actually surprised that he was there, you know,

25 because, like I said, he didn't really -- he never

45

1    really had anything -- but then, I guess with things

2    happening at the workplace, problems with Ryan and

3    different ones at Darien PD, I guess, you know,

4    maybe -- maybe he -- he didn't really care anymore

5    what they thought he did.

6          Q.    Was that the first time that you

7    personally saw him hanging around --

8          A.    Yeah.

9          Q.    -- the Sheriff's deputies?

10         A.    Well, I mean, it's not like he would avoid

11   us completely.

12         Q.    Right.  I know he's not like giving you

13   the cold shoulder --

14         A.    But as far as -- yeah.

15         Q.    -- or anything.  But as far as coming out

16   to --

17         A.    Exactly.

18         Q.    -- spend time around the Sheriff's --

19         A.    Yeah, that's about the first time I can

20   ever remember.

21         Q.    Okay.  And was that the first time that

22   Stacy had been used for a confidential -- to go along

23   with a confidential informant?

24         A.    No.  No, not with the Sheriff's Office.

25   She was used as a UC whenever she first got in law

46

1      enforcement with the PD.

2          Q.    Okay.  Had she been used regularly, then

3      --

4          A.    Yeah.

5          Q.    -- at the Sheriff's Office?

6          A.    Uh-huh.

7          Q.    Are you aware of what Officer Robinson was

8      driving when he came out that night?

9          A.    Yeah.  He was in a white GMC crew cab.

10         Q.    Wow.

11         A.    With a brush guard on the front of it.

12               COURT REPORTER:  With a what on front.

13               THE WITNESS:  A brush guard.

14               COURT REPORTER:  Thank you.

15               THE WITNESS:  Yeah.

16               As a matter of fact, that's Anthony

17         Brown's.  That's the truck that Anthony Brown

18         has right now, or I guess he's still got it.

19         Q.    (By Ms. Hancock)  When you overheard a

20     conversation between Chief Howard and someone else in

21     the parking lot about who his daughter was dating, do

22     you know who he was talking to?

23         A.    I cannot remember who he was talking to.

24     It was another -- it was another male.

25         Q.    Okay.  And as you remember it, the exact

47

1    quote was that he used the names of people?  He was

2    saying, Carly is dating Barry Deverger, you said?

3         A.    He -- his --

4         Q.    -- is dating Barry Deverger?

5         A.    His -- it was more along the lines, When I

6    found out Carly was dating that one she was with.

7         Q.    That one?  So he didn't use the name?

8         A.    No.

9         Q.    How did you know the name?

10        A.    Because I knew who Carly was dating.  I

11   know who he was referring to.  I knew who he was

12   referring to Barry Diverger, a black male.

13        Q.    And what was the rest of the conversation?

14   You said there was some context.  Do you remember

15   what else Chief Howard had said?

16        A.    Oh, no.  He just -- basically what the --

17   the conversation revolved around interracial dating,

18   a white female dating a black man.  And then that's

19   when he made the statement.  That's when he made

20   that.

21        Q.    Okay.  Did Chief Howard say, I don't like

22   it when white females date black men?

23        A.    No, he didn't come out and say that, but,

24   I mean, he got physically ill.  So I guess he felt

25   some type of way about it.

48

1      Q.      When he found out his daughter was dating

2   that specific person?

3      A.      Right.

4      Q.      Okay.  Do you at the Sheriff's Office do a

5   miscellaneous report for a STAT9?

6      A.      Yes, we do.

7      Q.      Did you do them at the PD as well?

8      A.      No.

9      Q.      All right.  Do you know if you were

10  supposed to be doing them at the PD?

11     A.      If we were, we would have been told.

12     Q.      Okay.

13     A.      I've never seen the policy while I was

14  there, so ...

15     Q.      And you were asked some questions about

16  the level of knowledge that travels between the law

17  enforcement agencies --

18     A.      Yes.

19     Q.      -- up there.  If somebody is having a

20  meltdown at the BPD --

21     A.      Yeah.

22     Q.      -- then it's going to be talked about at

23  the Sheriff's Office.

24     A.      Yeah, absolutely.

25     Q.      Does that extend to every level of

49

1    problems?  If someone is having -- if someone is

2    having some minor issues at the BPD, is it your

3    testimony that everybody at the Sheriff's Office is

4    going to know about it?

5         A.    Maybe not, and maybe not to a certain

6    extent.  But law enforcement gossips, and they talk

7    about everything.  And they -- it's a brotherhood,

8    fraternity, whatever.  But they -- rumors get talked

9    about.  Problems with different people get talked

10   about.  That's why I keep to myself and I don't

11   really associate with anybody.

12        Q.    So they're probably not gossiping about

13   you, then; right?

14        A.    If they are, I don't care.  I know what I

15   do.

16        Q.    And someone like Officer Robinson, who you

17   said has, you know, taken steps to not really

18   associate with the Sheriff's Office, would he still

19   be gossiped about if there's something going on with

20   him --

21        A.    Yeah.

22        Q.    -- the guy nobody knows?

23        A.    Yeah.

24        Q.    The Sheriff's Office is just going to be

25   talking about how no one has ever hung out with this

1   guys, but, you know, There's this guy named Officer

2   Robinson, and I hear he's having problems?

3       A.    No.  What happens is, I mean, the PD

4   officers talk to the deputies at lunch and

5   everything, and they talk about what goes on, the

6   same as deputies do with the PD officers.

7       Q.    Okay.

8       A.    It's no different than you do with your

9   colleagues.

10      MS. HANCOCK:  All right.  That's all that

11      I had.  Thank you.

12      THE WITNESS:  You're welcome.

13                EXAMINATION

14  BY MS. MITCHELL:

15      Q.    When you left to go to the Sheriff's

16  Department, what did Korone tell you?  Do you

17  remember?

18      A.    He said, "Good luck, but I don't like the

19  Sheriff."

20      Q.    And real quick, you just said you didn't

21  -- you know, you'd never seen policy when you were

22  there.  Would you be required to sit down and have

23  training over the policy for this PD?

24      A.    I was never required to sit down and look

25  over anything.

51

1        Q.    Was anybody, to your knowledge when you

2  were there, ever required to sit down and go over

3  anything?

4        A.    Not that I know of.

5        Q.    And have you heard of anyone since then

6  being forced to sit down and go over policies?

7        A.    The only agency I've ever heard of that

8  happening at is Glynn County PD.

9        Q.    Okay.  And --

10       A.    Well, we have recently implemented at the

11  Sheriff's Office -- they issued everybody a thumb

12  drive with the policy on it, and you were given so

13  many weeks to go over it, and then you were to sign

14  that you read it and that you understood it.

15       Q.    But beyond that, it's not part of the

16  daily job?

17       A.    No.  I mean, I review policy in the

18  position I'm in to make sure that we follow it.

19       Q.    Because you're now a supervisor?

20       A.    Right.

21       Q.    So you like to know what the policy says?

22       A.    Yes.  I don't like to half-ass anything.

23       Q.    Would it surprise you if the supervisors

24  at the PD said they had no idea what their policy

25  says?

52

1      A.     No.

2      Q.     Would that be consistent with the

3  behaviors you observed from the supervisors at the

4  PD?

5      A.     Pretty much.

6      Q.     And in terms of the dating Stacy, you said

7  until you finally heard about it through the

8  grapevine; correct?

9      A.     Yeah.

10     Q.     Can you try to remember, when you finally

11 heard about it, was it close in time to when you also

12 started hearing bad things about Officer Robinson?

13     A.     Yeah.  It just gradually got worse.  You

14 know, it was like buildup, like a snowball effect.

15     Q.     So it started -- but that started around

16 the same time --

17     A.     Uh-huh.

18     Q.     -- hearing about that Robinson and Stacy

19 were dating and then hearing -- starting to hear

20 complaints about Robinson are close in time in your

21 memory?

22     A.     Yeah.  Yeah.

23     Q.     And then from there --

24     A.     Before then -- before -- before that, I

25 never heard anything.  It was like he was one of the

53

1    guys.

2         Q.    And the night before he was fired, do you

3    recall seeing Officer Robinson anywhere?

4         A.    He came by the Sheriff's Office.  Me and

5    Mike were sitting in the office, and he came in.

6    And, as a matter of fact, that's the next -- that's

7    the last -- that's the time I seen him after that

8    night.  He came in, up to the Sheriff's Office, and

9    was talking to me and Mike in the Investigations

10   office.  And he was on patrol, and then he got

11   dispatched to a call at B&J's, or I think -- the

12   chief called him for something, and --

13        Q.    Are you sure it was the chief?  Did you

14   hear the radio?

15        A.    Yeah, 101.

16        Q.    Okay.  Which is whose call sign, I mean,

17   whose badge number?

18        A.    Donnie Howard.

19              COURT REPORTER:  I'm sorry.  What's the

20        name.

21              THE WITNESS:  Donnie Howard.

22        Q.    (By Ms. Mitchell)  All right.  And then

23   one last question would be an example of gossip.

24   While you were at the SO, did you remember hearing PD

25   guys talking about Gary Stevenson and him having to

54

1    go see a mental health professional?

2         A.    Yeah.   I mean, that -- I think Gary has

3    been a couple of times to see somebody.

4         Q.    Is that something that you would consider

5    actually private?

6         A.    Yeah.

7         Q.    But everybody still knew about it, didn't

8    they?

9         A.    Right.

10        Q.    And that would be an example of the PD and

11   the SO just telling each other each other's

12   business?

13        A.    Exactly.

14             MS. MITCHELL:  Okay.  I don't have any

15        further questions.

16             MS. HANCOCK:  Let me just follow up

17        quickly.

18                       EXAMINATION

19   BY MS. HANCOCK:

20        Q.    The night that you were sitting in the

21   Investigations office with Officer Robinson and you

22   said he was fired the next day, do you know what the

23   date would have been or around when that was?

24        A.    I don't.

25        Q.    Okay.  Do you know if the next --

55

1      A.     I don't know --

2      Q.     I'm sorry?

3      A.     I don't know what -- what day it was

4  whenever I -- we were in the office.  I know that --

5  I know that the next day he was terminated.

6      Q.     Okay.

7      A.     Because I remember Mike telling me about

8  it.  He said, "You know they fired Korone."

9      Q.     Your information about that was from Mike?

10     A.     Yes.

11     Q.     Okay.  Did you ever talk to Officer

12 Robinson about him possibly coming to work for the

13 Sheriff's Office --

14     A.     I did --

15     Q.     -- before you found out he was terminated?

16     A.     I don't remember talking to him about it.

17     Q.     Okay.

18     A.     No, I don't think -- me and Korone didn't

19 really -- I don't recall having too much in

20 conversation with Korone up until the point where he

21 was fired and then I went to the Sheriff to get him

22 a job.

23     Q.     What was he doing hanging out in your

24 office if he wasn't someone you really knew at that

25 point?

56

1      A.    Him and Mike had history from Brunswick

2  PD. Mike was his supervisor there.

3      Q.    Okay.

4      A.    So he was more or less coming up there to

5  talk to Mike.

6      Q.    Okay.

7      A.    And I was just in there, in the office.

8            MS. HANCOCK:  All right.  Thank you.

9            MS. MITCHELL:  No further questions.

10            THE WITNESS:  I waive.

11            (Brief recess from 1:26 p.m. until 1:35

12      p.m.)

13            (Discussion held off the record.)

14            MS. MITCHELL:  We are back on the record

15      for Officer Gault.  He is drawing a diagram of

16      the Narcotics investigation room at the new

17      Darien headquarters.

18                      EXAMINATION

19  BY MS. MITCHELL:

20      Q.    So if you can explain so far what you're

21  doing.

22      A.    This is -- basically, you walk down the

23  hall.  The PD is an old wing of a YDC school center.

24  So you've got windows going to the outside, and

25  there's two windows.  You've got your desks.  The

57

1    desks were pretty much in line with the windows.

2            When you walk in, this desk was Jonathan

3    Howard.   This desk was Sidney Bush.

4            MS. HANCOCK:  Can you put initials on it.

5            THE WITNESS:  I will.

6            This desk was Ryan Alexander, and this one

7       was Korone.  Of course, at the -- on the front

8       of Ryan's desk was a Swastika flag.

9            The amount of distance between the two was

10      6 to 8 foot.  So I don't know specifics, but the

11      flag was very visible.  From the time you walked

12      in the front door, you could see it.  I mean,

13      when you walked in the room, you would see the

14      flag hanging off the front of the desk.

15      Q.    (By Ms. Mitchell)  Was it a full-sized

16   flag?

17      A.    Yeah.  It took up the whole front of it.

18      Q.    And in the space in between the desks --

19   how tall are you?

20      A.    6'2".

21      Q.    Do you feel like you could have laid, head

22   to foot, and sit between the desks?

23      A.    Should be able to.

24      Q.    So you're positive that the space between

25   desks, though, wouldn't be either -- I don't know

58

1    what that's called -- pressed flat against each

2    other?

3        A.    No, they weren't flush.

4        Q.    Flush, that's the word.

5              Or at the most was maybe about 2 feet?

6        A.    No.

7        Q.    Okay.

8        A.    No.  There was -- there was more distance

9    than 2 foot.

10       Q.    Okay.  And, to your knowledge, who did

11   that flag belong to?

12       A.    I thought -- I -- I always knew -- knew it

13   to be Ryan's because it was in the old drug office

14   before I really seen Korone starting, coming around.

15       Q.    Coming around?

16             And you wouldn't have been in the drug

17   office a lot at the old PD?

18       A.    No.  But anytime they had the door open,

19   you could see it up on the wall.

20       Q.    Okay.  And have you ever heard anyone say

21   -- other than when this case started, have you ever

22   heard anyone say that the flag belonged to Robinson?

23       A.    No.

24             MS. MITCHELL:  Okay.  I don't any further

25       questions.

59

1                          EXAMINATION

2     BY MS. HANCOCK:

3          Q.     Let me just clarify with you, what is the

4     time period for which you're saying this was the

5     setup that you would have been in there personally

6     observing it?

7          A.     From the time we moved in to the new PD

8     until the time I left.

9          Q.     Okay.  And I guess we know when the move

10    was, so that was several months, I guess, that --

11         A.     And I left in July of '14.

12         Q.     Okay.  Had you seen it at all after you

13    left?

14         A.     I hadn't been back in the PD.  I don't --

15         Q.     Okay.

16         A.     -- think I've been in the office.  Maybe

17    two times, but I never went in that end of the PD.  I

18    went in the front.

19         Q.     And you've never personally seen Ryan

20    Alexander hang that flag up or heard him say that

21    it's his; correct?

22         A.     I have not.

23         Q.     Okay.

24         A.     But, I mean --

25         Q.     All right.

60

1      A.    -- it was attached to his desk.

2          MS. HANCOCK:  Okay.

3          MS. MITCHELL:  We're done.  This time I

4  mean it.

5          MS. HANCOCK:  Thank you.

6          MS. MITCHELL:  I apologize.

7          MS. HANCOCK:  That's definitely our best

8  diagram.

9          MS. MITCHELL:  It is.  We should have had

10  him do them.

11          So we'll mark this as P-3 -- 1.

12          MS. HANCOCK:  I think it's 1.

13          THE COURT REPORTER:  One.

14          (Plaintiff's Exhibit 1 was marked for

15  identification.)

16          (Deposition concluded at 1:39 p.m.)

17          (Pursuant to Rule 30(e) of the Federal

18  Rules of Civil Procedure and/or O.C.G.A.

19  9-11-30(e), signature of the witness has been

20  waived.)

21

22

23

24

25

61

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA:

COUNTY OF GLYNN:


        I hereby certify that the foregoing
transcript was reported as stated in the caption
and the questions and answers thereto were
reduced to writing by me; that the foregoing 60
pages represent a true, correct, and complete
transcript of the evidence given on Friday,
February 23, 2018, by the witness, ROBERT GAULT,
who was first duly sworn by me.
        I certify that I am not disqualified for a
relationship of interest under O.C.G.A.
9-11-28(c); I am a Georgia Certified Court
Reporter here as an independent contractor of
Gilbert & Jones, Inc., who was contacted by
Mitchell & Reddock to provide court reporting
services for the proceedings; I will not be
taking these proceedings under any contract that
is prohibited by O.C.G.A. 15-14-37(a) and (b) or
Article 7.C. of the Rules and Regulations of the
Board; and by the attached disclosure form I
confirm that neither I nor Gilbert & Jones,
Inc., are a party to a contract prohibited by
O.C.G.A. 15-14-37(a) and (b) of Article 7.C. of
the Rules and Regulations of the Board.
        This the 17th day of March, 2018.


_____
Suzanne R. Robinson
Certified Court Reporter,
5026-1420-3354-3168

GILBERT & JONES

62

## DISCLOSURE OF NO CONTRACT

I, Debbie Gilbert, do hereby disclose
pursuant to Article 10.B of the Rules and
Regulations of the Board of Court Reporting of
the Judicial Council of Georgia that Gilbert &
Jones, Inc., was contacted by Katie S. Mitchell
to provide court reporting services for these
proceedings and there is no contract that is
prohibited by O.C.G.A. 15-14-37(a) and (b) or
Article 7.C. of the Rules and Regulations of the
Board for the taking of these proceedings.
There is no contract to provide reporting
services between Gilbert & Jones, Inc., or any
person with whom Gilbert & Jones, Inc., has a
principal and agency relationship, nor any
attorney at law in this action, party to this
action, party having a financial interest in
this action, or agent for an attorney at law in
this action, party to this action, or party
having a financial interest in this action.  Any
and all financial arrangements beyond our usual
and customary rates have been disclosed and
offered to all parties.
This the __18th__ day of March, 2018.


_____
Debbie Gilbert
FIRM REPRESENTATIVE
Gilbert & Jones, Inc.

GILBERT & JONES

