IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| KORONE ROBINSON, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | |
| ) | CIVIL CASE NO. 2:17-cv-99 |
| ) | |
| CITY OF DARIEN, DARIEN POLICE ) | |
| DEPARTMENT, DONNIE HOWARD, ) | |
| RYAN ALEXANDER AND ) | |
| JOSEPH CRESWELL, ) | |
| Defendants. ) | |
| ) | |

## WITNESS AFFIDAVIT

Personally appeared before the undersigned officer duly authorized to administer oaths

**Korone Robinson,** who, after being duly sworn on oath, being over the age of twenty-one (21), who

is legally competent to testify, deposes and says the facts stated herein are true and are stated upon

the personal knowledge of the undersigned for use in any manner allowed by law in the above case:

1. I began volunteering on a part-time basis assisting with narcotics investigations when I was
   when I was employed with Jesup Police Department. I had always wanted to be a narcotics
   investigator and would spend the majority of my off duty time assisting or observing
   narcotics investigations. I continued to assist with or observe narcotics investigations when I
   went to work for Glynn County Police Department and from there when I worked for
   Brunswick Police Department.

2. On April 10, 2015 Lt. Alexander had a meeting with me and Miller to discuss our
   traveling in the same vehicle. He advised that Captain Davis and Chief Howard felt "it
   doesn't look good" when we "ride around" together. He said he was receiving pressure

Page **1** of **8**

for us to not be seen in a vehicle together.  At this time I was still living with my girlfriend at the time, Amanda Mosley, and was not engaged in a romantic relationship with Miller.  During the meeting Lt. Alexander did not discuss, question, or allege, that Miller and I were involved in a romantic relationship.  Lt. Alexander advised that he did not have an issue with us traveling in a vehicle together.  He did not cite to any policy in the DPD Standard Operating Procedure or the City Employee Manual as a source for the directive.  He only requested that we provide him with prior notice when we needed to travel together, or even if we decided to go to lunch together, that way if a situation required investigators to respond to different locations he would already know where we were.  He also explained that this would help him be prepared if Cpt. Davis or Chief Howard made a comment about seeing us together.

3.  By April 2015 I had experience assisting with narcotics investigations with four (4) local state law enforcement agencies and two (2) Federal law enforcement agencies (the ATF and DEA).  Due to the nature of narcotics investigations, it is customary for an investigator not to meet confidential informants or execute a controlled buy- where I attempt to purchase illegal substances from a suspect- alone.  The best option is to take another plain clothes investigator.  You would not take uniformed officers because their presence makes the meeting highly visible to onlookers and undermines the trust the informant has in the investigator to keep their identity and involvement confidential.

4.  In my nearly three (3) years working for DPD I had yet to experience a situation which required the immediate simultaneous response of investigators to separate locations.  Investigators are not dispatched by the communications center.  Dispatch notifies patrol

officers who respond to the scene and secure it. Only after patrol has responded, analyzed the situation, secured the scene and taken statements is the matter then referred to investigations and often not even on the same day. Investigators are not the first responders to the scene.

5. After the April 10, 2015 meeting Miller and I continued to accompany each other when necessary for our respective investigations and per the directive we had been given we would notify Lt. Alexander. We would speak with him directly when it was possible but due to his part time status and the fact that he worked full time during the day for Glynn County Sheriff's Office, we often had to notify him by sending a text message or leave him a voicemail.

6. In summer 2015 I lost my private vehicle and began driving my DPD issued vehicle exclusively. The Chief was aware of this fact and saw me on numerous occasions driving my DPD issued vehicle off duty for personal reasons. On one occasion he saw me at a local restaurant in another county, on another he saw me at a store. He would make statements to me which supported my use of my DPD issued vehicle as my personal vehicle. On one occasion I parked my DPD vehicle at a gas station and rode with a friend to the store to purchase beer and when I returned to the gas station the Chief was walking out of the store and asked me "why didn't you take your truck?" I explained that I was not going to drive the DPD vehicle to the liquor store to purchase beer and he agreed with my judgment. Lt. Alexander was also aware I no longer had a private vehicle. In December 2015 Miller and I went to a concert with Lt. Alexander and his wife, this was the same timeperiod we disclosed we were dating. I drove to the concert in my DPD

vehicle and after the concert he instructed me to go to his house to swap my work truck for one of his private trucks because we wanted to go to a tavern.

7. I wrote a letter to myself in August 2015 about what I was feeling towards Miller and opportunity she would be sacrificing if she got into a relationship with me. Miller and her husband were already separated but her estranged husband was a white man with a respectable military career and ability to provide for a wife and family. I believed he was the perfect example of how simple and acceptable a relationship with him would be in stark contrast to what a relationship with a black man would entail. I was reminding myself how accepting the world is and would be of any relationship she had with him in terms of society, acceptance of their potential children, and even the standard of living he could provide. I wanted to be sure that my feelings were serious enough to warrant pursuing a relationship with her first. The letter is symbolic and cannot be taken literally otherwise it makes no sense at all. At the time I wrote the letter Miller and her husband were already separated, they had no children, they were not attempting to reconcile, Miller had not discussed even thinking about reconciling, and she did not know my true feelings.

8. On or about January 6, 2016, DPD, with the assistance of the DEA, and Camden and McIntosh counties' Special Response Teams (SRT), we executed arrest warrants for Joe Black as a result of my investigation.. After the arrest, Alexander took exclusive control of the case terminating my involvement and publicly took credit for my efforts as his own. This was the first time Alexander excluded had me from any investigation. After Black was arrested Alexander ordered me to notify him before I took any action in any

investigation.  Prior to this occasion I had always had substantial leeway to conduct my investigations and only had to brief Lt. Alexander regarding my progress.  He did not provide an explanation for the change in procedure.

9.  On January 8, 2016 Lt. Alexander instructed Miller to transfer to the evening shift.  He never provided explanation or instructions regarding her transfer to the evening shift.

10. On January 16, 2016 I traveled to Atlanta with Miller.  We previously notified Lt. Alexander and Chief Hoard we were going to a wedding for one of Miller's friends in Atlanta, Georgia.   Due to the fact we would be off duty when we went out of town we did not inform Lt. Alexander that we would be riding in a vehicle together. Chief Howard and Lt. Alexander both knew that neither Miller nor I had a private vehicle and we both drove our DPD vehicles exclusively. After returning from Atlanta Lt. Alexander advised he was angry we had ridden together and on February 3, 2016, he instructed me and Miller to meet with him and Cpt. Davis.

11. Miller's meeting was first.  Later that day Chief Howard reassigned her to Lt. Anthony Brown's chain of command and from that day forward Miller reported to and work under Lt. Brown exclusively.  During my meeting Lt. Alexander advised me he was suspending me for three (3) days for violating his prior direct order from April 10, 2015 not to ride in a vehicle with Miller and for driving my DPD issued truck to Atlanta.   During the meeting Cpt. Davis assured me I was not in trouble for driving to Atlanta while Lt. Alexander focused his attention on the fact that Miller was in the vehicle with me at all.

12. At that time the only explanation that made sense was that Lt. Alexander must have actually been ordered back in April to forbid me and Miller from ever riding together

even if it was not based on official policy. We never had any further discussion, verbal or written, about his order to provide notice nor had he ever forbidden us from riding in a vehicle together, rather he merely ordered us to notify him. However, I was not going to betray his confidence or be the reason Cpt. Davis focused his attention Lt. Alexander's actual order from April 10th. At that time I still believed Lt. Alexander would have a reasonable explanation for his actions so I remained silent believing he would speak to me privately. Historically whenever Lt. Alexander would instruct me to do or not do something, from specific orders to changes in investigation procedure, he had had always spoken to me privately and explained his true motivation for his actions. After the meeting I waited for Lt. Alexander to call but he never did. I did not appeal the suspension because I had already spent the three (3) days at home and with Miller transferred to Lt. Brown's command and I mistakenly believed there would not be any further issues.

13. I continued under Lt. Alexander's command so I continued to give advance notice when I would ride with Miller on the very limited occasions it was necessary for us accompany each other to meet an informant or execute a controlled buy. At no point did Lt. Alexander ever modify his directive to order I never ride in a vehicle with Miller.

14. Lt. Alexander attempted to suspend me again in March 2016. On this occasion he did not ask a single question instead he immediately announced he was suspending me for allegedly contacting Verizon Wireless and claiming DPD had an officer abroad. After he had suspended in me February for violating an order he had never given and then failed to speak to me privately as was his normal behavior I knew I needed to defend myself. I

immediately produced my phone and showed Lt. Alexander the text messages from the City Manager. During my deposition testimony I mistakenly said the incident occurred in May 2016, however the terrorist attack which prompted my conversation with the City manager occurred in March 2016. By this time I was shocked and seriously disturbed by the increasingly hostile attempts my once best friend was now making to ruin my career.

15. On May 3, 2016 I was suspended for allegedly working with the Sheriff's Office. Lt. Alexander was attempting to punish me for fictional misconduct, just as he had in January, February, and March. I knew appealing to the same Chief who at that moment was allowing Alexander to degraded me and who was also aware of his prior actions, would have only resulted in being accused of additional misconduct. After the meeting Chief Howard asked me to take a drive. During our private conversation he offered to arrange for me to speak with T.J. Kidder. However, he never said anything about lifting the suspension or that he was only giving me time off until Mr. Kitter cleared me to work. Chief Howard did not express any concern regarding my mental state or fitness for duty, merely concern I seemed to be under a lot of stress. I contacted and met with Mr. Kidder the same day yet could not return to work until the end of two weeks.

16. I did not hang the Nazi Swastika flag I found in my issued vehicle at either DPD location. It hung on the front of Lt. Alexander's desk at the new PD location until sometime in 2016 when Lt. Alexander resigned. Chief Howard did make a comment about the flag on one single occasion while we were still housed in the old PD location. He advised it should not be displayed in a humorous tone but he did not instruct me to take it down. This was the only comment he ever made in my presence regarding the flag. Due to his

apparent amusement with the flag I made a joke about the flag representing "my people" to feel less awkward under the circumstances.

17. The DPD Standard Operating Procedure contains specific provision in Chapter 12 expressly forbidding an officer from engaging in a pursuit of a suspect vehicle while any civilian in any capacity is in the vehicle. Despite the express prohibition Officer Dobberly had his girlfriend in his patrol vehicle during a high speed chase of a suspect and she continued to ride in his patrol vehicle on multiple occasions after that date.

18. No one from DPD ever informed me what would happen once my timeframe to find a new job had expired. I believed that if Chief Howard went through with forcing me to leave, contrary to what my supervisor Joe Creswell was leading me to believe, I would be called in and told to resign or be terminated. Being given the express choice between resignation and termination was the actual method used for terminating every other officer, with the sole exception of Nicholas Roundtree who resigned in lieu of termination, the Chief had practiced the entire time he had been the Chief of Police. Every other officer, except Roundtree, was given the choice without having the grounds for their forced departure issued as written discipline for inclusion in their personnel files.

Farah Sonia Borras Hernandez
NOTARY PUBLIC
STATE OF FLORIDA
Comm# FF951563
Expires 1/19/2020

Korone Robinson

Sworn to and subscribed before me
This _____ day of _____, 2018.

NOTARY PUBLIC,
My Commission Expires: 01/19/2020

Page **8** of **8**