# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

KORONE ROBINSON,          *
                          *
        Plaintiff,        *
                          *          NO. 2:17-CV-99
    v.                    *
                          *
CITY OF DARIEN, DARIEN POLICE *
DEPARTMENT, DONNIE HOWARD, *
RYAN ALEXANDER, and JOSEPH *
CRESWELL,                 *
                          *
        Defendants.       *

## ORDER

Before the Court is Defendants the City of Darien, the Darien Police Department, Donnie Howard, Ryan Alexander, and Joseph Creswell's Motion for Summary Judgment. This Motion has been fully briefed and is ripe for review. Factual disputes prevent the early termination of this case. Defendants' Motion is **DENIED** with the exception of the Darien Police Department, which is **DISMISSED** from this action as a non-legal entity incapable of being sued.

## BACKGROUND

### I. Plaintiff's Employment with the Darien Police Department and his Relationship with Stacey Miller

This case involves the employment of Plaintiff Korone Robinson with the Darien Police Department and his relationship

with his co-worker and fellow Darien Police Department investigator, Stacey Miller. Plaintiff, an African American, was hired as a narcotics investigator by his "best friend" Ryan Alexander, his new direct supervisor, and Chief Donnie Howard of the Darien Police Department. Defendants' Statement of Undisputed Material Facts, Dkt. No. 26-2 ¶¶ 4, 8.[1] Plaintiff began working on a part-time basis, but after Howard negotiated with the City Manager for the City of Darien for more funding necessary to bring Robinson on full-time, Plaintiff joined the Darien Police Department as a full-time narcotics investigator in June 2014. Id. ¶¶ 8, 12-13; Dkt. No. 32 at 3; Dkt. No. 27-2. Although Plaintiff began this new position as best friends with his supervisor, Alexander, over the following two years, Plaintiff's relationship with Alexander and others at the police department would change drastically.

At some point during his employment with the Darien Police Department, Plaintiff began a romantic relationship with his white, married co-worker, Stacey Miller. Dkt. No. 26-2 ¶ 16. Miller was a criminal investigator in the investigation division with Plaintiff. Dkt. No. 27-13 ¶¶ 2-3. Exactly when Plaintiff

---

[1] Throughout this Order, the Court cites only those statements in Defendants' Statement of Undisputed Material Facts that Plaintiff explicitly admits.

and Miller began their relationship and when the relationship became public knowledge are in dispute.

Defendants maintain that, based on a September 11, 2015 text message from Plaintiff to Alexander asking for time off to go out of town with an unspecified woman to celebrate an "anniversary," Plaintiff and Miller had been in a relationship since possibly September of 2014. Dkt. No. 27-2 at 20. Defendants also point to a letter dated August 12, 2015, that Plaintiff wrote to himself about his feelings for Miller and that Alexander found lying in the office as evidence that the relationship had been ongoing prior to that point. Dkt. No. 27-2 at 21-24.

Plaintiff disputes Defendants' interpretation of the text message and the letter regarding the timeline of his relationship with Miller. Plaintiff testified that he did not remember sending the text but acknowledged that it was sent from his phone. Dkt. No. 27-1 at 63-64. He also maintained that it could not coincide with his and Miller's relationship and thought that maybe it was referring to his relationship with a previous woman named Amanda Mosely and a possible trip they had planned that never ended up happening. Id. at 68-69. But, he admitted that his anniversary with Mosely was in October, not September as the text referred to. Id. at 69.

Plaintiff asserts that he first had a friendship with Miller and that the two were working together as investigators in 2014.

AO 72A
(Rev. 8/82)

See Dkt. No. 27-1 at 56-58, 196-97; Dkt. No. 33-4 ¶ 3 (explaining the reason why Plaintiff and Miller would conduct "controlled buys" with each other as investigators). He explains that Miller became friends with Plaintiff and his girlfriend, Amanda Mosely, and would even spend time with Mosely apart from Plaintiff. Dkt. No. 27-1 at 196-97. Plaintiff asserts that he broke up with Mosely in April of 2015. Dkt. No 27-1 at 65-66; see also dkt. no. 27-3 (corroborating Plaintiff's testimony that he got furniture from Alexander to move out of his residence with Mosely). Then, by August 2015, Plaintiff argues that he and Miller were spending the majority of their off-duty time together and had engaged in some intimate contact, which was the impetus of the letter he wrote about his feelings that same month. Dkt. No. 27-1 74-75. Plaintiff testified that he and Miller entered into an exclusive relationship in October 2015 but alleges in his Response to Defendants' Motion to Dismiss that the relationship did not become public until around January 2016. Id. at 57; Dkt. No. 34 at 7. He also stated that they did not disclose their relationship to Alexander until December 2015, but he testified that he did not know when Howard was made aware of their relationship. Dkt. No. 27-1 at 120, 122. Plaintiff supports this timeline with respect to Alexander by pointing to both his own testimony and Alexander's testimony that Alexander knew Plaintiff and Miller were dating when they went to a country music concert together in December

2015. Id. at 120, 200-201; Dkt. No. 27-3 at 161. Plaintiff also disputes Defendants' timeline based on the anniversary text by arguing that he advocated for Howard to hire Officer Michael Melton in June 2015, which would have meant that Miller would be transferred to patrol—something that he testified he would not have done had he been in a relationship with Miller at the time. Dkt. No. 27-1 at 199-201. Melton also testified that at this time, June 2015, he was not aware that Plaintiff and Miller were dating—though he says he did not ask because it was none of his business—and did not find out about the relationship for "several months later." Dkt. No. 27-6 at 27-28.

Defendants argue that Howard and Alexander were aware of the relationship much earlier, prior to the spring of 2015, which was part of their basis for giving an order to Plaintiff and Miller not to ride in the same patrol vehicle together. Dkt. No. 27-4 at 309-10 (testifying that he [Howard] found out in 2015 and initially thinking that they [Plaintiff and Miller] needed to be separated); Dkt. No. 27-3 at 158-159 (testifying that he [Alexander] knew about the relationship at the time of his grandfather's funeral in March 2015). A document dated April 13, 2015, indicates that Alexander had told Plaintiff and Miller not to ride in the same vehicle without prior "approval," and it documented a verbal counseling to both of them for riding together on April 10, 2015, without authorization from Alexander. Dkt. No. 27-2 at 26. Defendants

AO 72A
(Rev. 8/82)

maintain that this verbal order about riding in the patrol vehicle together was a ban on riding together without specific authorization. Dkt. No. 35 at 6-8. Alexander testified that the reason for the order was based on two things: (1) the need to possibly have two investigators at two different locations simultaneously and (2) to separate officers who were romantically involved for various reasons such as one officer choosing the safety of the other over the public in a dangerous situation.[2] Dkt. No. 27-3 at 149.

Plaintiff testified in his deposition and swore in his affidavit that he understood the order to really be coming from Howard or Archie Davis, the former City Manager of Darien, and that Alexander was just asking them to give him notice, or a "heads up", when they would be riding together. Dkt. No. 27-1 at 92-93; Dkt. No. 33-4 ¶ 2. Furthermore, based on Plaintiff's version of the dating timeline, he maintains that he and Miller were not dating when this order was initially given. Dkt. No. 33-4 ¶ 2 (explaining that he was dating Mosely during this time and that Alexander said nothing about a relationship with Miller during the conversation about traveling in the same vehicle). Plaintiff stated in his affidavit that he and Miller would notify Alexander of when they road together with texts and voicemails, but he also

---

[2] But, Alexander testified that he only told Plaintiff and Miller the first reason for the vehicle policy, not the reason based on their romantic involvement.

testified that he did not always follow the order.  Id. ¶ 5; Dkt. No. 27-1 at 94-96.  The evidence regarding the timing of Plaintiff's relationship with Miller, the progression of that relationship, and the knowledge of other people as to that relationship is sharply disputed.

## II. Disciplinary Actions Against Plaintiff

Fast-forwarding to around January, 2016, when Plaintiff alleges that his relationship with Miller became public knowledge, Plaintiff asserts that he began to experience a change in behavior from his supervisors at the Darien Police Department.  See Dkt. No. 27-1 at 54-55 (explaining that he did not know "that" Ryan Alexander "anymore" in January 2016).  Officer Robert Gault stated in his affidavit that he noticed Plaintiff and Miller were "disciplined more often" after their relationship became public. Dkt. No. 33-18 at 1.  Archie Davis testified in response to a question about if there was ever a time that Howard stopped saying that Plaintiff was doing a good job in his work that he would say "right around January of [20]16."  Dkt. No. 27-5 at 146.  Plaintiff stated in his affidavit that on January 6, 2016, Alexander terminated Plaintiff's involvement with a case that had previously been Plaintiff's investigation and ordered Plaintiff to notify

Alexander before taking any action in any other investigation. Dkt. No. 33-4 ¶ 8.

On January 16, 2016, Plaintiff took a trip to Atlanta with Miller in his patrol vehicle. Although the general policy in the City of Darien's handbook says that City-owned vehicles may not leave a twelve-mile radius around the City, the City Manager had given Howard the authority to allow exceptions to this rule for his employees. Dkt. No. 27-4 at 156-57. Howard would also give permission for employees to drive their vehicles for errands or vacations if they received permission and did not abuse the privilege. Id. at 157-58. Officer Nicholaus Roundtree described using patrol vehicles for non-work related errands and some out of town trips as a "perk" that was encouraged by Howard. Dkt. No. 33-1 at 109-110. Officer Gault, on the other hand, stated that he only knew of Davis being allowed to take his patrol car out of town when Davis was an officer so that he could get back quickly if an emergency arose. Dkt. No. 33-18 at 2. Nevertheless, Plaintiff testified that he told Howard while washing his patrol vehicle that he was getting ready to "take off and go to Atlanta," and he stated that at this time, Howard and Alexander were aware that neither he, nor Miller, had a private vehicle. Dkt. No. 27-1 at 97-98; Dkt. No. 33-4 ¶¶ 6-10. Plaintiff also stated in his affidavit that he had previously notified Alexander and Howard that he and Miller were going to a wedding for one of Miller's

friends in Atlanta but indicated that he did not notify Alexander that he and Miller would be riding together since they would be off duty. Dkt. No. 33-4 ¶ 10.

On February 3, 2016, Alexander met with Plaintiff and Miller and issued them both written reprimands for insubordination as a result of violating the previous order not to ride in the same vehicle together and for taking the patrol car to Atlanta. Dkt. No. 27-2 at 27; Dkt. No. 27-3 at 163. Alexander also suspended Plaintiff for three days. Dkt. No. 27-2 at 27. This was Plaintiff's first and only written reprimand in his file. Dkt. No. 27-4 at 250-251. Plaintiff testified that Davis, who was present during this meeting, assured him that the reprimand and suspension had more to do with riding in the same car with Miller than taking the car to Atlanta. Dkt. No. 27-1 at 98-99. As for Miller, Alexander attempted to demote her to patrol, but because he did not have the authority to do so, Howard transferred Miller to Lieutenant Anthony Brown's command. Dkt. No. 27-3 at 186-87; Dkt. No. 33-19.

In March 2016, Alexander told Plaintiff that he was suspended for allegedly contacting Verizon Wireless and claiming that the Darien Police Department had an officer abroad. Dkt. No. 27-1 at 108-09. Plaintiff explained to Alexander that he had only been in contact with the City Manager, not Verizon, about the City's phone plan and the ability to pay out of pocket for international

coverage for Miller. Id. Plaintiff was looking in to this because Miller was traveling in the United Kingdom, where a terrorist attack had recently taken place, and Miller's phone had limited access. Id. After Plaintiff's explanation, Alexander did not suspend Plaintiff, but Plaintiff maintained in his deposition that had he not been able to show the texts to the City Manager, Alexander still would have suspended him. Id. at 110.

On May 3, 2016, Plaintiff was given a two-week suspension for allegedly participating in a raid with the McIntosh County Sherriff's Office. Dkt. No. 27-3 at 210; Dkt. No. 33-4 ¶ 15. At some point prior to this suspension, Alexander had given an order to both Miller and Alexander to not participate in any investigations with the sheriff's office. Dkt. No. 27-3 at 214. On the night at issue, Miller, with permission from her new supervisor, Brown, assisted the sheriff's office in executing an undercover narcotics operation. Id. at 224-25. Plaintiff, while off-duty, was present at the staging area of the operation to socialize with the officers that were there. Plaintiff testified that he "wasn't working" and stayed behind talking with Doug Shire while the others, including Miller, left to conduct the operation. Dkt. No. 27-1 at 123-24. Officers Gault and Melton testified that Plaintiff had not participated in the operation. Dkt. No. 27-10 at 32 (stating that Plaintiff "showed up after everything was done to the meeting location"); Dkt. No. 27-6 at 37. Nevertheless,

believing that he had worked with the sheriff's office, Alexander took Plaintiff's gun, badge, and keys and suspended him for two-weeks. Dkt. No. 27-3 at 210. Alexander testified that Plaintiff admitted to working with the sheriff's office, dkt. no. 27-3 at 223, but Plaintiff testified that he remained silent and did not argue with Alexander about the basis for the suspension at the meeting, dkt. no. 27-1 at 126. After the meeting with Alexander and Howard where he was suspended, Plaintiff accompanied Howard for a drive at Howard's request. Dkt. No. 33-4 ¶ 15. Howard thought that Plaintiff appeared stressed and offered to set up a meeting between Plaintiff and a counselor, and Plaintiff agreed. Id.; Dkt. No. 27-3 at 311-12. Howard also changed Alexander's discipline to a two-week leave period with pay, but Robinson testified that he was not allowed to return to work until the two-week period was over, despite being "cleared" by the counselor. Dkt. No. 27-3 at 209; Dkt. No. 33-4 ¶ 15; Dkt. No. 27-1 at 130-131.

When Plaintiff returned from his two-week suspension, Howard notified him that he was being demoted to patrol. Dkt. No. 27-1 at 131. Defendants assert that the basis for this demotion was Alexander finally telling Howard about Plaintiff's continued insubordination, specifically in regard to Plaintiff continuing to ride in the same vehicle with Miller. Dkt. No. 27-12 ¶¶ 6-7; Dkt. No. 27-13 ¶ 2. Around this same time, in April or May of 2016,

Alexander left the Darien Police Department, but it is unclear when exactly he did so. Dkt. No. 27-5 at 140; Dkt. No. 27-4 at 221. However, Alexander also testified that he had not presented additional information to Howard about Plaintiff and Miller because he had already left the department, stating that "he had no decision in that at all." Dkt. No. 27-3 at 232. In addition, Davis testified that when he asked Howard about why Plaintiff was being transferred to patrol, Howard responded by saying "I'm shutting down narcotics and I'm going to give it a break . . . put Korone on patrol, if he does a good job, works hard for me, in three or six months . . . we'll open it back up and he can start running it again." Dkt. No. 27-5 at 147-48. Furthermore, Davis's understanding was that Alexander had resigned prior to Plaintiff being transferred, thus leaving Plaintiff in charge of narcotics and Miller in charge of investigations. Dkt. No. 27-5 at 147. Howard disputed Davis's recollection of Plaintiff and Miller being in charge of their respective units in his own deposition. Dkt. No. 27-4 at 236-37. Howard also testified that he disbanded narcotics because Plaintiff had already been transferred to patrol, and once Alexander resigned, there was no need for a narcotics division. Dkt. No. 27-4 at 237.

The next disciplinary issue that Plaintiff experienced involves B&J's restaurant, a seafood restaurant in Darien. Terry Dowling, the owner of B&J's, has an agreement with the Darien

Police Department for off-duty officers to provide security at the restaurant at night. Dkt. No. 27-14 ¶ 3. Dowling would coordinate with Brown to schedule officers for shifts. Id. ¶ 4. Plaintiff had worked security at B&J's before, but at one point, he was asked not to work security anymore after falling asleep in his vehicle on a shift after taking Benadryl for his shellfish allergy. Dkt. No. 27-1 at 136-37. Later on, Brown asked Dowling to let Plaintiff work again. Id. at 137; Dkt. No. 27-14 ¶ 8. On June 8, 2016, Brown texted Plaintiff to inform him that he and Miller were not allowed to work security anymore because there was a "conflict" between the couple and some of B&J's employees. Dkt. No. 27-2 at 33; Dkt. No. 27-8 at 184. Brown explained that the couple made some of the employees "uncomfortable." Dkt. No. 27-8 at 186. In his affidavit, Dowling stated that he wanted Plaintiff off of security the second time because he had fallen asleep again. Dkt. No. 27-14 ¶¶ 9-12. Brown, on the other hand, testified that the decision was made because Dowling said he did not want to make his employees uncomfortable and referenced the situation involving Alexander, Plaintiff, and Miller. Dkt. No. 27-8 at 186-87. Both Alexander and Howard's wives were employed at B&J's. Dkt. No. 27-1 at 138; Dkt. No. 27-8 at 186.

On June 26, 2016, Plaintiff was dispatched to a call at B&J's. Dkt. No. 26-2 ¶ 103. In response, Plaintiff stated over the radio, "I'm not allowed inside that establishment." Id. Believing that

he was not welcome inside the establishment based on not being allowed to work there, he told the dispatcher that the complainant would have to come outside. Dkt. No. 27-1 at 142-143. The next day, June 27, 2016, while eating lunch at the Nautica Joe's restaurant, Howard was approached by the fire chief who commented on Plaintiff's radio call and made a "big deal" about the fact that one of Howard's employees was banned from B&J's. Dkt. No. 26-2 ¶ 109. It is unclear whether Brown was with Howard at lunch or joined later after the comment by the fire chief, and it is unclear if Howard learned initially or later after speaking to Brown that it was Plaintiff who made the radio comment. But, at some point on June 27, Howard, after speaking with Brown, decided to terminate Plaintiff. Dkt. No. 27-13 ¶¶ 4-7. Brown informed Plaintiff that same day that he had 60 or 30 days to find a new job. Dkt. No. 27-1 at 147-48. While the initial number given to Plaintiff is in dispute, texts show that Brown told Plaintiff the number was 30 a few days later. Brown indicated that Howard said the number was 30 after Plaintiff did not speak to Howard in the hallway at work—revealing that the number had either been changed to 30 from 60 or that the number had always been 30 and Howard would not give any additional time. Dkt. No. 27-2 at 36.

On August 3, 2016, Plaintiff was terminated during a meeting with Sergeant Creswell, his patrol supervisor, and he was given six disciplinary forms that stated the grounds for his termination.

AO 72A
(Rev. 8/82)

Dkt. No. 33-11 at 1-6. The stated grounds included: failing to notify dispatch at the beginning and end of each shift during June 2016, failing to file two incident reports, failing to speak to the Chief (Howard), and using his patrol vehicle for personal use,[3] and the statement over the radio regarding B&J's. Id. After his termination, Plaintiff asked Brown if it would be possible for the termination to be revoked so he could tender a resignation instead. Dkt. No. 26-2 ¶ 125. After speaking with Howard, Brown told Plaintiff that the decision was that Plaintiff could resign in lieu of termination, but Plaintiff rejected this option. Dkt. No. 27-8 at 317; Dkt. No. 27-1 at 187.

### III. Other Relevant Factual Information

Plaintiff has also presented evidence of other facts relevant to his employment with the Darien Police Department and the discipline he received from his supervisors. First, although the facts are in dispute about who owned it and who hung it, a Nazi flag was placed in Alexander and Plaintiff's shared office after Plaintiff found it in a confiscated vehicle. Dkt. No. 33-20; Dkt. No. 34 at 3; Dkt. No. 33-4 ¶ 16. Howard testified that he thought the flag belonged to Robinson and that he told Plaintiff and Alexander to take the flag down. Dkt. No. 27-4 at 265. Howard

---

[3] The use of his patrol vehicle in the disciplinary forms referred to a separate incident of using his patrol vehicle to meet another officer and use his pick-up truck in July, not the trip to Atlanta with Miller the previous January. Dkt. No. 33-11 at 6.

AO 72A
(Rev. 8/82)

also testified that he never saw the flag after leaving the old police department office and moving to a new office. Id. Gault testified that the flag was hung on Alexander's desk and that it was large enough to cover the front of the desk and be visible from door. Dkt. No. 27-10 at 57. Gault testified that he believed the flag belonged to Alexander, id. at 58, and Officer Gary Lee Stevenson Jr. swore that the flag was Alexander's personal property, dkt. no. 33-21. Officers Roundtree and Stevenson testified and swore that they saw the flag hung up at the old police department office as well as the new office. Dkt. No. 33-1 at 30; Dkt. No. 33-21. Finally, Howard testified that when he commented on the flag to Plaintiff and Alexander, Plaintiff stated "they my people, Chief, I got to represent," dkt. no. 27-4 at 265, but Plaintiff swore in his affidavit that he made that comment as a joke to "feel less awkward" since he said Howard told them it should not be displayed in a humorous tone, dkt. no. 33-4 ¶ 16.

Second, Howard made statements overheard by members of the police department or said while at the police department involving racial stereotypes and possible racial animus. Gault testified that he heard Howard say to another person in the parking lot of B&J's that when Howard learned that his daughter, a white female, was dating a "black male" he "vomited."[4] Dkt. No. 27-10 at 16.

[4] In Howard's deposition, he agreed that he made this comment at the police department. Dkt. No. 27-4 at 259. But, regardless of where it was said, Howard admitted to making the statement.

Gault stated that the context of this comment was a conversation about interracial dating. Id. Howard admitted to saying the comment, but he asserted that he would have said it about any male dating his daughter, regardless of race. Dkt. No. 27-4 at 259-60. But, Howard admitted to saying the statement as follows:

> Q. What was actually said was when I found
> out she was dating a black boy, I became so
> physically ill I vomited.
> A. Okay.
> Q. And you don't deny saying it?
> A. I said it.

Id. at 261. Additionally, Davis testified that he had heard about this comment from Howard. Dkt. No. 27-5 at 155.

Howard also admitted to telling a story while in the police department office about African Americans. As described in a question during his deposition, "the story was about [Howard] . . . putting watermelon beside the road and that [Howard] would hide and wait for the blacks to come get it and [Howard would] shoot them with BB guns." Dkt. No. 27-4 at 259. When asked if that story sounded familiar, Howard answered "[j]uvenile kid, yeah" and subsequently affirmed that he told the story while at the police department. Id.

## IV. Procedural History

Plaintiff unsuccessfully appealed his termination with the City Manager, Archie Davis. Dkt. No. 27-5 at 112. Thereafter, Plaintiff filed a charge with the EEOC and received a right to sue

AO 72A
(Rev. 8/82)

letter on July 18, 2017.  Dkt. No. 1-2.  He filed this suit on August 25, 2017.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  <u>FindWhat Inv'r Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>  In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  <u>See Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The movant must show the court that there is an absence of evidence to support the nonmoving party's case.  <u>See</u> <u>id.</u> at 325.  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the

pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).  Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. at 1117.  Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required."  Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

I.  **Plaintiff's Racial Discrimination Claims Under Count I, 42 U.S.C. § 2000e et seq.; Count II, 42 U.S.C. §§ 1981 and 1983; and Count III, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.**

Under Counts I, II, and III Plaintiff brings claims against Defendants for racial discrimination under 42 U.S.C. § 2000e et

seq., 42 U.S.C. §§ 1981 and 1983, and 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment. "[D]iscrimination claims . . . brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, are subject to the same standards of proof and employ the same analytical framework." Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009). To prove intentional discrimination in a disparate treatment claim under these three causes of action, a plaintiff must show discriminatory intent either through direct or circumstantial evidence. E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." Id. (citations omitted). "Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas paradigm for circumstantial evidence claims." Id. Here, the parties agree that Plaintiff has no direct evidence of discrimination. Dkt. No. 26-1 at 28; Dkt. No. 39, Motions Hearing on 10-10-2018 ("Motions Hearing") at 2:06:04. As a result, Plaintiff must establish intentional discrimination through circumstantial evidence under the McDonnell Douglas framework.

Under that framework, the first step requires a plaintiff to show a prima facie case of racial discrimination. "Presenting a

prima facie case is not onerous as it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Rioux v. City of Atlanta, 520 F.3d 1269, 1275 (11th Cir. 2008). Under the traditional rule, "[t]o make out a prima facie case of racial discrimination a plaintiff must show (1) [he] belongs to a protected class; (2) [he] was qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). However, the Eleventh Circuit has also recognized that "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). Other methods recognized by the Eleventh Circuit include where a plaintiff, can show "other evidence of discrimination," despite the absence of a comparator. Rioux, 520 F.3d at 1277 (finding a prima facie case where a plaintiff in "the absence of a similarly-situated employee . . . has also come forward with "other evidence of discrimination"). Furthermore, the Eleventh Circuit has stated that absent a comparator, a plaintiff can still survive a motion for summary judgment where he presents a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." Smith v. Lockheed-Martin

AO 72A
(Rev. 8/82)

Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); see also Washington v. United Parcel Serv., Inc., 567 F. App'x 749, 752 (11th Cir. 2014).

If a plaintiff can establish a prima facie case, a presumption of discrimination in favor of the plaintiff is created and the burden of production then shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its actions." Wilson, 376 F.3d at 1087. If the employer satisfies this burden, "then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Id.

Ultimately, "the Eleventh Circuit allows a Plaintiff to survive summary judgment 'if he presents circumstantial evidence that creates a triable issue regarding the employer's discriminatory intent.'" Cook v. Glynn-Brunswick Hosp. Auth., No. CV 213-152, 2015 WL 9690385, at *9 (S.D. Ga. Sept. 30, 2015) (quoting Smith, 644 F.3d at 1328). In other words, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." Smith, 644 F.3d at 1328. Here, whether under the McDonnel Douglas framework or other methods recognized by the Eleventh Circuit, Plaintiff has established that a genuine disputes of material fact exists, thereby creating a triable issue,

on the question of Defendants' discrimination in this case, which makes summary judgment improper.

## A. Prima Facie Case

Beginning with the prima facie case analysis, only one element is at issue—that Defendant treated similarly situated employees outside of Plaintiff's protected class ("comparators") more favorably. The parties agree that Plaintiff belongs to a protected class, that he was qualified to do his job, and that he was subjected to adverse employment actions. Dkt. No. 26-1 at 28.

### i. Similarly Situated Comparator

To determine if an employee is "similarly situated" so as to be a proper comparator, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)), opinion superseded in part on denial of reh'g, 151 F.3d 1321 (11th Cir. 1998). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Id. "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir.2006)). We analyze whether Plaintiff has presented a sufficient comparator for each

AO 72A
(Rev. 8/82)

adverse action separately. See, e.g., Wilson v. City of Chesapeake, 290 F. Supp. 3d 444, 457 (E.D. Va.) ("In addition to identifying an adverse employment action, for each one identified, a proper comparator under McDonnel Douglas must be similar in all relevant respects."), aff'd, 738 F. App'x 169 (4th Cir. 2018) (citations omitted).

With respect to three of the four adverse actions, Plaintiff pointed to Miller as a comparator.[5] Defendants have not pointed the Court to any case law showing that the other member of an inter-racial relationship in a discrimination suit cannot be considered a comparator. As a general matter, Miller is white, so she is not a member of Plaintiff's protected class, and she was employed by the Darien Police Department as an investigator like Plaintiff. Additionally, Miller was subjected to the same order involving riding in the same patrol car with Plaintiff, which is alleged to have to have led to the adverse actions Plaintiff experienced in this case.

Looking to the first adverse action—the February reprimand and three day suspension for Plaintiff taking his patrol car on a personal trip to Atlanta with Miller and for continuing to ride in the same vehicle in violation of Alexander's order—Plaintiff argues that Miller was subject to the same order about riding in

---

[5] Plaintiff raised this argument during the Motions Hearing on October 10, 2018. Motions Hearing at 2:06:59. Defendants were given an opportunity to respond through supplemental briefing.

AO 72A
(Rev. 8/82)

the same car but that her reprimand was removed from her file while Plaintiff's reprimand was permanent. However, the only evidence in the record of Miller's reprimand being removed is an answer from City Manager Archie Davis's deposition to the question "can you give an example of a discipline record that has been removed from the personnel file that you're aware of?" Dkt. No. 27-5 at 134. Davis responded: "Like Officer Miller's was removed after six months. It's been taken out." Id. at 135. Based solely on this testimony, the Court cannot conclude, without more, that the reprimand that Davis is referring to is the February 2016 written reprimand given to Plaintiff and Miller. Therefore, Plaintiff cannot show for this adverse action that Miller was treated more favorably by having her written reprimand removed.

Second, Plaintiff argues that Miller is a comparator for Plaintiff's two-week suspension in May 2016 because Plaintiff did not work with the McIntosh County Sheriff's Office on a drug raid but was punished with suspension. In comparison, Miller was allowed to work with the McIntosh County Sheriff's Office, did participate in the raid, and was not punished with a suspension. Defendant argues that Robinson and Miller were under different chains of command at this point, so they are not similarly situated. However, in a small police department where everyone answers to Howard as the chief of the department, the fact that Plaintiff and Miller were under separate supervisors—Alexander and

Brown—is not dispositive here. See Dkt. No. 27-4 at 312-13 (showing that at the time of Howard's deposition, the department had nine officers). First, the order to not work with the sheriff's office was given by Alexander to both Plaintiff and Miller. Only after Alexander attempted to demote Miller to patrol was she transferred to Brown's chain of command. The fact that Alexander continued to enforce this order against Plaintiff while Miller, who was an investigator in the same police department run by Howard and was given the same initial order, was allowed to work with the sheriff's office is still different treatment for two investigators who were in a public relationship, who worked in the same office, and who were both subject to discipline from Alexander previously.

Furthermore, the parties dispute whether or not Plaintiff actually worked with the sheriff's department on this particular occasion and to what Alexander's basis was for believing that Plaintiff did participate when he suspended Plaintiff. Investigators from the sheriff's office testified that Plaintiff did not work with the sheriff's department on this occasion; rather, he only showed up after the raid was done to socialize at the checkpoint with the other officers. When asked about this testimony, Alexander said Plaintiff told Alexander that he had participated. But, Alexander also stated that he had not asked any narcotics investigators from the sheriff's department about

AO 72A
(Rev. 8/82)

Plaintiff's alleged participation and that he "was not concerned" with finding out the exact details of who Plaintiff allegedly worked with or what he allegedly did with the sheriff's office. Dkt. No. 27-3 at 228. Thus, reading these facts in the light most favorable to Plaintiff, a reasonable jury could find Miller to be a comparator for this adverse action and could infer intentional discrimination from the fact that Plaintiff was given a two-week suspension, even though he did not participate in the raid, while Miller was not suspended after she did participate with the McIntosh County Sheriff's Office.[6]

Third, Plaintiff argues that he was demoted to patrol from his position as a narcotics investigator while Miller was allowed to retain her position as a criminal investigator. Defendants' main argument is that Plaintiff was demoted because of his continued insubordination of riding in the car with Miller as well as taking his work vehicle, with Miller, to Atlanta without permission. Defendants argue that Plaintiff's disciplinary history differed notably from Miller since Plaintiff, in addition

---

[6] Defendants characterize this two-week suspension as a two-week paid leave. However, the two-week period is more appropriately referred to as a suspension, and thus, an adverse employment action. Defendants' characterize the suspension as two weeks of paid leave because Howard and Alexander testified that Howard converted it from an outright suspension to paid-leave. However, Plaintiff points to evidence showing that this was not merely a two-week vacation of sorts. Alexander took Plaintiff's gun, badge, and keys, and there is no evidence showing that Plaintiff could return before the two weeks ended. In fact, Plaintiff stated in his affidavit that after meeting with the counselor Howard referred him to, he was "cleared" to work but "could not return to work until the end of two weeks." Dkt. No. 33-4.

AO 72A
(Rev. 8/82)

to continuing to ride in the car with Miller, also took his work vehicle out of town without permission. Defendants also argue that Miller was not demoted to patrol because her role as the criminal investigator was more indispensable than Plaintiff's as a narcotics investigator.

As an initial matter, the content of the patrol car order given in April of 2015 is in dispute.[7] Plaintiff says that the

---

[7] Defendants argue that Plaintiff's understanding of the April 10, 2015 order about the patrol car as explained in his affidavit should be disregarded as it is inherently inconsistent with his prior testimony. The Eleventh Circuit has held that a court "may only disregard an affidavit that contradicts, without explanation, previously given clear testimony." Lane v. Celotex Corp., 782 F.2d 1526, 1532 (11th Cir. 1986) (citations omitted) (emphasis in original). This Circuit has also explained that this rule is "applied sparingly because of the harsh effect it may have on a party's case." Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1316 (11th Cir.2007) (citations omitted). In this case, Alexander documented the verbal counseling about the patrol car order said that Plaintiff and Miller were instructed not to ride in the same vehicle without "approval" or "authorization" from Alexander. Dkt. No. 27-2 at 26. In light of this documentation, Plaintiff's affidavit is not inconsistent with his deposition testimony.

Defendants point to the following testimony in Plaintiff's deposition:

> Q: Did you decide it was unlawful not to ride in the car together?
> A: It's not a policy. So my question was – and I would never ask him because in my mind you know, my friend is going to take of it. My question was why. Why? Because I could ride around with Aaron Turner, who is not even in investigations, all day long. And nobody would utter a word. So why?
> . . .
> Q: Okay. And so my question is you didn't ask why. You didn't get any clarification. Did you follow this order and never get in the car with her again after this?
> A: No, I didn't.
> Q: You didn't follow the order?
> A: Correct.
> Q: Because you thought it was not a lawful order?
> A: Correct.

Dkt. No. 27-1 at 95-96. But earlier in the same deposition, Plaintiff also stated in explaining his understanding of the order that Alexander told him to just "let me know if y'all need to go somewhere together" and "[g]ive me a heads up if y'all need to go somewhere" or if "[y]ou're going to lunch, give me the heads up." Id. at 93. In his affidavit, Plaintiff states that Alexander "only requested that we provide him with prior notice when we needed to travel

order was to only notify Alexander when he would ride in the same car with Miller while Defendants say the order was an outright ban on riding together. This dispute matters because Plaintiff and Miller's violations of this order are the basis for the written reprimand and three-day suspension in February 2016, so whether and to what extent they violated the order is important for knowing whether they were insubordinate. Next, the fact that Plaintiff was given a written reprimand for taking his car to Atlanta does not make his disciplinary record "notably" different from Miller's when looking at the demotion, especially considering the facts that Miller was in the car with him and that Plaintiff testified that Davis told him that the reprimand was really more about continuing to ride in the car with Miller. Alexander also testified that he reprimanded "them," referring to Plaintiff and Miller, for taking the car to Atlanta, not just Plaintiff. Dkt. No. 27-3 at 164. The standard for a similarly situated employee

together." Dkt. No. 33-4. This affidavit statement is not inherently inconsistent with the deposition testimony because it mirrors Plaintiff's statements on page 93 of the deposition, and it is possible to read Plaintiff's deposition testimony highlighted by Defendants as indicating that Plaintiff believed the order to only require notice to Alexander. In other words, the deposition testimony highlighted by Defendants does not clearly contradict that understanding; rather, it shows that he did not follow the order, whether it be an order to not ride together period or to provide notice. Plaintiff's understanding of the order is bolstered by the written documentation of the reprimand which describes the order as not being allowed to ride together without approval or authorization. While Defendants maintain that notice through a call or text message could not possibly constitute approval or authorization, they cite no evidence for that assertion. Because Plaintiff's affidavit and deposition testimony are not inherently inconsistent, the Court will consider both pieces of evidence, and based on that evidence, a genuine dispute of material fact exists as to what the exact terms of the order were that led to subsequent adverse actions for Plaintiff.

AO 72A
(Rev. 8/82)

is "nearly identical" not "identical," and this conduct is very close to identical.

Furthermore, Howard's statement that he chose to transfer Plaintiff over Miller because Miller was more indispensable does not prevent Miller from being similarly situated. Both Plaintiff and Miller were investigators. Based on at least one proffered justification for the demotion, both were allegedly insubordinate for riding in the same car together. And, Miller had apparently been considered for a transfer to patrol at least once before. See Dkt. No. 27-3 at 179-80; Dkt. No. 33-6. Therefore, a reasonable jury could find that Howard treated Miller better than Plaintiff by demoting him to patrol over her and infer intentional discrimination based on that choice.

Fourth, and finally, in regard to his termination, Plaintiff argues that all other officers at the Darien Police Department were permitted to resign rather than be terminated. However, Plaintiff fails to point to a sufficient comparator for this adverse action for a few reasons. First, he cannot show any other officer who had the combination of his disciplinary record and an inappropriate statement made over the police radio. While disputes exist as to his disciplinary record and the context and reason behind his not being allowed to work security at B&J's, even viewing these facts in Plaintiff's favor, Plaintiff has not shown a sufficient similarly situated employee on this point.

Additionally, even if Plaintiff could establish a comparator, he could not show that the comparator was treated better by being allowed to resign. This is because Plaintiff was given either 60 or 30 days to find a new job, during which he could have resigned voluntarily. After he was terminated, he was given the option to have the termination changed to resignation in lieu of termination, but he admitted during his deposition that he declined that offer.[8] Thus, at this stage, he is unable to show that another officer was treated better by being allowed to resign over being terminated.

Therefore, Plaintiff has met his burden for his prima facie case by showing that a reasonable jury could find Miller to be a comparator with respect to at least two of the adverse actions that he suffered.[9] But, even if he could not show a comparator

---

[8] Plaintiff states in his testimony that he wanted to voluntarily resign, which is separate and different from resignation in lieu of termination. Dkt. No. 27-1 at 186. However, he admits in the same testimony that he could have voluntarily resigned during the 36 days in between being told to find a new job and being terminated. Id. Furthermore, as stated above, he rejected an opportunity to resign in lieu of termination, which meant that the result was instead an official termination. Id. at 187. Brown testified that POST will automatically investigate a termination, but it has discretion to investigate a resignation in lieu of termination. Dkt. No. 27-8 at 318.

[9] Plaintiff also argues that he has established a prima facie case by showing that he "(1) he is a member of a protected class; (2) he was qualified for the job; (3) he was demoted; and (4) following the demotion he was replaced by someone outside his protected class." Dkt. No. 32 at 29. Plaintiff points to the fact that Creswell was selected to be the new narcotics investigator under Brown when Howard revived the narcotics investigations department. However, Plaintiff cannot show a prima facie case based on this formulation because, despite other factual disputes about why narcotics was disbanded, the position of narcotics investigator was not left open (rather the department was closed with Alexander and Plaintiff gone), there is no evidence Howard sought applications for the position, and when the position was brought back, it was about a year and a half later. See Connelly v. Metro. Atlanta Rapid Transit Auth., 764 F.3d 1358, 1364 (11th Cir. 2014) (finding no prima facie case where an employer sought no applicants and left the position vacant for nearly a year and a half).

for these adverse actions, Plaintiff has demonstrated additional grounds for establishing his prima facie case.

### ii. Other Evidence of Discrimination

In addition to pointing to Miller as a similarly situated comparator who was treated more favorably, Plaintiff also meets his prima facie burden by coming "forward with other evidence of discrimination." Rioux, 520 at 1276-77. At the very least, reading the facts in the light most favorable to Plaintiff, genuine disputes of material fact exist because a reasonable jury could infer based on the circumstantial evidence presented by Plaintiff that he was subjected to discrimination in the various adverse employment actions he experienced. Thus, summary judgment would be inappropriate in this case, and a trier of fact should decide Plaintiff's discrimination claims.

First, going in order of adverse action again, Plaintiff has shown other evidence of discrimination with respect to the verbal counseling and reprimand for riding in the same patrol car with Miller. As mentioned above, whether the order was for them to only notify Alexander before riding in the same car or whether it was an outright ban on riding together is in dispute. Additionally, the timeline of when Plaintiff and Miller began dating is in dispute. Specifically, when Alexander and Howard became aware of the relationship is in dispute. This dispute is material because Defendants maintain Howard and Alexander knew

about the relationship prior to the April 2015 verbal counseling regarding the patrol car order and that the romantic relationship was a key basis for the order not to ride together. Alternatively, Plaintiff argues that Howard and Alexander were not made aware of the relationship until closer to January 2016. A reasonable jury could find that based on Plaintiff's version of the timeline and the order, that he began to experience more discipline as a result of his public relationship with Miller. In other words, a jury could infer that the reprimand for riding together was discrimination aimed at their inter-racial relationship as part of a change in attitude toward Plaintiff as a result of the relationship becoming public. This dispute becomes even more important in light Plaintiff's testimony that Davis told him that the reprimand had more to do with him riding in the same car with Miller than the trip to Atlanta. If their relationship became public knowledge close the start of 2016 as Plaintiff argues, then the reprimand could be inferred to be a discriminatory response to the newly public inter-racial relationship, rather than just violating a neutral vehicle policy. This argument is bolstered by Gault and Davis's testimonies about the change in discipline and attitude toward Plaintiff and Miller after their relationship became public, possibly in January 2016. Dkt. No. 33-18 at 1; Dkt. No. 27-5 at 146.

AO 72A
(Rev. 8/82)

Additionally, Plaintiff has shown that other officers were allowed to ride in patrol cars with significant others and those officers did not face similar reprimands. Dkt. No. 27-4 at 247-50. Furthermore, a dispute of material fact exists as to whether officers in the Darien Police Department were allowed to use their patrol vehicles for personal use. Officers like Nicholaus Roundtree stated that using patrol vehicles for non-work-related errands and some out of town trips was a "perk" that was encouraged by Howard. Dkt. No. 33-1 at 109-10. Plaintiff also had this understanding of his work vehicle. But Gault stated in his affidavit that the only time he heard of a work vehicle being used during "off time" was when Davis was allowed to take his car to Atlanta so he could get back quickly if an emergency arose. Dkt. No. 33-18 at 2. Moreover, Plaintiff was reprimanded and suspended for taking his patrol vehicle to Atlanta with Miller, and his ultimate termination was also partially based on a separate personal use of the vehicle. However, Plaintiff testified that before he took his car to Atlanta with Miller, he mentioned the trip to Howard while washing his car in front of Howard. A reasonable jury could find based on Plaintiff's evidence that he was singled out for the personal use of his vehicle.

Second, as for the two-week suspension, material disputes of fact exist over whether Plaintiff participated in the raid with the McIntosh County Sheriff's Office, which was Alexander's

AO 72A
(Rev. 8/82)

alleged basis for the suspension. As mentioned above, what Alexander's basis for believing that Plaintiff worked with the Sheriff's department despite witnesses' testimony to the contrary is unclear as he did not ask any of the witnesses and did not even want to concern himself with the specifics of Plaintiff's alleged involvement. A reasonable jury could find that based on evidence presented by Plaintiff that he did not participate in the raid and that Alexander did not have actual knowledge of such alleged participation, thereby making the suspension further mistreatment unfairly singling out Plaintiff.[10]

Third, looking to Plaintiff's demotion to patrol, Plaintiff has pointed out the multiple conflicting justifications for his demotion to patrol by Alexander and Howard that a reasonable jury could infer to be evidence of discrimination. Alexander first testified in his deposition when asked about Plaintiff being transferred to patrol after his two-week suspension that it happened "during my getting close to getting gone" (referring to his resignation from the Darien Police Department) and that he "did not" have any part in the transfer "at all." Dkt. No. 27-3 at 231-32. He also said that although he knew of other instances of Plaintiff and Miller riding together, he did not "present" those

---

[10] Plaintiff also makes arguments on this point based on the testimony of the counselor (named Kidder) who Howard referred Plaintiff to. However, this counselor's deposition testimony is not found in the record, and thus, the Court cannot rely on it.

documented instances, allegedly referring to presenting them to Howard, because he had already left the Darien Police Department. Id. at 165-66. But in his affidavit, Alexander says that while Plaintiff was on his two-week suspension, he "told Chief Howard how much trouble I had been having for almost a year with them refusing to stop riding in the same vehicle" and that "the two investigators were still riding in the same vehicle while on duty even after Robinson was suspended for doing so." Dkt. No. 27-12 at 2. In other words, Alexander says that he did in fact tell Howard about other instances of Plaintiff and Miller riding together, and Howard states in his affidavit that Alexander's statements were the reason he demoted Plaintiff to patrol.

As for Howard, Davis testified that Howard told him that the reason for transferring Plaintiff to patrol was that he was "shutting down narcotics and I'm going to give it a break . . . put Korone on patrol, if he does a good job, works hard for me, in three to six months . . . we'll open in back up and he can start running it again." Dkt. 27-5 at 148. In his own deposition, Howard stated that he disbanded the narcotics division because Plaintiff had already been transferred to patrol, leaving Alexander as the only narcotics investigator. Dkt. No. 27-4 at 237. As such, once Alexander resigned, there was no need for a narcotics division. Id. But, this justification conflicts with the reason given to Davis and calls into question the statement

AO 72A
(Rev. 8/82)

that "he can start running it again," which seems to imply that Plaintiff was in charge of narcotics and that Alexander left before Plaintiff was demoted.[11]   Both of these justifications conflict with Howard's affidavit which states that after hearing about Plaintiff and Miller's continued insubordination from Alexander, he "concluded that there was no way to solve the issue but to remove either Robinson or Miller from the investigation division." Dkt. No. 27-13 at 2.   These various conflicting explanations and the conflicting timing of when Alexander resigned create a genuine dispute of material fact as to the reason for and timing of Plaintiff's demotion to patrol because a reasonable jury could conclude, based on these conflicting justifications, that Plaintiff, as the head of narcotics, was unfairly demoted because of his race or his interracial relationship with Miller or that such justifications were pretext for discrimination, as discussed in the relevant section below.

Fourth, as to Plaintiff's termination, even though he did not voluntarily resign and turned down an offer of resignation in lieu of termination, he has presented other evidence of discrimination

---

[11] Further supporting the possibility that Plaintiff was at one point in charge of narcotics, Davis testified that "at one point in time [Alexander] was in charge of investigations for the City of Darien CID and narcotics and that now [Alexander] wasn't and Investigator Korone was in charge of narcotics and Miller in charge of CID." Dkt. NO. 27-5 at 147.  He also explained that "[t]hat's why he [Plaintiff] was in charge of narcotics and she [Miller] was in charge of CID."   Id.   Making all reasonable inferences in Plaintiff's favor, the Court infers that in the previous quote from Davis, based on context of deposition questions, Davis was referring to Plaintiff and Miller.

surrounding the decision to terminate him initially.  Defendants'
principle reason given for terminating Plaintiff is the statement
he made over the police radio about B&J's restaurant.  However,
underlying that reason is a material dispute of fact about why
Plaintiff, and Miller, were not allowed to work at B&J's.  Brown
testified that the owner of B&J's, Terry Dowling, did not want
Plaintiff or Miller working security because "he didn't want his
workers feeling uncomfortable with all the stuff that was going
on."  Dkt. No. 27-8 at 186.  Considering this statement along with
the fact that both Howard and Miller's wives work at B&J's, while
making all reasonable inferences in Plaintiff's favor, a
reasonable jury could find a connection between Howard and
Alexander and Plaintiff and Miller's not being allowed to work at
the restaurant.  See id. (testifying that Alexander's wife was not
speaking with Plaintiff at this time).  Furthermore, all of the
evidence and disputed facts regarding the other adverse actions
discussed above factor into Plaintiff's termination because
Defendants argue that he was terminated because of his long history
of insubordination.  Thus, if a jury determines that Plaintiff was
discriminated against in previous adverse actions based on alleged
insubordination, they could also find that his termination was a
continuation of that discrimination.

Finally, in addition to evidence related specifically to the
adverse actions that Plaintiff experienced, Plaintiff also points

to other general evidence of discrimination. For example, having to work in an office with a Nazi flag. See Hoeft v. Lewallen, No. 09-CV-121-WMC, 2010 WL 1687871, at *1 (W.D. Wis. Apr. 23, 2010) (describing the racial and discriminatory meaning associated with Nazi symbols). A material dispute of fact exists as to who hung the flag, when it was taken down, and what Plaintiff's views of the flag were. Plaintiff also points to statements made by Howard about him becoming physically sick when he learned that his daughter was dating an African American and the story that Howard told in the office about placing watermelons by the road and shooting African Americans with a BB gun when he was a kid. Lastly, there is a dispute about why Plaintiff and Miller were prohibited from working security at B&J's. Since the police department coordinated with Dowling in some capacity to staff security for B&J's, Plaintiff not being allowed to work security at the restaurant could be the result of actions by the Defendants. A dispute exists because Brown testified that Plaintiff was no longer allowed to work at B&J's because there were "conflicts" of some kind and that he and Miller made some of the employees uncomfortable. Dkt. No. 27-2 at 33. Defendants, on the other hand, argued in their brief-pointing to a prior incident where Plaintiff had fallen asleep on the job—that the "uncomfortable" statement was really about B&J's employees feeling uncomfortable

AO 72A
(Rev. 8/82)

for having to walk alone to their cars or work in the restaurant without security when Plaintiff fell asleep. Dkt. No. 35 at 13.

At this summary judgment stage, reading all facts in the light most favorable to Plaintiff and making all inferences in his favor, the Court finds, based on the totality of "the other evidence of discrimination" discussed above, that a genuine dispute of material fact exists as to whether Plaintiff was discriminated against in this case. In other words, a reasonable jury could infer based on the "mosaic of circumstantial evidence" that Defendants intentionally discriminated against Plaintiff for his interracial relationship with Miller. For this reason, in addition to the separate and sufficient grounds that Plaintiff has pointed to Miller as a comparator, he has established his prima facie case at this stage.

### B. Non-discriminatory Reason

Moving to the next step of the McDonnell Douglas framework, because Plaintiff has established a prima facie case, Defendants must provide a non-discriminatory basis for their adverse actions against Plaintiff. First, Defendants assert that the order to Plaintiff and Miller to not ride in the same vehicle together, which later led to the adverse action of the reprimands, was given because of the potential need to have two investigators respond to two different places at the same time and of the need to separate officers who are romantically involved. As explained above,

Defendants maintain that they knew about Plaintiff and Miller's relationship prior to the patrol car order. Defendants state that officers who are romantically involved should not ride together because they may put the safety of their significant other above their duties to the public in a dangerous situation, among other reasons. Then, as for the reprimand based on violating the car-riding order, Defendants state that "any insubordination, let along flagrant, repeated, and unrepentant insubordination" would motivate a reasonable employer to act. Dkt. No. 26-1 at 36.

Second, as to the two-week suspension, Defendants argue that Plaintiff was insubordinate to Alexander by working with the sheriff's department against Alexander's specific order. Third, while in dispute, Defendants have argued that Plaintiff was demoted to patrol either for insubordination regarding riding in the car together with Miller or because the narcotics department itself was being shut down to give it "a break." Dkt. No. 27-5 at 149. Finally, Defendants point to Plaintiff's call over the radio about not being allowed into B&J's combined with his record of insubordination and failure to report while on patrol as justification for Plaintiff being given 60 or 30 days to find a new job and ultimately being terminated. Thus, despite the existence of factual disputes, the Court finds at this stage that Defendants have provided non-discriminatory reasons for their actions against Plaintiff.

## C. Pretext

At this point in the framework, the burden shifts back to Plaintiff to show that Defendants' proffered reasons are pretext for discrimination. "The inquiry into pretext requires [the Court] to determine whether, in view of all the evidence, 'the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct.'" Webb v. Int'l Bus. Machines Corp., 458 F. App'x 871, 876 (11th Cir. 2012) (quoting Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir.2001)). "To show pretext, [an employee] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). "The evidence of pretext may include . . . the same evidence offered initially to establish the prima facie case." Wilson, 376 F.3d 1079, 1088 (11th Cir. 2004).

Here, Plaintiff has presented sufficient evidence to create a genuine dispute of material fact such that a reasonable jury could conclude that Defendants' proffered reasons for the adverse actions suffered by Plaintiff were "not what actually motivated [their] conduct." Webb, 458 F. App'x at 876. Specifically,

AO 72A
(Rev. 8/82)

Plaintiff has pointed to various contradictions and disputes in Defendants' proffered justifications such that a reasonable jury could find those justifications unworthy of credence. Because much of the same evidence and many of the same factual disputes that supported Plaintiff's prima facie case are also what allow Plaintiff to meet his burden for pretext, the Court will briefly summarize the facts relevant to pretext in this case.

First, Plaintiff testified in his affidavit as to the order about riding in the car with Miller and the March reprimand and that the order was to notify Alexander when he was riding with Miller in the same patrol car, contrary to Defendants' characterization of the order as an outright ban on riding together without express permission. Reading the facts in the light most favorable to Plaintiff, a jury could decide that the insubordination basis for the reprimand and three-day suspension(and other subsequent adverse actions) was not justified, especially in light of Plaintiff's testimony that Davis told him the reprimand was really about riding in the car together as opposed to driving out of town without permission. Plaintiff also presented evidence that using patrol vehicles outside of work hours for personal use was a "perk" of the job and that Howard was aware that neither Plaintiff nor Miller had a separate personal vehicle and that he was aware of their trip to Atlanta in the work vehicle prior to them leaving. Dkt. No. 33-1 at 109-110. This

AO 72A
(Rev. 8/82)

evidence calls into question Defendants' justification for reprimanding Plaintiff for taking his work vehicle out of town. Furthermore, the timeline of Plaintiff's relationship with Miller, and when Howard and Alexander became aware of it, is in dispute, and based on Plaintiff's version of when the relationship began and became public, a reasonable jury could find that Defendants began treating Plaintiff and Miller differently as a result of their relationship becoming public. See Gault Deposition, Dkt. No. 33-18 at 1 (testifying that Plaintiff was disciplined more often after his relationship with Miller became public). In other words, when viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could decide that the reprimand was given because of Plaintiff's interracial relationship with Miller rather than insubordination.

Second, Plaintiff pointed to evidence that a jury could find would weaken Alexander's justification for the two-week suspension, namely Plaintiff's alleged participation in a raid with the sheriff's office. Plaintiff pointed to testimony from others on the scene of the raid stating that he did not participate, and Alexander, when questioned about his basis for believing Plaintiff had participated, stated that he did not talk to anyone besides Plaintiff about Plaintiff's alleged involvement and did not want to concern himself with the specifics of Plaintiff's alleged involvement. Finally, as explained above,

Miller was allowed to participate in raids with the sheriff's department while Plaintiff was suspended for allegedly doing so even though both worked under Howard in the same, small police department. A reasonable jury could conclude based off of this evidence that Alexander's justification for the suspension based on Plaintiff's alleged participation in the raid with the sheriff's office was pretext.

Third, Plaintiff demonstrated that a dispute of material fact exists as to the timing and reason for his demotion to patrol. Defendants' proffered non-discriminatory reason on this point is unclear because they argue on one hand that the demotion was because of Plaintiff's insubordination (which brings up the disputes over the patrol car order and the dating timeline) while arguing on the other that Howard was merely shutting the department down to give it a break. Plaintiff has pointed to inconsistencies in Howard's statements about the justification for his demotion, and he has highlighted inconsistencies in the timing of Alexander's departure from the department in relation to when the department was shut down. Plaintiff has also pointed out that Miller, another investigator in the police department, was not demoted to patrol because she was more indispensable. A reasonable jury could find that these inconsistencies and disputes weaken Defendants' justifications for demoting Plaintiff to patrol, and, therefore,

AO 72A
(Rev. 8/82)

also find that the justifications were mere pretext for discrimination.

Fourth, Plaintiff has pointed to evidence that calls into question Defendants' justification for firing him—namely the call over the radio about being banned from B&J's. When he was terminated, Creswell gave Robinson six discipline forms with separate grounds for termination. These forms included the radio call as well as failures to notify dispatch, failures to file incident reports, failing to speak to Howard, and using his vehicle for personal use. The evidence in this case is unclear about the exact timeline, but looking at the evidence in the light most favorable to Plaintiff, Howard made the decision to fire Plaintiff on June 27, 2016, after hearing about the radio call from the fire chief at Nautica Joe's and being asked by Brown for permission to terminate Plaintiff. However, it is not clear that the additional policy violations beyond the radio call were known to the Defendants until after the decision was made to terminate Plaintiff. While Brown testified that Creswell or someone else had told him about Plaintiff's failing to report at some point, Creswell, Plaintiff's direct supervisor, testified that he had not previously given Plaintiff any verbal warnings or written reprimands for any of the six disciplinary actions and that he did not pull the CAD reports containing these policy infractions like the failing to report until June 27, 2016, when Brown asked him to

look for policy infractions against Plaintiff. Dkt. No. 27-9 at 157-60, 174-75; Dkt. No. 27-8 at 242-244. Furthermore, when asked about the 30 or 60-day notice by Plaintiff in a text message conversation on June 28, 2016, Creswell responded that he did not know why these things were happening to Plaintiff. Dkt. No. 27-9 at 137-39. These facts call into question Defendants' use of the infractions on the CAD reports as a proffered justification for terminating Plaintiff since they were not pulled until after the decision to terminate had already been made. Additionally, these facts could lead a jury to conclude that these other reasons were added to bolster the case for firing Plaintiff when the real reason was related to his relationship with Miller.

Moreover, Plaintiff presents other evidence that shows the disciplinary infractions he was given as the basis for his termination may have been selectively enforced against him. Howard testified that no review of failing to notify dispatch had been conducted for any other officer, that Brown—who was requesting that Plaintiff be terminated—had also failed to notify dispatch, and that Plaintiff never received a written reprimand for failing to notify dispatch before being terminated. Additionally, the personal use of his patrol vehicle as a justification for his firing is undermined by other officers' testimonies of such use being a perk or encouraged practice at the police department.

AO 72A
(Rev. 8/82)

Furthermore, because the main justification for Plaintiff's firing centers around his comment about B&J's on the radio, the dispute over why both Plaintiff and Miller were not allowed to work security at the restaurant and the statement that they would make employees "uncomfortable" could lead a reasonable jury to conclude that the firing had something to do with Plaintiff's interracial relationship with Miller. This point is especially true considering the possible issue of Howard and Alexander's connection to B&J's as a result of their wives' employment and the security provided by the police department through the department's relationship with Terry Dowling.

Fifth, and finally, Plaintiff has presented other overarching evidence of discriminatory animus in this case that a reasonable jury could conclude is evidence of pretext. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) ("Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case."). Plaintiff pointed to two different racially discriminatory statements made by Howard, both of which Howard admitted to saying (though he disputed the context of the statements). First, Gault testified about Howard's statement that he vomited when he learned that his daughter was dating a black male. Although Howard testified that he would have been sick about any male dating his daughter,

regardless of race, Gault testified that the context of the conversation where this comment was made "specifically" was interracial dating between black males and white females. Furthermore, when asked "[w]hat was actually said was when I found out she was dating a black boy, I became so physically ill I vomited . . . . And you don't deny saying it?" Howard stated "okay" and "I said it." Dkt. No. 27-4 at 261. Second, Howard admitted to telling a story at the Darien Police Department about him in his youth placing watermelons on the road, hiding, waiting for African Americans to come try to pick them up, and then shooting them with a BB gun.

While these statements were not made directly to Plaintiff or in the context of one of the adverse actions Plaintiff experienced, the Court cannot, at this stage, step into the role of a fact finder and say that Howard's general attitude about race and interracial relationships evinced by these statements had nothing to do with the adverse actions against Plaintiff. See Cooper-Houston v. S. Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)(holding that the district court "exceeded its proper role" when it found that the defendant supervisor, who used racial slurs, "did not hold black people in equal respect" but nonetheless held that "there was no evidence that the chief's general attitudes played a part in the decision."). Finally, the evidence shows that someone hung a Nazi flag in the police department, and a genuine

AO 72A
(Rev. 8/82)

dispute of material fact exists as to Plaintiff's view of that flag and how long it was allowed to stay hung in the office. A reasonable jury could conclude in light of the other evidence in this case, that the flag being hung and allowed to stay in the office was evidence of pretext and Defendants' racial animus toward Plaintiff. See Hoeft, 2010 WL 1687871 at *1 ("The swastika is a symbol historically associated with Nazism, Hitler and neo-nazis organizations, as well as with oppression and genocide directed toward racial, religious and ethnic minority groups . . . . in western cultures the primary significance of the swastika is its association with white supremacy.").

Therefore, under the McDonnel Douglas framework, Plaintiff has met his burden by showing sufficient evidence and disputed facts that cast doubt on Defendants' proffered reasons such that a reasonable jury could determine that those reasons were not actually what motivated the adverse actions in this case. Moreover, Plaintiff has demonstrated enough circumstantial evidence to create a genuine dispute of material fact and raise an inference of discrimination such that a triable issue of fact regarding Defendants' discriminatory intent exists in this case. See Cook v. Glynn-Brunswick Hosp. Auth., No. CV 213-152, 2015 WL 9690385, at *9 (S.D. Ga. Sept. 30, 2015) (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir.2011)) ("[T]he Eleventh Circuit allows a Plaintiff to survive summary

AO 72A
(Rev. 8/82)

judgment 'if he presents circumstantial evidence that creates a triable issue regarding the employer's discriminatory intent.")." As a result, summary judgment is not appropriate in this case, and a jury must make the ultimate determination. For these reasons, Defendants' Motion with respect to Plaintiff's claims of racial discrimination under Counts I, II, and III of the Complaint is **DENIED**.

## II. Intimate Association

Under Count IV of the Complaint, Plaintiff claims that Defendants violated his right to intimate association under the First Amendment. "The right of intimate association . . . is the freedom to choose to enter into and maintain certain intimate human relationships, and it is protected from undue government intrusion as a fundamental aspect of personal liberty." Gaines v. Wardynski, 871 F.3d 1203, 1212 (11th Cir. 2017) (citations omitted). This right is grounded in the First Amendment.[12] See id. "To show that a public employer has impermissibly burdened or infringed a constitutional right, the employee must first demonstrate that the asserted right is protected by the Constitution—which . . . the right to freedom of intimate association is—and that he or she suffered adverse action for exercising the right." Gaines v. Wardynski, 871 F.3d 1203, 1212-13 (11th Cir. 2017). In a recent

---

[12] Although Plaintiff asserts this right under the Fourteenth Amendment in the Complaint, it is properly characterized as being a First Amendment right. Gaines, 871 F.3d at 1212.

AO 72A
(Rev. 8/82)

unpublished opinion involving a retaliation claim for exercising intimate association rights, the Eleventh Circuit has explained the standard here as requiring the Plaintiff to show that the "associational activity was a substantial or motivating factor in the employer's retaliatory action, and, if so, whether a preponderance of evidence supports the conclusion that the adverse action would not have occurred in the absence of the associational activities." Boudreaux v. McArtor, 681 F. App'x 800, 803 (11th Cir. 2017). The Court will use this characterization of the rule as this case is essentially a retaliation claim for the exercise of Plaintiff's associational rights with Miller. Finally, if the employee makes this initial showing, then, the Court applies the Pickering balancing test from Pickering v. Board of Education, 391 U.S. 563 (1968), which, "in the public employment context involves the weighing of the employee's interest in the exercise of a constitutional right against the employer's interest in maintaining an efficient workplace." See Shahar v. Bowers, 114 F.3d 1097, 1103, 1112 (11th Cir.1997) (en banc) (Tjoflat, J., concurring) (applying Pickering in the intimate-association context).[13]

---

[13] Defendants argue that the appropriate case to analyze a right to intimate association under is Parks v. City of Warner Robins, 43 F.3d 609, 615 (11th Cir. 1995). However, the Eleventh Circuit in Shahar made clear that Pickering is the appropriate test in these circumstances. Id. at 1103 n.14. This Circuit specifically explained that Parks applied to cases involving legislative acts, rather than ad hoc executive decisions. Id.

AO 72A
(Rev. 8/82)

Here, Plaintiff argues that Defendants interfered with his right of intimate association with Miller "through the targeted and arbitrary application of an ad hoc vehicle policy applicable only to Robinson and Miller, unexplained shift transfers, an attempt to transfer Miller to patrol, and the attempt to suspend Robinson in March 2016 when he acted in his private capacity regarding Miller's cellular service." Dkt. No. 41 at 9-10. Plaintiff asserts that these actions were an "attempt to damage [Plaintiff's] relationship with Miller outside of work by putting pressure on them within the workplace." Id. at 10 (emphasis in original). Defendants argue that because Plaintiff and Miller were two employees of the same law-enforcement agency, their relationship "invites and even necessitates some level of employer-generated restriction on the relationship." Dkt. No. 35 at 24.

At the summary judgment stage, the movant—Defendants in this case—has the burden of showing the absence of any genuine dispute of material fact such that the Court can rule on a claim as a matter of law. Looking to Plaintiff's intimate association claim, Defendants have failed to meet their burden. First, the Court will assume that Plaintiff and Miller's relationship, despite its extramarital context, is a protected intimate association. The Eleventh Circuit has recognized a dating relationship as being an intimate association, Wilson v. Taylor, 733 F.2d 1539, 1544 (11th

AO 72A
(Rev. 8/82)

Cir. 1984), abrogated on other grounds as recognized in Scala v. City of Winter Park, 116 F.3d 1396, 1402 n.4 (11th Cir.1997) ("We conclude that dating is a type of association which must be protected by the first amendment's freedom of association."); see also Moore v. Tolbert, 490 F. App'x 200, 203 (11th Cir. 2012), and it has assumed for the sake of argument, without expressly deciding the issue, that an extramarital affair is protected under the First Amendment right to intimate association,[14] see Starling v. Bd. Of Cty. Comm'rs, 602 F.3d 1257, 1261 (11th Cir. 2010).

---

[14] Defendants raise, for the first time in their supplemental brief, the defense of qualified immunity. The Court will not address the merits of this argument for two reasons. First, Defendants did not meet their burden. "To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." Estate of Cummings v. Davenport, 906 F.3d 934, 940 (11th Cir. 2018) (citations omitted) (emphasis in original). Here, Defendants state in one sentence that "because the right to adulterous intimate association is not clearly established, Defendants would be entitled to qualified immunity regardless of what conduct they engaged in that allegedly infringed on that right" and cite to the Supreme Court case of Pearson v. Callahan, 555 U.S. 223, 231 (2009). Dkt. No. 42 at 12 (emphasis in original). This one sentence, which also fails to indicate which Defendants are being referred to, is insufficient to meet the Defendants' burden to establish that qualified immunity applies as it does not even mention Defendants' discretionary functions. Thus, the burden does not shift to Plaintiff.

Second, even if Defendants did meet their burden, they waited until a post-Motions Hearing supplemental brief filed after Plaintiff had already filed his supplemental brief. The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991). Waiting until the final supplemental brief after a Motions Hearing and multiple other briefs for summary judgment does not afford the Court or the Plaintiff the opportunity to address the issue of qualified immunity in an early and timely manner. In that same vein, Plaintiff is prejudiced in that he had no occasion to respond to Defendants' qualified immunity argument. Thus, for these reasons, the Court will not address the merits of Defendants' qualified immunity argument at this time. If any Defendant seeks to move for summary judgment based on qualified immunity, such motion must be filed within ten (10) days of this Order. Plaintiff shall have ten (10) days to respond.

AO 72A
(Rev. 8/82)

Second, a genuine disputes of material fact exists as to whether Plaintiff's intimate association with Miller was a substantial or motivating factor in the adverse actions against him. It is undisputed that Plaintiff suffered multiple adverse actions in this case, but material disputes of facts exist as to whether his relationship with Miller was a substantial or motivating factor in the adverse actions. At a minimum, his relationship with Miller played some part in the enforcement of the order about riding together in the patrol car, the reprimand for doing so, Miller's transfer out of Alexander's control, and Plaintiff's subsequent adverse actions for alleged insubordination like his demotion to patrol. Reading the facts in the light most favorable to Plaintiff, such as what the exact language of the order was regarding riding in the patrol car together and the timeline of Plaintiff and Miller's relationship, a reasonable jury could conclude that that Plaintiff's intimate association with Miller was "substantial or motivating factor" in Defendants' adverse actions against Plaintiff in this case. In other words, a reasonable jury could conclude that Plaintiff's relationship with Miller was a substantial or motivating factor for one or more adverse actions that he experienced. Thus, the Court cannot conclude as a matter of law that the adverse actions Plaintiff experienced would not have occurred in the absence of his relationship with Miller.

AO 72A
(Rev. 8/82)

Third, under the final _Pickering_ balancing test step, material disputes of fact exist as to Defendants' asserted government interest in this case. Generally, the government, particularly law enforcement, does indeed have an interest in efficient operation of the workplace, especially when officers are involved romantically. However, Plaintiff has called into question Defendants' basis for the order about riding in the car together by showing evidence of other officers being permitted to ride with their significant others in their patrol vehicles. While these other instances may not be enough under the comparator analysis in the _McDonnell Douglas_ analysis in the section above, they do cause a dispute as to the specific basis for order and other actions taken by the Defendants against Plaintiff and Miller under the _Pickering_ analysis. Because of the genuine disputes of material fact in this case about Plaintiff and Miller's relationship and the adverse actions Plaintiff experienced, the Court cannot say as a matter of law that the Defendants' government interest would outweigh Plaintiff's interest in exercising his intimate association rights in this case. As a result, summary judgment is inappropriate on this claim, and a jury should decide it. For these reasons, Defendants' Motion with respect to Count IV of the Complaint is **DENIED**.

AO 72A
(Rev. 8/82)

## III. Conspiracy

In Counts V and VI, Plaintiff claims that Defendants Howard, Alexander, and Creswell conspired to violate his fundamental rights in violation of 42 U.S.C. § 1985. Specifically, he claims that they conspired to deprive him of his right to freedom of intimate association by interfering with and attempting to hinder his relationship with Miller and to deprive him of his right to equal protection under the Fourteenth Amendment by engaging in discriminatory employment practices because of his race and his involvement in an interracial relationship. Defendants argue that they are immune from Plaintiff's conspiracy claims under the intracorporate conspiracy doctrine.

"Under the intracorporate conspiracy doctrine, a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation." Dickerson v. Alachua Cty. Comm'n, 200 F.3d 761, 767 (11th Cir. 2000). "The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself." Id. Because only Howard, Alexander, and Creswell—all members of the Darien Police Department—are mentioned in the conspiracy counts in Plaintiff's Complaint, Defendants argue that Plaintiff's claim must fail.

AO 72A
(Rev. 8/82)

However, Defendants have failed to present the Court with case law supporting the rule that at the summary judgment stage, after discovery, Plaintiff cannot allege new members of a conspiracy unless those members are alleged in the initial complaint and in the specific conspiracy counts there within. In their supplemental brief, Defendants point the court to three cases, but each of these cases involve a motion to dismiss where the courts were looking at the allegations in the initial complaint. This case has proceeded past the motion to dismiss stage, the parties have conducted discovery, and the Court is now presented with Defendants' Motion for Summary Judgment. At this stage in the proceedings, unlike the motion to dismiss stage, parties can rely on, and the Court can consider, evidence beyond the allegations.

Plaintiff initially alleged a conspiracy between Howard, Alexander, and Creswell, but now, based on information gathered during the discovery process, Plaintiff argues that the owner of B&J's, Terry Dowling, was also a member of this alleged conspiracy. Plaintiff does not argue that Dowling is a party to the case, or that he should be added, which would require an amended complaint. Rather, Plaintiff argues that based on the evidence gathered about B&J's such as Plaintiff and Miller not being allowed to work there like other police officers, the statement that Plaintiff made people uncomfortable, and that Howard and Alexander's wives work

AO 72A
(Rev. 8/82)

at the restaurant, that in addition to the named Defendants, Dowling was also part of this conspiracy. While Dowling is not named in the Complaint, Plaintiff does allege in the Complaint that Plaintiff was informed by Brown that he and Miller were "banned" from B&J's because Plaintiff "made some of the female employees uncomfortable," that Howard and Alexander's wives worked at the restaurant, and that Plaintiff had previously provided private security for the restaurant. Dkt. No. 1 ¶¶ 72-73. Furthermore, these alleged facts are incorporated into the conspiracy counts by reference. Finally, as explained in detail above, genuine disputes of material fact exist as the reason for Plaintiff and Miller not being allowed to work at B&J's, which is related to the call over the radio that Plaintiff made that was one of the alleged bases of his termination. In summary, Plaintiff alleged a conspiracy existed in the Complaint, named three defendants under that claim as members of the conspiracy, and then, after discovery, alleges that the conspiracy included another non-Defendant member, Dowling, based on disputed material facts in the evidence.

For these reasons, the Court cannot bar Plaintiff's conspiracy claims as a matter of law under the intracorporate conspiracy doctrine. Defendants only challenged these claims under the intracorporate conspiracy doctrine, and they have failed to show that Plaintiff could not allege Dowling—an individual not

AO 72A
(Rev. 8/82)

employed by the Darien Police Department—as being a non-party member of the conspiracy, which means the doctrine does not apply. A jury could ultimately decide that no such conspiracy existed, but at this stage, Defendants have failed to show that no genuine dispute of material fact exists as to these claims. Therefore, Defendants' Motion with respect to Counts V and VI of Plaintiff's Complaint is **DENIED**.

## IV. Claims Against Darien Police Department

As for Plaintiff's claims against the Darien Police Department, both parties agreed at the hearing on Defendants' Motion for Summary Judgment that the Darien Police Department is a non-legal entity incapable of suing or being sued. See Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992) ("[P]olice departments are not usually considered legal entities subject to suit."). Therefore, with respect to claims against the Darien Police Department, Defendants' Motion for Summary Judgment is **GRANTED**, and the Darien Police Department is **DISMISSED** from this case.

### CONCLUSION

Defendants' Motion with respect to Defendants the City of Darien, Howard, Alexander, and Creswell is **DENIED**. Defendants' Motion with respect to Defendant the Darien Police Department is **GRANTED** and the Darien Police Department is **DISMISSED** from the case.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 22nd day of January, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)