**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **KORONE ROBINSON,** | * | |
| | * | |
|   **Plaintiff,** | * | |
| | * | |
| **Vs.** | * | **Case Number:  2:17-cv-99** |
| | * | |
| **CITY OF DARIEN, DARIEN POLICE** | * | |
| **DEPARTMENT, DONNIE HOWARD,** | * | |
| **RYAN ALEXANDER AND JOSEPH** | * | |
| **CRESWELL,** | * | |
| | * | |
|   **Defendants.** | * | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**STATEMENT OF MATERIAL FACTS AND CONCLUSIONS OF LAW**

1.   Plaintiff Korone Robinson was terminated from the Glynn County Police Department for

"willful harassment . . . proximate to sexual harassment" and insubordination after repeatedly

disobeying multiple direct orders to stop contacting a coworker who had broken off a romantic

relationship with him. (Robinson Dep., 27:10-13, 28:19-29:4, 29:20-23, 32:16-23, 34:11-16,

38:13-18, Ex. 1 pp. 1-2, 9-13).

**Denied.**

2.    Although he claims not to remember being terminated from the employ of the Wayne

County Sheriff, his personnel file from the sheriff's office indicates that he was. (Id., Ex. 3).

**Denied.**  Sheriff Carter states that Robinson was not terminated by the Wayne County Sheriff's

Office. The letter referencing "Termination of Part Time Employment" is a standard letter that

Sheriff Carter places in an officer's personnel file after part-time employment has come to an

end.

3.     Robinson was counseled multiple times by the Brunswick Police Department for failing to complete incident reports and for rudeness to citizens. (Id., 44:21-45:46:13).

**Admit.**

4.     Nonetheless, Robinson's best friend – Defendant Ryan Alexander – wanted Robinson to come work with him as a narcotics investigator at the Darien Police Department. (Alexander Dep., 20:15-21:2).

**Admit.**

5.     Robinson and Alexander had worked together at the Glynn County Police Department, and had quickly progressed from coworkers to "best buds" to "brothers." (Robinson Dep., 52:5-8, 51:13-14).

**Admit.**

6.     They frequently spent time together outside of work and talked on the phone "all the time." (Id., 52:12-22).

**Admit.**

7.     Unfortunately, the Darien Police Department did not have a narcotics investigator position open for Robinson, who was at that time employed by the Brunswick Police Department. (Alexander Dep., 21:3-8).

**Admit.**

8.     Robinson decided to start performing narcotics-investigation work for the Darien Police Department on a part-time, volunteer basis in the hope that a paid, full time position would soon come available. (Id., 21:5-8).

**Admit.**  In addition to working part-time with the Darien Police Department Robinson also continued to work full-time for Brunswick Police Department. (Alexander Dep., 20:11-12).

9.     While Robinson was performing unpaid, part-time work for the Darien Police Department, he applied for a position on the Glynn-Brunswick Narcotics Enforcement Team. (Robinson Dep., 50:7-8).

**Admit.**

10.     Both Donnie Howard, the Chief of the Darien Police Department, and Ryan Alexander, who was then the Lieutenant over narcotics investigations, wrote glowing letters of recommendation for Robinson. (Id., 50:9-12).

**Admit.**  Including recommendation letters from Will Cove and Michael Melton.

11.     However, Robinson did not even get an interview for the position. (Id., 50:13-16).

**Admit.**

12.     Soon thereafter, Donnie Howard began negotiating with the City Manager for the City of Darien about getting the additional funding necessary to bring Robinson on as a full-time narcotics investigator. (Robinson Dep., 49:17-20).

**Admit.**

13.    Eventually, Howard was successful at securing enough additional funding to bring Robinson on at his desired salary. (Id., 49:15-50:1).

**Admit.**

14.    Robinson resigned from the Brunswick Police Department with a letter in which he noted that Howard had "fought for" him to be able to work at the Darien Police Department. (Id., Ex. 4).

**Admit.**

15.    Although "a lot of people" warned Robinson that going to a new job where his best friend would be his boss could cause problems with their friendship, Robinson was determined not to let his friendship with Alexander interfere with their new working relationship. (Id., 52:9-11, 52:23-53:7).

**Admit.**

16.    In his Complaint, Robinson alleges that he began "a romantic relationship" with his Darien Police Department coworker, Stacy Miller, in October 2015. (Dkt. No. 1, ¶ 62).

**Admit.**

17.    On September 11, 2015, Robinson sent a text message to Ryan Alexander, who was at that time the direct supervisor of both Robinson and Miller. The message included a picture of a calendar for the month of September 2015, and read: 25, 26, 27 that weekend we need off. Taking her out of town, Also need that Monday & Tuesday. We will b back Tuesday evening. That's the weekend after u come back. I booked St. Petersburg Florida for that weekend a few

months ago and just got the reminder. I told you back n june. That weekend is our anniversary (Robinson Dep., Ex. 5).

**Denied.**  Robinson did not remember sending the text. (Robinson Dep., 63:21-23).

18.    Robinson does not deny sending this text message, but testified that he cannot remember what he was talking about, as he denies that he and Miller began dating in September 2014. (Robinson Dep., 64:8-16).

**Denied.**  Robinson does not recall sending the text and the substance of the text did not make sense.  Robinson expressly denies that the text message was about he and Stacy. (*Id.,* 64:25; 65:1-4).

19.    However, Robinson acknowledges that the text cannot refer to an anniversary with the woman he dated before Miller, both because that relationship ended in the spring of 2015 and because his anniversary with that woman was not in September. (Id., 63:6-10, 69:16-21).

**Denied.**  This anniversary was closer to Robinson's anniversary with Amanda and Robinson believes the text could only be about Amanda.

20.    He further acknowledges that he did not have any serious relationships between that woman and Miller. (Id., 63:15-20).

**Admit.**  Robinson did not date anyone else while in a relationship with Amanda. (*Id., 63:11-20).*

21.    He admits that he cheated on the woman whom he was dating prior to Miller, precluding any argument that Robinson and Miller cannot have started dating in September 2014 because Robinson was involved in another relationship at that time. (*Id.,* 67:3-17).

**Denied.** Robinson was positive about when he broke up with Amanda and did not date anyone else while with Amanda. Robinson did not admit to cheating on Amanda. He says things happened and did; not say that he engage in overlapping relationships. (Id., 65:25; 66:1-3; 66:23-25; 67:4-14).

22.    And, directed to the part of the text stating that "we need off," Robinson admits that he has never dated anyone other than Stacy Miller who would have needed permission from Ryan Alexander to take off of work. (Id., 64:17-65:1).

**Denied.** Robinson did not say that "we" meant Stacy Miller. (*Id.,* 64:25; 65:1-4).

23.    Robinson admits that he has no evidence, other than his own self-serving testimony, to support his contention that the text is inconsistent with the timeline of his relationship with Miller. (Id., 65:5-10).

**Denied.** Robinson points to several uncontested independent corroborating events:

1.    Background check of other cop; (Robinson Dep., 88:7-25; 89:1-4)

2.    Helping Melton get a job;

3.    Alexander confirms when Robinson moved. (Alexander Dep., 156:10-15).

4.    November, 2014 Robinson went on a cruise with Amanda. (Robinson Dep., 91:6).

24. On August 12, 2015, Robinson wrote a stream-of-consciousness note to himself that he then left lying around the police station, where Alexander found it days after it was written. (Alexander Aff., ¶ 2).

**Admit.**

25. In the note, Robinson expresses concern that he is standing in the way of Miller's relationship with her husband, that he is preventing them from "moving on" as a couple, and that he is selfish to be asking Miller to walk away from the financial circumstances she enjoys with her husband. (Robinson Dep., Ex. 6, p. 1).

**Denied.**  This is not what Robinson was expressing. (*Id.,* 247:3-21, Robinson Aff., ¶ 7).

26.    Although Robinson claims that he believed Miller and her husband were separated and on the way to divorce when he wrote the August 2015 note, the note itself suggests otherwise; Robinson writes in vivid detail about the two "little blond" children – one boy and one girl – that Miller and her husband will have if he gets out of the middle of their marriage, laments that "they fit together so easy, and all your [sic] doing Korone is fucking up what God brought together!!!!" and concludes that he needs to let Miller return to "the warm embrace of her husband." (Id., pp. 1-3).

**Denied.** Robinson was speaking to himself about the hypothetical negative consequences of pursuing a relationship with Miller. (Id., 72:7- 77:8; 247:3-21; Robinson Aff., ¶ 7).

27.    By August of 2015, Robinson was writing to himself that "you truly love her, you need her, your [sic] addicted to her, your [sic] obsessed with her, you need her to breathe," and that "you know for a fact you could not allow yourself to share a bed with another woman!!!" (Robinson Dep., Ex. 6, pp. 2-3).

**Admit.**

28.    Robinson admits that, for some time leading up to the writing of the note, he and Miller had been spending nearly all of their waking hours together, had become very close, and were "past a friendship level." (Robinson Dep., 247:22-248:22).

**Denied.**  Robinson expressly denies being past friends. (*Id.,* 249:3-5).

29.    Critically, Robinson acknowledges that by August of 2015, his devotion to Miller was such that he would never have planned a romantic getaway with any other woman – leaving no question that the anniversary trip, planned in June 2015 and to be taken in September 2015 to celebrate a relationship dating from September 2014, can only have been a trip with Miller. (Robinson Dep., 84:23-85:14, 91:8-18).

**Denied.**  Again, Robinson expressly says that the trip could only be with Amanda. (*Id.,* 64:12-16; 64:25; 65:1-4).

30.    Ryan Alexander testified that he knew no later than the day of his grandfather's funeral, in late March of 2015, that Robinson and Miller were romantically involved. (Alexander Dep., 155:7-18).

**Denied.**  Ryan Alexander gave conflicting statements with the same level of certainty. (Alexander Dep., 155:7-12; 155:19-25; 156:14-20; 158:13-22.

31.    Asked to identify any evidence refuting Alexander's recollection, Robinson came up empty-handed, and he admits that he does not know when Alexander first became aware of the relationship. (Robinson Dep., 87:7-21, 121:24-122:1).

**Admit.**  Robinson does not know when Alexander found his note to himself regarding his feelings for Miller but he does know when he disclosed the relationship to Alexander.

32.    Alexander also testified that Robinson and Miller began dating around the time that Miller dyed her hair red in response to Robinson broadcasting that he was attracted to redheaded women. (Alexander Dep., 153:1-8). According to Robinson, this occurred in October or November of 2014. (Robinson Dep., 61:10-62:4).

**Denied.**  Robinson testified he did not begin a romantic relationship with Miller until October 2015. However, he had only engaged in some intimate contact by August of 2015. (Id., 64:12-16; 64:25; 65:1-4; 72:7- 77:8; 247:3-248:22; Robinson Aff., ¶ 7 ).

33.    Donnie Howard learned that Robinson and Miller were dating in early 2015. (Howard Dep., 309:3-8 (testifying that he found out about the relationship around the time Archie Davis returned to Darien from Atlanta); Davis Dep., 8:5-10 (testifying that he moved back to Darien in January or February of 2015)).

**Denied.**  Robinson's testimony as to when he and Miller began dating contradicts Howard's testimony. See number 32 above, of Statement of Material Facts.

34.    Howard's initial reaction to the news was to consider separating Robinson and Miller with respect to their work duties, but Alexander advocated for them to be allowed to continue working together in the investigations department. (Howard Dep., 309:13-16).

**Denied.**

35.    Howard contacted City Manager Brett Cook to ask him how the issue of two employees who worked closely together entering into a romantic relationship should be handled, and Cook said that if neither was the supervisor of the other, Howard could use his discretion. (Id., 309:17-19).

**Admit.** However, the record necessitates that any such conversation would have to have occurred in or around January, 2016.

36.    In the end, Howard relented to Alexander's pleas that the investigations department which, at that time, consisted of Alexander, his best friend Robinson, and their friend and Robinson's new love interest, Miller – stay intact. (Id., 309:20-310:1).

**Denied.** Contradicted by Alexander's testimony as to the timeline of when he learned they were dating and Robinson's testimony. See above Statement of Facts number 30 and 32.

37.    After learning that Robinson and Miller were in a relationship, Alexander – with Chief Howard's blessing – gave them a verbal directive to stop riding in the same vehicle while working. (Alexander Dep., 151:2-7).

**Denied.** This is contradicted by the language in the April 10th directive from Alexander and Robinson's testimony. (Id., Ex. 7).

38.    Alexander gave this directive both because he was concerned about response times if he needed his two investigators to respond to two different locations and they were out in one vehicle, and because he was concerned that officers in a romantic relationship could prioritize each other's safety to an extent detrimental to the handling of their duties if they encountered a dangerous situation. (Id.,149:3-150:24).

**Admit.**

39.    Experienced law-enforcement supervisors agree that a rule like the one imposed by Alexander is necessary for handling employees who are romantically involved, and suggested

rules that go even further to separate officers who are dating during work hours. Melton Dep.,

75:8-76:13; Doering Dep., 127:7-128:3.

**Denied.**

40. Robinson remembers Alexander presenting the order as something from the Chief that

Alexander was simply required to pass down, but does not deny that it was given. (Robinson

Dep., 92:20-93:9).

**Denied.** Robinson denies that he was ordered to refrain from ever riding with Miller, only that he

was to give prior notice. (Robinson Dep. 92:3-25; 93:1-16, Ex. 8; 102:20-25; 103:1-18;

Robinson Aff. ¶10-13).

41.    However, although Robinson promised his best friend and supervisor that he would go

along with the new directive, he actually concluded that it was invalid and that he did not have to

obey it:

Q:    But instead of asking why [the directive you disagreed with had been given], you just
decided it was an unlawful order and that you didn't have to follow it?

A:    Well, I didn't want to -- I didn't want to put my friend at the time in the position to have to
say why.

Q:    Okay.  And so my question is you didn't ask why.  You didn't get any clarification.  Did you
follow this order and never get in the car with her again after this?

A:    No, I didn't.

Q:    You didn't follow the order?

A:    Correct.

Q:    Because you thought it was not a lawful  order?

A:    Correct.  (Robinson Dep., 93:10-11, 94:24-95:16, 95:11-96:1).

**Denied.**  Reference the above Statement of Material Facts number 40.

42.     Predictably, Robinson and Miller were both given formal discipline by way of verbal counseling from Alexander on April 10, 2015. (Robinson Dep., Ex. 7). The written account of that counseling states that Robinson and Miller had been told "on several occasions" not to ride in the same vehicle, but were nonetheless found to be doing so. (Id.).

**Denied.**  Reference the above Statement of Material Facts number 40.

43.     Despite having been formally disciplined for violating the order not to ride in the same vehicle while on duty, Robinson and Miller continued disregarding it. (Robinson Dep., 96:6-11).

**Denied.** Reference the above Statement of Material Facts number 40.

44.     Alexander, who had advocated for Robinson and Miller to be able to stay together under his command, grew increasingly frustrated as he watched them repeatedly disobeying the very simple command not to be in the same vehicle while on duty. (Alexander Dep., 283:21-284:4).

**Denied.** Robinson was complying with the order as he understood it. Reference the above Statement of Material Facts number 40.

45. He pleaded with his friends to follow the order:  I pulled them into my office one time and looked at them, because we were buddies, and said, "Come on, guys." I said, "You know I've told y'all not to do it and y'all continue to do this." I mean, this is trying to still be the buddy and converse with them. And it was laughed off again. But, I mean, you know, it was -- yes, they continued to do it after that. (Alexander Dep., 284:8-17).

**Denied.** Reference the above Statement of Material Facts number 40 and 44.

46.     Robinson admits that, despite the repeated remonstrations of his best friend and supervisor, he and Miller continued to disobey the order. (Robinson Dep., 96:6-11, 100:13-17).

**Denied.**  Robinson only acknowledges that he did not argue. (*Id.,* 96:21-25).  Robinson is only acknowledging that it is stated in the Exhibit that was handed to him. (*Id.,* 96:2-11)

47.     In January of 2016, Robinson drove his City-issued vehicle on a vacation to Atlanta with Miller. (Alexander Dep., 165:3-11; Robinson Dep., 97:20-21).

**Admit.**  After having his work truck cleaned directly in front of Chief Howard and expressly telling the Chief that they were leaving for Atlanta. (Robinson Dep., 97:22-25; 98:1).

48.     While the City's handbook provides that City-owned vehicles may not leave a twelve-mile radius around the City, the City Manager has delegated to Chief Howard the authority to allow exceptions to this rule for his employees. (Howard Dep., 156:5-157:24).

**Denied.**  He did not allow "exceptions", he allowed the Chief full authority for all vehicles issued to the Darien Police Department officers. (*Id.,* 157:3-8)

49.     Howard gives all of his officers permission to drive their vehicles back and forth between work and their homes, and he also generally grants requests for permission to drive the vehicle on personal errands or even vacations, so long as the privilege is not being abused. (Howard Dep., 157:25-158:25).

**Denied.**  The ability to drive the vehicles on personal errands or even vacations was a perk. (Roundtree Dep., 109:7-25; 110:1-23; Davis Dep., 131:6-17; Gault Dep., 12:10-25; 13:1-3).

50.     However, Robinson did not seek permission from Chief Howard (or anyone else) to take his City-issued vehicle on his January 2016 trip to Atlanta. (Robinson Dep., 99:11-13).

**Denied.**  Robinson publicly prepared the vehicle by getting it washed directly in front of Chief Howard and expressly telling the Chief that they were leaving for Atlanta. (Robinson Dep., 97:20-21).

51.    On February 3, 2016, Alexander issued Robinson a written reprimand. (Robinson Dep., Ex. 8).

**Admit.**

52.    The document states that Robinson is being placed on a three-day unpaid suspension as a result of his insubordination with respect to his ongoing refusal to follow the order not to ride in a vehicle with Miller while on duty, and his improper use of his City-issued vehicle on the trip to Atlanta. (Id.).

**Admit.**

53.    Archie Davis, who was at that time the second-in-command at the Darien Police Department and was present for the meeting during which the discipline was administered, clarified that although Robinson should not have driven the vehicle to Atlanta without permission, this infraction was not the driving force behind the discipline. (Robinson Dep., 98:10-99:2).

**Denied.**  Archie Davis said he wasn't in trouble for driving his vehicle to Atlanta and Davis told him more than once that he wasn't in trouble and that he did  not know what was going on. (*Id.,* 98:8-22).

54.    Rather, as documented in the written reprimand, the principal issue was the repeated and flagrant insubordination of the order that Robinson and Miller not ride in the same vehicle while on duty. (Robinson Dep., Ex. 8).

**Denied.**  After having his work truck cleaned directly in front of Chief Howard and expressly telling the Chief that they were leaving for Atlanta. (Robinson Dep., 97:22-25; 98:1).

55.    Although Robinson was informed of the process to appeal the February 3, 2016 written reprimand and ensuing suspension, he did not file an appeal. (Robinson Dep., 99:21-22).

**Admit.**  Robinson did not believe that an appeal was necessary because he assumed that he and  Alexander would have a conversation after the fact as they had always done. (*Id.,* 99:24-25; 100:1-12).

56.    He assumed that Alexander did not really want to discipline him, and that Alexander would have a private meeting with him after the fact "to be like, hey, this is what why I had to do what I had to do." (Id., 99:24-100:12).

**Denied.**  This was per Robinson's and Alexander's historical custom. (*Id.,* 99:24-25; 100:1-5).

57.    Robinson evidently could not fathom that Alexander might actually be frustrated that neither repeated friendly conversations nor even formal counseling had put an end to Robinson's disobedience of a very serious order, because Robinson still did not believe the order was valid:

A: . . . So when he gave me this one, I'm like, okay, I'm going to leave out this meeting, he's going to call me and tell me what's going on. Didn't happen.  I went home for three days without no transportation and no explanation.  So this was the beginning of, okay, what's going on. Q: So what you were looking for from Ryan is an explanation of why -A:   Why -Q:    -- he's

disciplining you for stuff that you acknowledge happened, but you don't think he would usually have disciplined you for? A:    Well, stuff that I didn't even think that was against policy. (101:14-102:3).

**Denied.** This is pure speculation.  Robinson was relying on his and Alexander's historical custom. (*Id.,* 100:1-5).

58.    By this time, Alexander had begun feeling taken advantage of by Robinson and Miller. (Alexander Aff., ¶ 3).

**Denied.**

59.    He had advocated strongly for Robinson to get a job with the Darien Police Department, advocated strongly for Robinson and Miller to stay together in the investigations division after beginning a romantic relationship, and been repaid with a year during which it became increasingly apparent that his friends did not take him seriously as a boss. (Id.).

**Denied.** Stacy Miller had to be moved under Brown's supervision in February 2016 because Alexander acted without authority. Alexander was attempting to punish Robinson's private choices as to off duty time and trying to privately arrange for Miller to have cell service in March.

60.    Out of other options to combat Robinson's refusal to follow an order that law enforcement officials across the board acknowledge is critical to have in place where coworkers are dating, Alexander hoped that the suspension would help Robinson to finally understand the seriousness of the issue. (Alexander Aff., ¶ 4).

**Denied.**  Alexander sent Miller to night shift and he tried to transfer her to patrol without permission from Chief Howard. (Howard Depo., 251:9 – 256:25).

61.    Instead, however, it simply led Robinson to feel that he had been wronged by Alexander, and to wonder why their friendship was deteriorating. (Robinson Dep., 114:5-13).

**Denied.** Alexander was punishing and harassing Robinson regarding his off duty and non-work related actions. See above Statement of Material Fact 59.

62.    Robinson became so preoccupied by his troubles with Alexander that, in May of 2016, Chief Howard approached Robinson to say that it was obvious Robinson was extremely stressed and that Howard was contemplating giving Robinson some time off from work to clear his head. (Robinson Dep., 110:15-20).

**Admit.**  He was preoccupied with the ever increasingly hostile actions towards himself and attempts to suspend him for fabricated infractions. (*Id.,* 110:23-25; 111:1).

63. Some time prior to May of 2016, Stacy Miller was helping a Sergeant with the McIntosh County Sheriff's Office with his narcotics investigations. (Alexander Dep., 210:22-211:7).

**Admit.** Miller was helping a Sergeant from the McIntosh County Sheriff's Office with the permission of her supervisor, Anthony Brown. (Alexander Dep., 216:23-217:10)

64. When Alexander learned that one such investigation had been handled in a manner that was "problematic" and likely illegal, he ordered his subordinates – Miller and Robinson – not to participate in any further investigations with the Sheriff's Office. (Id., 211:22-214:8).

**Admit.** It was an older order overridden as to miller when she was taken out of Alexander's command. (Alexander Depo., 216:8-217:10)

65. Robinson remembers the order as one "[not to] work with the sheriff's office at all."
(Robinson Dep., 125:1-7).

**Admit.**

66. The day after Howard spoke to Robinson about Robinson's apparent mental distress,
Alexander learned that Robinson had been present during a drug bust conducted by the McIntosh
County Sheriff's Office the night before. (Alexander Dep., 221:5-11; Robinson Dep., 116:10-
24).

**Denied.** Donnie Howard spoke to Robinson after he had been placed on two-week leave, and at
which point, Alexander had already attempted to  put him on Administrative leave for allegedly
calling verizon. ( Howard Dep., 311:5-8).

67. Alexander texted Robinson and Howard to arrange a meeting, which blew up the moment the
feuding friends came face-to-face. (Id., 221:15-222:11).

**Denied.** Both Howard and Robinson testified that Robinson did not speak during the meeting.
Alexander also stated that Robinson was not exemplifying any explosive behavior during the
meeting. (Robinson Dep., 125:13 – 126:11; Howard Dep.. 329:17 – 331:18;  Alexander Dep.,
228:25 – 230:24).

68. Alexander remembers the meeting starting with him asking Robinson, "Do you have a
problem with me?" and Robinson likewise remembers leading off by asking Alexander, "What is
your problem with me?" (Id., 222:23; Robinson Dep., 126:5-7).

**Admit.**

69. This testy exchange evidently did not lead to any answers, and Alexander proceeded to discuss Robinson's presence at the previous night's drug raid. (Alexander Dep., 223:8-10).

**Denied.** Alexander did not ask Robinson any questions about Robinson's alleged involvement, but rather read the riot act about working with the Sheriff's Office. (Robinson Dep., 124:9 – 126:11; Howard Dep., 329:17 – 331:18).

70. Although Alexander remembers Robinson affirmatively agreeing that he worked with the Sheriff's Office after being told not to, and Robinson only remembers staying silent in the face of Alexander accusing him of having done so, it is undisputed that Robinson did not deny having worked the raid. (Alexander Dep., 223:10; Robinson Dep., 125:13-126:11). Although Robinson testified that he did not actually perform any work during the raid, and instead was simply present at a staging area, it is undisputed that he did not provide this information to Alexander. (Robinson Dep., 124:9-25).

**Denied.**  See Statement of Material Fact 67 and 70 above. Robinson Dep., 125:13 – 126:11).

71. At that point, Alexander – who was also aware that Robinson and Miller continued riding in the same vehicle while on duty even after Robinson had returned from his suspension – was beyond flustered. (Alexander Dep., 165:16 166:11; Alexander Aff., ¶ 5).

**Denied.** Alexander testified that he did not document or present any other instances of Robinson and Miller  riding in the same vehicle aside from the February write up. (Alexander Dep., 164:24 – 166:12). Alexander also stated that he no longer kept up with Miller's actions after she was transferred to Brown's command. (Alexander Dep., 225:3-4).

72. Alexander told Robinson that he would be suspended for two weeks, and that Robinson should use that time to "get his priorities straight." (Alexander Dep., 229:13-15).

**Denied.**

73. After taking Robinson's gun, badge, and keys, Alexander departed the meeting room. (Id., 229:16-21).

**Admit.**

74. Howard, who was already concerned about Robinson's mental well-being, invited Robinson to come for a ride in his truck. (Howard Dep., 311:7-8).

**Admit.**

75. On the road, Robinson broke down: [During] that ride, he -- I'm sure he was upset about the fact that Ryan -those two were best friends for many years and it was his relationship with Stacy. During the conversation -- I don't remember any specifics in the conversation but he became very upset and distraught, just snot, crying on the side of his truck. I got concerned for him.  I said, can I get you any help?  And he said yes.  I said, so you want me to get you some help?  He said yes. I said okay, this is what we're going to do, I'm going to call a doctor, set you up an appointment. (Howard Dep., 311:7-21).

**Denied.** Robinson was stressed, but was not distraught or crying as Howard Claims. (Robinson Dep., 116:15 – 23).

76. Howard arranged for Robinson to meet with a mental health counselor in Brunswick. (Howard Dep., 311:22).

**Admit.**

77. Howard also fully overturned the discipline imposed by Alexander, instead giving Robinson two weeks of fully paid leave. (Id., 311:23-25; Alexander Dep., 209:3-21; Robinson Dep., 127:3-10).

**Admit.** Only in so far, as Howard did not document a suspension in Robinson's personnel file.

78. Finally, Howard followed up with the doctor multiple times, checking unobtrusively on Robinson's well-being. (Howard Dep., 312:15-21).

**Denied.** TJ Kidder testified Howard did follow up, but Kidder also contacted Howard. (Kidder Dep., 41:2-6).

79. While Robinson was out on leave, Alexander – who had long downplayed the extent of his troubles with Robinson and Miller in order to protect his friends – finally filled Howard in on the insubordination issues that had been plaguing the investigations division for the past year. (Alexander Aff., ¶ 6).

**Denied**. Alexander's Deposition Testimony contradicts this assertion in that he testified he did not document or present any additional information regarding the pair traveling together before he resigned and had no part in Robinson being demoted. (Alexander Dep., 164:24 -166:6).

80. Alexander told Howard that he would never have advocated for Robinson and Miller to be allowed to keep working together had he known that they would abuse the privilege, and informed Howard that the two investigators were still riding in the same vehicle while on duty even after Robinson was suspended for doing so. (Id., ¶ 7).

**Denied**

81. Howard concluded that there was no way to solve the issue but to remove either Robinson or Miller from the investigation division, and decided that Robinson would be the one to transfer to patrol because Miller served a more indispensable role as the criminal investigation officer. (Howard Aff., ¶¶ 2,3).

**Denied.** The affidavit conflicts with the testimony from depositions of Howard and Alexander. See the above Statement of Material Facts 59, 71, and 79.

82. Shortly after Howard made the decision to move Robinson to patrol, toward the end of May 2016, Alexander tendered his resignation to Howard. (Howard Dep.,221:19-23).

**Denied.** Alexander testified he had no part in transferring Robinson to patrol, which would require him to have already resigned. (Alexander Dep., 231:232:16). Howard gave conflicting time frames and reasons for the demotion. (Howard Dep., 237:6-258:14).

83. Although this left Howard without a narcotics investigator, Howard felt that he could not allow Robinson and Miller to work together anymore, and he elected to leave the narcotics position vacant. (Id., 237:11-15).

**Denied.** See the Statement of Material Fact 82 above. Davis testified Howard told him he was going to give narcotics a break and that Robinson was over narcotic investigations at that time. (Davis Dep., 141:11-142:2). He further testified that Howard felt it was not fair that Alexander was gone and that Robinson and Miller were still at Darien Police Department. (Davis Dep., 142:10-143:23).

84. Robinson returned from leave and was informed that he was being transferred to patrol. (Robinson Dep., 131:13-24).

**Admit.**

85. To put it mildly, Robinson is highly disdainful of the patrol position with the Darien Police Department: [T]he City of Darien Police Department does not work patrol.  They're a traffic unit.  They're an entire police department with traffic cops. I worked patrol my entire career.  So I know how to work patrol, but it is not a patrol unit. It's an entire unit of let's see how many tickets we can write.  That is not patrol.  That is the opposite of patrol.  That is traffic. . . . I'm not a ticket writer.  You could teach a dog how to write a ticket.  That takes no policing ability.  All you do is sit on the interstate, wait for a machine to go ding, chase that car and write a ticket.  Get back.  Wait for it to go ding.  Chase that car and write a ticket. That is not patrol. (Robinson Dep., 152:16-153:7).

**Denied.** Robinson explained in detail that he enjoyed actual patrolling in the community and that he disliked focusing on speeding tickets on the interstate. (Robinson Dep., 152:8-154:24).

86. In fact, Robinson flatly states that he refuses to refer to the work performed by Darien Police Department officers as "patrol," coining instead the term "traffic duties." (Id., 153:18-20).

**Admit.** As explained above in the Statement of Material Fact 85.

87. Robinson told multiple coworkers and supervisors that he would be "no good" as a patrol officer, and that he was a "bad fit" for the position. (Id., 153:15-17; Brown Dep., 272:8-13).

**Admit.** Robinson expressed his frustrations with being demoted and his opinions as explained in Statement of Material Fact 85.

88. In his deposition, he testified that he would be lying if he said he could or would do the work of a Darien patrol officer. (Id., 153:12-14).

**Denied.** Robinson said that he had always done patrol. See Statement of Material Fact 85.

89. After beginning the patrol job in early June of 2016, Robinson spent the month failing to notify dispatch when he went on and off duty, failing to answer calls from his supervisors, and failing to complete necessary incident reports. (Brown Dep., 240:1-15).

**Denied.**

90. He received informal verbal counseling about these issues from both his direct supervisor, Joseph Creswell, and the head of the patrol division, Anthony Brown. (Id., 242:2-243:7).

**Denied.** Brown ultimately testified he thinks that he told Creswell to counsel Robinson (Brown Dep. 242:2-243:7). Creswell testified he was never ordered to counsel any officer regarding notification to dispatch. (Creswell Dep., 146:17-148:4).

91. The owner of B&J's seafood, a popular all-you-can-eat buffet in Darien, has an agreement with the Darien Police Department whereby off-duty officers provide private security services for the restaurant. (Dowling Aff., ¶ 3).

**Admit.**

92. The owner, Terry Dowling, arranges this security service through Anthony Brown. (Id., ¶ 4).

**Admit.**

93. For a time, Robinson was one of the officers who provided security services to B&J's, but this arrangement stopped when Dowling complained to Brown that he kept finding Robinson asleep in his truck or even in the dining room of the restaurant during the shift. (Id., ¶¶ 6, 7; Robinson Dep., 136:17-23).

**Denied.** Robinson had resumed providing security services before the relevant time involved in this case. (Robinson Dep., 136:7-137:24)

94. When Robinson told Brown that he was having a tough time financially, though, Brown asked Dowling to give Robinson another chance to work security, and Dowling agreed. (Dowling Aff., ¶ 8; Robinson Dep., 137:9-12).

**Denied.**

95. Unfortunately, Dowling once again found Brown sleeping in his truck during the security shifts, and again told Brown that he did not want Robinson working security for the restaurant anymore. (Dowling Aff., ¶¶ 9-11).

**Denied.** Brown testified the decision to no longer permit Robinson to provide security services was not based on sleeping, but on the fact the couple made B&J's employees uncomfortable. (Brown Dep., 185:23 – 187:19, Robinson Dep., Ex. 10).

96. On June 8, 2016, Brown texted Robinson to inform him that "they [don't] want you or Stacy working B&J's again because of the conflicts between you all and some of the workers." (Robinson Dep., Ex. 10).

**Admit.**

97. Two years later, no one is exactly certain what the "conflicts" were, but Dowling says that he did not want Robinson working security anymore because he continued falling asleep in his truck. (Dowling Aff., ¶¶ 11-14; Robinson Dep., 136:2-6, Ex. 9, p. 2-5).

**Denied.** See Statement of Material Fact 95.

98. In Robinson's case, and at least once in Miller's, there was no officer available to walk employees to their cars in the dark parking lot at the ends of their shifts, which is one of the critical duties of the position. (Dowling Aff., ¶¶ 3, 6, 12).

**Denied.** See Statement of Material Fact 95.

99. Brown recalls Dowling telling him that he did not want Robinson and Miller to work security because he "didn't want to have his employees feeling uncomfortable," likely because Robinson and Miller failed to provide the requisite parking lot security and visible security presence inside the often boisterous restaurant during their shifts. (Brown Dep., 187:8-13).

**Denied.** See Statement of Material Fact 95.

100. In response to a text from Joseph Creswell asking "They said u couldn't go there or eat there or anything[?]", Robinson responded, "Nope. Just asked Brown not to let us work there . . ." (Robinson Dep., Ex. 10).

**Admit.** Robinson testified he believed he was unwelcome at the restaurant. (Robinson Dep., 139:9-144:16).

101. And Dowling has testified that Robinson actually came into the restaurant in late June of 2016 to pick up a carryout order, apologizing as he did so for sleeping during security details. (Dowling Aff., ¶ 17).

**Denied.** Robinson testified he believed he was unwelcome at the restaurant. (Robinson Dep., 139:9-144:16, Robinson Dep. Ex. 10).

102. Given a chance to agree in his deposition that he truly thought he was not allowed to go in the restaurant, Robinson demurred, acknowledging that the issue was really that he did not want to go in the restaurant anymore. (Robinson Dep., 140:3-10).

**Denied.** See Statement of Material Facts 100 and 101.

103. At any rate, on the morning of June 26, 2016, Robinson was dispatched to a call at B&J's. Over the police radio – a public channel – he stated, "I'm not allowed inside that establishment." (Brown Dep., Ex. 10, p. 9).

**Admit.**

104. Robinson admits that he knew he could be on the premises of B&J's for work purposes, if nothing else, but that because he "didn't feel welcome," he told the dispatcher that he was "not allowed" to go in and that the complainant would have to come outside. (Robinson Dep., 143:20-24).

**Denied.** See Statement of Material Facts 100 and 101.

105. When Brown learned that Robinson had said this, he was livid. (Brown Dep., 275:4-7).

**Admit.**

106. It was a flat-out lie, and one that reflected poorly on the Darien Police Department to anyone who assumed it was true. (Id., 274:14-275:6).

**Denied.** See Statement of Material Facts 95,100, and 101.

107. Coming at the end of a month of Robinson making good on his promise to be "no good" on patrol, from an employee who was already troubled before he wound up under Brown's command, it was "the last straw." (Id., 271:22, 272:8 273:3).

**Denied.** See Statement of Material Fact 85.

108. Anthony Brown, intent on terminating Robinson, sought out Chief Howard. (Brown Dep., 271:10-22).

**Denied.**

109. Howard, meanwhile, was eating lunch at a local restaurant when he was approached by the fire chief, who "ma[de] a big deal" about the fact that one of Howard's employees was "banned from B&J's." (Turner Dep., 39:10-13; Howard Dep., 275:22-276:1).

**Admit.**  And further shows, that Brown was also present. (Brown Dep., 230:1-231:15).

110. Howard was deeply embarrassed, and quickly decided that serious discipline was called for, either because he had an officer who had gotten himself banned from a local restaurant and had not told Howard about it, or because he had an officer who had lied and said that he was banned when he wasn't. (Howard Aff.,¶ 4 ).

**Denied.** Turner testified he was also present and that Howard did not know which officer made the comment at that time. (Turner Dep., 40:9-41:6).

111. Brown arrived to join Howard at the restaurant, and when Howard told him what the fire chief had just reported, Brown informed Howard that it was Robinson who had made the comment over the radio and that it was a blatant lie. (Id., ¶ 5; Brown Aff., ¶ 3).

**Denied.** Brown's Deposition Testimony contradicts this timeline in that he originally testified he was at lunch with Howard when the Fire chief approached them. See the Statement of Material Fact 109. (Brown Dep., 230:1-231:15)

112. After bringing Chief Howard up to speed on Robinson's spotty performance and poor attitude since moving to patrol, Brown asked Howard for permission to terminate Robinson's employment. (Brown Aff., ¶ 4).

**Denied.** Robinson had not been counseled or disciplined by his superior before his termination and further, Creswell testified he had not pulled C.A.D. Reports until later, on June 27th. (Creswell Dep., 194:17-195:4)

113. Howard, mindful of the significant and unrepentant subordination in which Robinson had been engaged for more than a year as well as the newly arisen issues, agreed that Brown could let Robinson go. (Howard Aff., ¶ 7).

**Denied.** See the above Statement of Material Facts 71,79,82,83, and 90.

114. However, still wanting to "help [Robinson] out as much as possible," Howard told Brown that he did not want to terminate Robinson, and that they would instead give Robinson thirty days to find new employment. (Brown Dep., 271:23 272:2).

**Denied.** Robinson testified he was originally given 60 days. (Robinson Dep., 156:4-21).

115. Brown called Robinson on June 27, 2016, to tell him that he would need to find a new job within thirty days. (Robinson Dep., 147:24-148:3, Ex. 14, p. 3).

**Denied.** See the above Statement of Material Fact 114.

116. There is some evidence that Robinson initially believed he had sixty days or requested that he be given sixty days instead, but on July 5, 2016, he pointedly did not speak to Chief Howard in the hallway at work, which Howard felt was "childish." (Howard Dep., 280:1-3).

**Denied.** Plaintiff's direct testimony is that he was given 60 days. See Statement of Material Fact 114 and 118.

117. Howard made clear at that time that Robinson would not be getting any more than the thirty days he had been given to find a job. (Id.).

**Denied.** See Statement of Material Fact 114.

118. When Brown informed Robinson that he would, indeed, only be getting the initial thirty-day period to find a new job, Robinson protested that "I literally have not said a word to [Howard]!!" (Robinson Dep., Ex. 12).

**Denie**d. Brown informed Robinson he would now be given 30 days in direct response to Robinson's question as to why it went from 60 to 30 days. (Robinson Dep. 219:16-220:7)

119. Any question as to whether Robinson understood that this meant he had thirty days from June 27, 2016, or he somehow concluded that he got a new thirty-day window starting on July 5, 2016, is resolved by a text Robinson sent to fellow patrol officer Jeremy Owens. (Robinson Dep., 157:18-158:2).

**Denied** See Statement of Material Facts 114 and 118.

120. On July 13, 2016, Robinson told Owens that he was "trying to find a job," and noted, "only have 2 weeks before my 30 days runs out." (Robinson Dep., Ex. 13).

**Admit.** Admitted that the quotes came from his text messages. (Robinson Dep., Ex.13)

121. July 27 came and went, and Robinson neither found a new job nor handed in his resignation to the Darien Police Department. Robinson's rationale was that, as far as he knew, "the City of Darien had never terminated anybody," and he "figured they'd be like, 'hey, it's time for you to go' once it got to that point." (Robinson Dep., 168:5-7).

**Denied.** Robinson relied on the Chief's actual practice. Everyone resigned except one person and his direct supervisor, Creswell, told him in text message he did not know why he was being punished, no one had complained to him about Robinson and it would hopefully bow over.

122. Although he could have handed in his resignation at any time during the thirty day window (or the days that followed), and no one ever told him he could have more time or that he was no longer required to leave the City's employ, Robinson assumed that someone would prod him to produce a resignation rather than terminate him after the thirty days expired. (Id., 168:18-169:8).

**Denied.** Even if Plaintiff has tendered his resignation on earlier date the Chief would still not have accepted it, like with Roundtree.

123. When Robinson was out of town on vacation on his thirtieth day, Brown began marshaling the documents necessary for a termination. (Brown Dep., 309:5-12).

**Denied.**

124. Finally, on August 3, 2016 – 37 days after Robinson was given 30 days to leave voluntarily – Robinson was terminated. (Brown Dep., Ex. 10).

**Denied.** He was originally given 30 days. See Statement of Material Fact 114.

125. Following the termination meeting, which was conducted by Creswell after Brown accidentally slept through it, Robinson asked Brown if it would be possible for the termination to be revoked so he could tender a resignation. (Creswell Dep.,:3-11; Brown Dep., 315:14-24).

**Admit.**

126. Although Robinson apparently wanted to be allowed to provide a voluntary resignation, Brown understood Robinson's request to be one to tender a resignation in lieu of termination, and that is the request that Brown communicated to Howard. (Robinson Dep., 186:25; Brown Dep., 318:8-25).

**Denied.**  Robinson communicated only a request to tender resignation in lieu of termination.  Howard testified it was possible Brown had requested for Robinson to resign instead of being terminated. (Brown Dep., Ex. P-11, Howard Dep., 307:15-308:24)

127. Howard granted the request that had been presented to him by Brown, agreeing that Robinson's dismissal could be reported to POST as a resignation in lieu of termination rather than a termination. (Brown Dep., 317:20-22).

**Denied.**  Howard testified that the answer was no. (Howard Dep., 307:24-308:24, Brown Dep., Ex. P-11).

128. Despite the fact that a resignation in lieu of termination is treated more favorably by POST, which automatically investigates any termination but has discretion as to whether to investigate a resignation in lieu of termination, Robinson turned down the opportunity to tender a resignation in lieu of termination. (Robinson Dep., 187:2-7; Brown Dep., 317:18-24).

**Denied.** When Robinson responded to Brown on August 5, 2016 he stated that he had already been terminated. (Brown Dep., Ex. P-11.)

## CONCLUSIONS OF LAW

1.    Defendant Alexander was acting outside the scope of his discretionary authority, therefore he is not entitled to qualified immunity. *Estate of Cummings v. Davenport*, 906 F.3d 934 (11th Cir. 2018); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).

2.    Defendants Howard, Creswell and Alexander are not entitled to qualified immunity on Plaintiff's claim under 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment as well as 1981 because they violated clearly established law which prohibits demotions, transfers, and/or termination on the basis of race. *Ham v. City of Atlanta, Ga.*, 386 F. App'x 899, 905 (11th Cir. 2010); *Rioux v. City of Atlanta,* 520 F.3d 1269, 1283 (11th Cir.2008); *Lawson v. Curry*, 244 F. App'x 986, 988 (11th Cir. 2007); *Bogle v. McClure, 332 F.3d 1347, 1355 (11st Cir. 2003); Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1321 (11th Cir.2000).   Additionally, Defendants Howard, Creswell and Alexander are not entitled to qualified immunity under *Foy* framework because they are unable to point to indisputable evidence in the roecord in support of an adequate lawful motive. *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003); *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1295 (11th Cir. 2000); *Foy v. Holston*, 94 F.2d 1528 (11th Cir. 1996).

3.    Defendants Howard, Creswell and Alexander are not entitled to qualified immunity  on Plaintiff's claim under 1983 for violations of his First Amendment right of intimate association because they violated clearly established law that dating is a type of protected associational activity. *Lawson v. Curry*, 244 F. App'x 986, 988 (11th Cir. 2007) (citing *Loving v. Virginia,* 388

U.S. 1, 10-11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967)); *Foy v. Holston*, 94 F.2d 1528 (11th

Cir. 1996)

      Submitted this 11th day of February, 2019.

By:  /S/ Katie S. Mitchell_____
Katie S. Mitchell
Georgia Bar No.  106088

/S/ Scott G. Reddock
Scott G. Reddock
Georgia Bar No.  476162

MITCHELL & REDDOCK, LLC
Attorneys for Plaintiff
111 West Court Street
Hinesville, Georgia  31313
Phone:  (912) 332-7077
mandrlawoffice@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **KORONE ROBINSON,** | ) | |
| | ) | |
|    **Plaintiff,** | ) | |
| **vs.** | ) | |
| | ) | **CIVIL CASE NO. 2:17-cv-99** |
| | ) | |
| **CITY OF DARIEN, DARIEN POLICE** | ) | |
| **DEPARTMENT, DONNIE HOWARD,** | ) | |
| **RYAN ALEXANDER AND** | ) | |
| **JOSEPH CRESWELL,** | ) | |
|    **Defendants.** | ) | |
| | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

    This is to certify that I have this day served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing.

    Submitted this 11th day of February, 2019.

                By:  /S/ Katie S. Mitchell_____
                    Katie S. Mitchell
                    Georgia Bar No.  106088

                    /S/ Scott G. Reddock
                    Scott G. Reddock
                    Georgia Bar No.  476162

                    MITCHELL & REDDOCK, LLC
                    Attorneys for Plaintiff
                    111 West Court Street
                    Hinesville, Georgia  31313
                    Phone:  (912) 332-7077
                    mandrlawoffice@gmail.com