# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

KORONE ROBINSON,         *

     Plaintiff,       *

                   *

     v.               *       NO. 2:17-CV-99

                   *

CITY OF DARIEN, DONNIE HOWARD,  *
RYAN ALEXANDER, and JOSEPH     *
CRESWELL,                 *

     Defendants.     *

                   *

FILED
Scott L. Poff, Clerk
United States District Court

By cashell at 3:13 pm, Apr 16, 2019

## ORDER

Before the Court is Defendants Donnie Howard, Ryan Alexander, and Joseph Creswell's, in their individual capacities, Motion for Summary Judgment on the basis of qualified immunity. Dkt. No. 46. This Motion has been fully briefed and is ripe for review. For the following reasons, Defendants' Motion is **GRANTED in part and DENIED in part.**

## BACKGROUND

On January 22, 2019, the Court issued an Order denying Defendants' Motion for Summary Judgment,[1] dkt. no. 45, on Plaintiff's claims of racial discrimination under 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. §§ 1981 and 1983, intimate

---

[1] However, the Court did grant the motion with respect to the Darien Police Department as it is an entity incapable of being sued. See Dkt. No. 45 at 60.

association under the First Amendment, and conspiracy under 42 U.S.C. § 1985 against the Defendants. Specifically, the Court found that genuine disputes of material fact made summary judgment on Plaintiff's claims improper. In that Order, the Court noted that Defendants had raised, for the first time, in their supplemental brief the defense of qualified immunity. Dkt. No. 45 at 54 n.14. The Court declined to address the qualified immunity defense because Defendants had not met their burden to show a discretionary function and Plaintiff had no opportunity to respond to the qualified immunity argument. Id. However, the Court gave leave to the Defendant to move for summary judgment based on qualified immunity in a separate motion to be filed within ten days of the Order. Id. The Court indicated that the Plaintiff would have ten days to respond. Id.

On February 1, 2019, Defendants Howard, Alexander, and Creswell filed a Motion for Summary Judgment arguing that they are entitled to qualified immunity in their individual capacities from Plaintiff's discrimination claims under § 1983 for violation of the Equal Protection Clause and Plaintiff's First Amendment intimate association claim.[2] Dkt. No. 46. Plaintiff responded to

[2] Defendants assert qualified immunity from Plaintiff's claims under § 1981 and § 1983. Dkt. No. 46-1 at 8. However, Plaintiff's § 1981 claim, Count II of the Complaint, dkt. no. 1 at 21, was only asserted against the City of Darien—a separate defendant not before the Court in this Motion. Thus, the Court will only analyze Defendants' qualified immunity arguments with respect to the § 1983 claims of discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and interfering with Plaintiff's right to intimate association under the First Amendment.

Defendants' Motion disputing the qualified immunity defense. Dkt. Nos. 49, 51.[3]

As the Court described the factual background and evidence in this case in lengthy detail in its prior Order, it will not reiterate all of those facts here. Rather, all of the facts from the prior summary judgment Order, dkt. no. 45 at 1-18, are incorporated herein by reference. However, Plaintiff has submitted new evidence into the record since the Court's prior Order.

First, Plaintiff submitted copies of the Darien Personnel Policies and Procedure manual ("City Manual") and the Darien Police Department's "Standard Operating Procedure" ("SOP"), which set forth, among other things, the city and police department's policies for discipline. Dkt. Nos. 48-2, 48-3. The relevant sections of those documents are discussed in the analysis below. Plaintiff also submitted the deposition testimony of Dr. Kidder, the counselor who Plaintiff saw upon Howard's recommendation during Plaintiff's two-week suspension. Dkt. No. 48-1. This testimony provides support for Plaintiff's claims that he was experiencing negative treatment at work because of his relationship with Miller. The relevant statements from the testimony are included below. Finally, Plaintiff also submitted

---

[3] Plaintiff filed an initial response at dkt. no. 49 but then filed an amended response to correct formatting errors at dkt. no. 51. From here on, the Court will cite to the amended response, dkt. no. 51.

AO 72A
(Rev. 8/82)

a second affidavit in which he explains more details about his relationship with Miller, and specifically, he explains when Miller divorced her ex-husband. Dkt. No. 48-5. These facts are also discussed further below.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges

4

this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).   Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.  Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033–34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

Defendants assert that they are entitled to qualified immunity from Plaintiff's claims under § 1983 for discrimination in violation of the Equal Protection Clause and interfering with Plaintiff's right to intimate association under the First Amendment.   Plaintiff responds that Defendant Alexander is not

entitled to qualified immunity because he was not performing a discretionary function within the scope of his authority, and even if he was, all three Defendants violated Plaintiff's clearly established constitutional rights.

Qualified immunity grants "complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). The Eleventh Circuit has summarized the qualified immunity framework as follows:

> To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law.

Estate of Cummings v. Davenport, 906 F.3d 934, 940 (11th Cir. 2018), petition for cert. filed., No. 18-1191 (U.S. Mar. 3, 2019). The Plaintiff's burden is divided into a two-step inquiry. "First, the court must ask whether the plaintiff's allegations, if true, establish the violation of a constitutional or statutory right. If a constitutional or statutory right would have been violated under the plaintiff's version of the facts, the next step is to ask whether the right was clearly established." Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003) (citations omitted). The

Court has discretion to analyze these two-steps in either order. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

## I.   Discretionary Function

Plaintiff first argues that Alexander is not entitled to qualified immunity because the adverse actions that he took against Plaintiff were not within the scope of his discretionary authority. Defendants argue that Alexander was acting within the scope of his discretionary authority to administer discipline.

"To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." <u>Estate of Cummings</u>, 906 F.3d at 940 (citation omitted). "In other words, '[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize.'" <u>Id.</u> (citation omitted). "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," rather, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d 1271, 1282 (11th Cir. 1998). "[A] government official can prove he acted within the scope of

AO 72A
(Rev. 8/82)

his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" Estate of Cummings, 906 F.3d at 940 (citation omitted). However, "[a] bald assertion by the defendant that the complained-of actions were . . . within the scope of his discretionary authority is insufficient." Id. (quotation and citation omitted). In conducting this analysis, the Court must not characterize the issue of an officer's discretion too narrowly or at too high of a level of generality; instead, the Court should "consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004) (explaining, for example, that for a proper characterization for an alleged use of excessive force claim, "we do not ask whether police have the right to use excessive force" or "immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest," but "instead ask whether they have the power to attempt to effectuate arrests").

Here, the proper question is whether Alexander's duties and scope of authority included administering discipline to officers under his command for violations of Chief Howard's orders, his own orders, or other police department policies. In short, the answer

8

to this question is yes.  In this case, Alexander was at all times under Chief Howard's command and also Plaintiff's immediate supervisor.  Both sides agree that the vehicle order, whatever its actual terms, came from Howard through Alexander to Plaintiff and Miller.  Thus, Alexander, as Robinson's immediate supervisor, was entrusted with enforcing that order along with any other directions from Howard concerning Alexander's subordinates—including department vehicle policies set by Howard.  So whether Plaintiff's reprimand and three-day suspension in February 2016 was for taking a work vehicle to Atlanta or for riding in the vehicle with Miller against Howard and Alexander's order, Alexander was operating within his capacity as Plaintiff's supervisor and under the authority given by Howard to administer discipline to Plaintiff.

As for the two-week suspension in May 2016, Alexander was acting in his capacity as Plaintiff's supervisor and head of narcotic investigations when he told Plaintiff and Miller to not work with the sheriff's office, and he acted pursuant to his authority as Plaintiff's supervisor when he suspended him for allegedly participating in an investigation with the sheriff's department.  Therefore, Alexander was performing his duties and within his authority as Plaintiff's supervising officer when he administered discipline by reprimanding Plaintiff and suspending him for three days in February 2016 and suspending for two-weeks in May 2016.  In other words, these suspensions, "if done for a

AO 72A
(Rev. 8/82)

proper purpose, would be within, or reasonably related to, the outer perimeter of" Alexander's "discretionary duties" as the head of the narcotics investigation unit and Plaintiff's immediate supervisor. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998).

Plaintiff points to various sections of the City Manual and the Darien Police Department's SOP to argue that Alexander's actions fell outside of his discretionary function. However, the Court cannot say that based on the provisions of these documents highlighted by Plaintiff that Alexander's actions fell outside of his authority as Plaintiff's direct supervisor. In general, just because Alexander allegedly may not have followed proper procedure under the City Manual or SOP in suspending Plaintiff, it does not necessarily mean that he lacked the authority under his job position to do so. For example, Plaintiff argues that Alexander was required to give Plaintiff three-days notice before suspending him, but just because Alexander may have violated this provision does not mean he could not otherwise suspend Plaintiff.

Indeed, Section IV-A-3 of the SOP gives "[a]n immediate or higher level supervisor . . . authority to immediately relieve an employee from duty if the retention of such employee will cause or continue a disruption of the workforce" and then give a recommendation for the appropriate disciplinary action to the department head within one day. Dkt. No. 33-23 at 7. Moreover,

10

the SOP does not require notice for conditions such as "gross insubordination or misconduct" or "any violation of department rules or regulations that would submit the violating employee to immediate dismissal." Id. at 7-8. Finally, the SOP states that "a supervisor may suspend an employee up to ten days without prior approval of the Chief of Police" with any suspension longer than ten days requiring approval from the Chief of Police. Id. at 8. So here Alexander either had authority to give these suspensions on his own, or he had that authority through Howard who approved of both suspensions.[4]

Plaintiff only challenges Alexander's discretionary authority, but Defendants also independently show that Howard as the Chief of the Darien Police Department and Creswell as Plaintiff's immediate supervisor in the summer of 2016 also acted within the scope of their discretionary authority in their actions involving Plaintiff. Thus, Defendants have met their burden, and the burden shifts to Plaintiff to show a violation of clearly established law.

---

[4] Even though Howard allowed Plaintiff to be paid during his two-week suspension, he still confiscated his gun and badge and did not allow Plaintiff to return to work prior to the end of the suspension period. See Dkt. No. 33-13 at 8 ("It will be mandatory for an officer suspended for more than ten (10) days to surrender his/her departmental issued weapon(s), badge and identification card.").

O 72A
Rev. 8/82)

## II. Discrimination Claims

The Court will address qualified immunity with respect to Plaintiff's § 1983 claims for discrimination under the Equal Protection Clause first.[5]

### A. Violation of a Constitutional Right

In its prior Order denying Defendants' motion for summary judgment, dkt. no 45, the Court, reading the facts in the light most favorable to Plaintiff, found that Plaintiff had met his burden under the McDonnel Douglas framework to establish a claim of intentional discrimination against the Defendants. In so finding, the Court explained that genuine disputes of material fact existed as to the issue of Defendants' alleged discrimination, thereby making summary judgment in their favor inappropriate. Because the Court already found that under Plaintiff's version of the facts, he met his burden to establish a case for intentional discrimination, it must also find that Plaintiff has established a violation of a Constitutional right—the right to be free from racial discrimination under the Equal Protection Clause—under the

---

[5] The Eleventh Circuit has held that while Title VII claims must be asserted against government defendants in their official capacities—thus making qualified immunity inapplicable—claims under § 1983 may be asserted against such defendants in their individual capacities—meaning that those defendants can assert qualified immunity. Wu v. Thomas, 996 F.2d 271, 273 (11th Cir. 1993) ("Qualified immunity is no defense to a Title VII action. But defendants could assert qualified immunity once plaintiffs tried to recover damages under section 1983 for the alleged Title VII violation."). Defendants concede this point. Dkt. No. 46-1 at 8. Therefore, the qualified immunity analysis here only applies to Plaintiff's discrimination claims under § 1983, not Plaintiff's Title VII claim.

72A
v. 8/82)

first prong of the qualified-immunity analysis.  <u>Hudson v. City of</u> <u>Atlanta</u>, 685 F. App'x 740, 743 (11th Cir. 2017) (citing <u>Lee v.</u> <u>Ferraro</u>, 284 F.3d 1188, 1190 (11th Cir. 2002)) ("[F]or qualified immunity, we must determine whether [the plaintiff's] rights were violated under [the plaintiff's] version of the facts.").

To briefly reiterate Plaintiff's version of the facts of this case, Plaintiff, an African-American male, began dating Miller, a white female, sometime in the late summer of 2015, and that relationship became public knowledge around December 2015 or January 2016 at which time Alexander and Howard became aware of the relationship.  <u>See</u> Dkt. No. 27-1 at 57, 74-75, 120, 122; Dkt. No. 34 at 7; Dkt. No. 27-3 at 161; Dkt. No. 27-6 at 27-28.  At this point, Robert Gault and Harvey Prater noticed a change in attitude toward Plaintiff and Miller and that they were "disciplined more often."  <u>See</u> Dkt. No. 33-18 at 1; Dkt. No. 27-5 at 146.  Shortly thereafter in February 2016 Plaintiff and Miller were reprimanded and Plaintiff was suspended for riding in the same vehicle together without receiving permission from Alexander and for taking a work vehicle to Atlanta without permission.  <u>See</u> Dkt. No. 27-2 at 27; Dkt. No. 27-3 at 163.  Plaintiff understood the previously imposed order about riding in the car together to just be that he was supposed to let Alexander know when he was

O 72A
Rev. 8/82)

riding in the car with Miller,[6] see dkt. no. 27-1 at 98-99, and Harvey Prater indicated to Plaintiff that the reprimand and suspension was really about his riding in the car with Miller, not taking the car to Atlanta, see dkt. no. 27-1 at 98-99.  A short time later on May 3, 2016, Alexander suspended Plaintiff for two weeks for allegedly working with the McIntosh County Sheriff's Office against Alexander's orders not to participate in any investigations with the sheriff's office, but Plaintiff had not actually worked with them.  See Dkt. No. 27-3 at 210; Dkt. No. 33-4 ¶ 15; Dkt. No. 27-10 at 32; Dkt. No. 27-6 at 37.  Miller, on the other hand, who had worked with the Sheriff's Office, was not suspended.  See Dkt. No. 45 at 26-27.  Then, after Plaintiff returned from his suspension and after Alexander left to patrol, Howard demoted Plaintiff from being the head of narcotics investigations and gave conflicting explanations as to why he made that decision.  See Dkt. No. 27-1 at 131; Dkt. No. 27-5 at 147-48; Dkt. No. 27-4 at 237.  Miller, who Howard characterized as more indispensable as a criminal investigator, was not demoted to patrol but instead maintained her position as a criminal investigator.  See Dkt. No. 27-13 ¶ 3.

---

[6] Plaintiff stated in his affidavit that he and Miller would notify Alexander of when they road together with texts and voicemails, but he also testified that he did not always follow the order.  See Dkt. No. 33-4 ¶ 2 ¶ 5; Dkt. No. 27-1 at 94-96.

AO 72A
Rev. 8/82)

In June 2016, Plaintiff was told that he and Miller were no longer allowed to work private security at B&J's, a local seafood restaurant, because the owner, Terry Dowling, said that they made people uncomfortable.  See Dkt. No. 27-2 at 33; Dkt. No. 27-8 at 184, 186-87.  Moreover, Alexander and Howard's wives worked at B&J's.  See Dkt. No. 27-1 at 138; Dkt. No. 27-8 at 186.  On June 26, 2016, Plaintiff received a call from 911 dispatch about an incident at B&J's, but he responded over the radio that he "was not allowed inside that establishment."  Dkt. No. 26-2 ¶ 103.  The next day, Howard decided to fire Plaintiff.  See Dkt. No. 27-13 ¶¶ 4-7.  After Howard made this decision, Officer Brown had Officer Creswell collect information about Plaintiff off of the CID reports to begin the process of Plaintiff's termination.  See Dkt. No. 27-9 at 157-60, 174-75; Dkt. No. 27-8 at 242-244.  Officer Brown informed Plaintiff that he had 30[7] days to find a new job.  See Dkt. No. 27-1 at 147-48.  On August 3, 2016, Plaintiff was terminated.  Dkt. No. 33-11 at 1-6.

In addition, Plaintiff has established that Howard had on two previous occasions made racist comments.  First, while discussing the topic of interracial dating and standing outside of B&J's, he told another officer that when he heard his daughter was dating a black man, he became physically ill.  See Dkt. No. 27-10 at 16;

---

[7] While the initial number given to Plaintiff is in dispute, texts show that Brown told Plaintiff the number was 30 a few days later.  See Dkt. No. 45 at 14; Dkt. No. 27-2 at 36.

15

Dkt. No. 27-4 at 259-61; Dkt. No. 27-5 at 155.   Second, he told a story at the police department office that when he was younger he placed watermelons on the road, waited for African Americans to come by to pick up the watermelons, and shot those African Americans with a BB gun.   See Dkt. No. 27-4 at 259.   Finally, Alexander took a Nazi flag that Plaintiff found in the trunk of a patrol car and hung it on his desk in the office that he shared with Plaintiff.   See Dkt. No. 33-20; Dkt. No. 34 at 3; Dkt. No. 33-4 ¶ 16.   Howard was aware of the flag, and it was hung up in the office again after the police department moved locations.   See Dkt. No. 27-4 at 265; Dkt. No. 33-1 at 30; Dkt. No. 33-21.

In addition to these facts discussed at length in the Court's previous Order, Plaintiff has also presented new facts supporting Plaintiff's claims for discrimination based on the deposition testimony of Thomas Kidder, the counselor with whom Howard arranged for Plaintiff to meet after Plaintiff was given the two-week suspension.   Notably, Kidder testified that based on his notes from his meeting with Plaintiff, it was not relationship trouble that was distressing Plaintiff as Defendants argue; rather, it was issues at work. Dkt. No. 48-1 at 34-35.   Specifically, Plaintiff indicated that "[t]here's something going on with [Alexander]" and that Alexander was "being difficult."   Id. at 33-34.   Plaintiff expressed that "[t]hey're trying to ruin my job . . . they're trying to ruin my life," and that he did not know why.   Id. at 34.

16

Kidder testified that Plaintiff "had worries that the concerns were involving with whomever his girlfriend was" and that "they weren't happy he was seeing whoever this girl is." Id. at 34.

Based on all of this evidence in Plaintiff's version of events, he can establish a prima facie case under either the McDonnel-Douglas framework or the other evidence of discrimination standard and can show that Defendants' asserted non-discriminatory reasons are pretext as explained in the Court's prior Order. Specifically, this version of events shows that in the eight months after Plaintiff's interracial relationship with Miller became public, he received increasingly harsher punishments from Alexander and Howard ultimately leading to his termination from the police department by Creswell, and these events unfolded in light of evidence about Howard and Alexander's views on race such as Howard's stories and the Nazi flag. While numerous factual disputes exist in this case, taking Plaintiff's version of events, the Court finds that a reasonable jury could conclude that Howard, Alexander, and Creswell discriminated against him in violation of the Equal Protection Clause.[8] Thus, Plaintiff meets the first prong of the qualified immunity analysis.

---

[8] It is important to note for this analysis that after the Court issued its first Order, dkt. no. 45, denying Defendants' motion for summary judgment, the Eleventh Circuit changed its rule regarding the definition of a comparator in the prima facie analysis for employment discrimination claims. Lewis v. City of Union City, No. 15-11362, 2019 WL 1285058, at *1 (11th Cir. Mar. 21, 2019). However, the new rule does not change the Court's prior findings regarding comparator evidence. In Lewis, the Eleventh Circuit held that "a plaintiff asserting an intentional-discrimination claim under McDonnell Douglas must

## B. Clearly Established Law

Turning to the second prong of the qualified immunity analysis, Plaintiff must show that Defendants were on notice that when they subjected Plaintiff to the various adverse actions in this case that they were violating clearly established law.  As a general matter, the right to be free from racial discrimination in the workplace, which includes discrimination based on interracial relationships, is clearly established in this Circuit.  See Rioux v. City of Atlanta, 520 F.3d 1269, 1283 (11th Cir. 2008) (agreeing

---

demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'"  Id. at *2.  The court determined that the prior cases using the "nearly identical standard" imposed too high of a burden while the "same or similar" standard used in other cases was too low of a threshold.  Id. at *7-*8.  The Court also rejected another test used by the Seventh Circuit.  Id.

This Court used the "nearly identical" standard to determine that Miller was a comparator for two of the four adverse actions that Plaintiff experienced, that she was not a comparator for the initial February reprimand and suspension, and that other officers who had been fired could not be considered sufficient comparators to Plaintiff's termination.  Because the new "similarly situated in all material respects" definition is less stringent that the "nearly identical" definition, the Court's findings that Miller was a comparator for the two-week suspension and the demotion necessarily meet the new definition.  The Court's determination that Miller was not a comparator for the February reprimand and suspension was based on the fact that Plaintiff could not show any evidence that Miller's reprimand was removed from her file, not on the definition of a comparator.

Finally, the Court's determination that Plaintiff could not show a comparator for his termination because the officers he pointed to had very different disciplinary histories remains intact under the new "similarly situated in all material respects" test.  The Eleventh Circuit points to four factors that will ordinarily be present for a comparator under the new definition: the comparator "will have engaged in the same basic conduct as the plaintiff; will have been subject to the same employment policy, guideline, or rule as the plaintiff; will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and will share the plaintiff's employment or disciplinary history."  Id. at *9.  This Court used these same factors in making its determinations under the "nearly identical" definition, and the key for Plaintiff's termination comparators was the lack of a similar employment and disciplinary history.  As such, the Court's findings in its previous Order regarding comparators for the prima facie case analysis are not changed by the Eleventh Circuit's new standard described in Lewis.

AO 72A
(Rev. 8/82)

with the statement that "the right to be free from employment discrimination" is clearly established in this Circuit); Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1378 (11th Cir. 1997) ("[T]he right to be free from workplace discrimination and harassment on the basis of race ... [was] clearly established at the relevant times"); Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003) ("[T]here is no doubt that in May 2000, . . . it was clearly established that intentional discrimination in the workplace on account of race violated federal law.") (citation omitted); Lawson v. Curry, 244 F. App'x 986, 988 (11th Cir. 2007) ("Discrimination based on interracial relationships constitutes discrimination based on race." (citing Loving v. Virginia, 388 U.S. 1, 10-11 (1967))). "However, the clearly established prong of the qualified immunity analysis asks the question in light of the specific context of the case, not as a broad general proposition." Rioux, 520 F.3d at 1283 (internal quotation marks and citations omitted).

"We therefore turn to an examination of whether the defendant's conduct was nonetheless objectively reasonable in light of that [Equal Protection] right." Id. (internal quotation marks and citations omitted). It is under this more specific inquiry that the Court turns to the rule set out in Foy v. Holston, 94 F.3d 1528, 1534-35 (11th Cir. 1996). In Foy, the Eleventh Circuit recognized that "state officials can be motivated, in part,

AO 72A
(Rev. 8/82)

by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully." Id. at 1534. It explained further that "state officials act lawfully despite having discriminatory intent, where the record shows they would have acted as they, in fact, did act even if they had lacked discriminatory intent." Id. Thus, the court concluded that "[u]nless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct—despite his having adequate lawful reasons to support the act—was the result of his unlawful motive, the defendant is entitled to [qualified] immunity." Id. at 1535.

The Eleventh Circuit has since explained that "defendant is entitled to qualified immunity under the Foy rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations." Bogle v. McClure, 332 F.3d 1347, 1356 (11th Cir. 2003) (quoting Stanley v. City of Dalton, 219 F.3d 1280, 1296 (11th Cir. 2000)); see also, Ham v. City of Atlanta, 386 F. App'x 899, 905-07 (11th Cir. 2010) (denying qualified immunity where the record did not indisputably show that defendants were motivated at least in part by lawful considerations); Mitchell v. City of Jacksonville, 734 F. App'x 649, 651 (11th Cir. 2018) (same). Therefore, even where a court finds that under a plaintiff's version of the facts, government officials committed intentional

20

discrimination, those officials are still entitled to qualified immunity where the facts <u>indisputably</u> establish that the officials "were motivated, <u>at least in part</u>, by lawful considerations." <u>Rioux</u>, 520 F.3d at 1284 (citations omitted) (finding that under the plaintiff's version of the facts, a violation of the equal protection clause occurred, but also holding that the defendants were entitled to qualified immunity because their actions were motivated at least in part "by lawful justifications").

Before turning to the facts of this case, it is important to note that the <u>Foy</u> doctrine's purpose is to further the policy justifications of qualified immunity. As the Eleventh Circuit stated in <u>Foy</u>, "[t]he qualified immunity defense functions to prevent public officials from being intimidated—by the threat of lawsuits which jeopardize the official and his family's welfare personally—from doing their jobs." 94 F.3d at 1534. Therefore, in the employment context, government employers have this extra layer of protection that private employers do not enjoy for the policy reasons explained in <u>Foy</u>. What this means is that qualified immunity, and specifically the <u>Foy</u> doctrine, can allow a court to find that a plaintiff has established a case of intentional discrimination on the merits while also granting immunity to the defendants on those same facts. <u>See Rioux</u>, 520 F.3d at 1275–85 (finding that the plaintiff established a prima facie case of discrimination and met his burden to show that the defendant's

21

lawful justifications were pretext while also finding that the defendants were entitled to qualified immunity under Foy).

### 1. Alexander

Turning first to the allegations against Alexander, the Court determines that under the Foy analysis, Alexander is entitled to qualified immunity with respect to the February reprimand and suspension but not the two-week suspension in May. The February reprimand and suspension were based on Plaintiff taking his patrol car to Atlanta without permission and for violating the order not to ride in the car with Miller without first notifying Alexander. The justification based on taking the car to Atlanta cannot be the lawful motivation because it is disputed in that under Plaintiff's version of events, personal use of the patrol vehicle was a perk encouraged by Howard, Plaintiff told Howard that he was going to Atlanta with Miller while washing his patrol car, and Howard was aware that neither Plaintiff nor Miller had a personal vehicle at that time.

However, Alexander is entitled to qualified immunity for this adverse action because the record indisputably shows that the reprimand and suspension were motivated, at least in part, by Plaintiff's violation of Alexander's order. It is important to note that this Court found material disputes of fact existed as to the exact language of the order, the timeline of when Plaintiff and Miller were dating, and when their relationship became public.

But, what is not in dispute, is that even under Plaintiff's version of the facts, he admitted to violating the order.   Under Plaintiff's version of the facts, the order was given prior to his relationship with Miller sometime before April 13, 2015, and the order was that he was supposed to notify Alexander when he was riding in the car with Miller.   A document dated April 13, 2015, confirms that the order was given at some point prior to that date and that Plaintiff and Miller were verbally counseled for riding together without authorization from Alexander on April 10, 2015. Dkt. No. 27-2 at 26.   Plaintiff admitted in his deposition that he had not always followed the order, dkt. no. 27-1 at 95-96, and at least two instances—the April 2015 verbal counseling and the February 2016 reprimand and suspension—of him not following the order are documented.   As the Court stated in its prior Order, Plaintiff's deposition "shows that he did not follow the order, whether it be an order to not ride together period or to provide notice." Dkt. No. 45 at 29 n.7.

Therefore, even if Alexander enforced the order in February 2016 for mostly discriminatory reasons, the record indisputably shows that Plaintiff admitted to not following an order from his supervisor, whatever the content of that order may have been, and that he failed to do so on more than one occasion.   Moreover, the record shows that even if Alexander was motivated mostly by discriminatory reasons in reprimanding and suspending Plaintiff

for violating the order, Plaintiff's failure to follow the order was still necessarily part of that decision. This fact is demonstrated in the written reprimand that documents that Alexander met with Plaintiff and Miller about riding in the same patrol car together without approval and that Plaintiff stated that he did not deny the allegations. Dkt. No. 27-2 at 27. Plaintiff also recognized in his affidavit that he was suspended for violating the order—even though he thought the order meant something other than an outright ban on riding together up to that point—and the fact that Plaintiff said Archie Davis told him that the punishment was really about riding in the car with Miller, not the trip to Atlanta. See Dkt. No. 33-4 ¶¶ 10-12. What the record shows is that even if other discriminatory reasons motivated Plaintiff's reprimand and suspension, that punishment was motivated, at least in part, by the fact that he rode in the car with Miller without notifying Alexander against Alexander's order. Thus, because Alexander's actions were motivated, at least in part, by lawful considerations, "the law did not clearly establish that a reasonable official faced with the same evidence of disobedience and deception should not have disciplined [Plaintiff] in the same manner." See Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1379 (11th Cir. 1997) ("Even assuming that the defendants acted with some discriminatory or retaliatory motives in demoting and discharging Johnson, the law did not clearly establish that a

reasonable official faced with the same evidence of disobedience and deception should not have disciplined Johnson in the same manner."). As such, Alexander is entitled to qualified immunity with respect to the February 2016 reprimand and suspension.[9]

Turning to the two-week suspension in May 2016, the Court reaches the opposite conclusion because the record does not indisputably show that Alexander's suspension was motivated at least in part by lawful considerations. Alexander's justification for suspending Plaintiff for two weeks was Plaintiff's alleged participation in a drug raid with the McIntosh County Sheriff's Office against Alexander's order to not work with the sheriff's office. However, Plaintiff asserts that he did not participate in the raid; instead, he only met up with officers to socialize at the staging area. Two witnesses corroborated Plaintiff's assertion. Thus, under Plaintiff's version of events, he was suspended for something that he did not do. Defendants argue that because Plaintiff remained silent in the face of Alexander's accusations and punishment, Alexander still had a lawful motivation to suspend Plaintiff for insubordination. However, Alexander's testimony in his deposition raises questions as to his basis for accusing Plaintiff of working with the sheriff's office. When pressed on his basis for believing that Plaintiff participated

---

[9] To the extent that Howard was involved with the February 2016 reprimand and suspension by approving Alexander's actions, the same analyses applies to him.

AO 72A
(Rev. 8/82)

in the raid, Alexander admitted that he did not ask the investigators from the sheriff's office if Plaintiff had participated and said that he "was not concerned" with finding out the exact details of what had happened the night before. Dkt. No. 27-3 at 228. In light of these facts, the Court cannot say that the record indisputably shows that Alexander was motivated in part by a lawful consideration to suspend Plaintiff for something that he did not do. Therefore, Alexander is not entitled to qualified immunity with respect to this adverse action.[10]

### 2. Howard

Next, the Court finds that under Foy, Howard is not entitled to qualified immunity for demoting Plaintiff to patrol but is entitled to qualified immunity for terminating Plaintiff. Looking first to the demotion to the patrol, the record does not indisputably establish that Howard was motivated to demote Plaintiff at least in part by lawful considerations because the record shows multiple conflicts in his alleged lawful considerations.

First, Alexander testified that he knew of other instances of Plaintiff's violation of the car order but did not present them to Howard before leaving the department and that he did not have any part in Plaintiff's demotion "at all." Dkt. No. 27-3 at 231-32.

---

[10] Again, to the extent that Howard was involved with the May 2016 two-week suspension by approving Alexander's actions and converting the suspension to a two-week period of leave, the same analyses applies to him.

AO 72A
(Rev. 8/82)

But, in his affidavit, Alexander says that while Plaintiff was on the two-week suspension, he told Howard about all the trouble he had been having with Plaintiff and Miller riding together against his order for the past year.   Second, Howard's affidavit states that after he heard about Plaintiff's continued insubordination from Alexander, he concluded that he had to either remove Plaintiff or Miller from the investigation division.   But Archie Davis testified that Howard explained his basis for transferring Plaintiff to patrol by stating that he was "shutting down narcotics and I'm going to give it a break . . . put Korone on patrol, if he does a good job, works hard for me, in three to six months . . . we'll open in back up and he can start running it again."   Dkt. 27-5 at 148.   This explanation conflicts with Howard's deposition testimony in which he stated that he disbanded the narcotics division because Plaintiff had already been transferred to patrol, leaving Alexander as the only narcotics investigator.   Dkt. No. 27-4 at 237.   As such, once Alexander resigned, there was no need for a narcotics division.   Id.   This testimony conflicts with Davis's because Davis's testimony implied that Plaintiff was in charge of narcotics after Alexander had already left.   Even though these various conflicting justifications may be lawful if true, a record of disputed lawful considerations is still a disputed record.   As such, the Court cannot say that the record indisputably shows that Howard was motivated at least in part by lawful

AO 72A
(Rev. 8/82)

considerations when he demoted Plaintiff to patrol, and therefore, he is not entitled to qualified immunity for this adverse action.[11]

Looking to the final adverse action, despite all of the factual disputes surrounding things like why Plaintiff made people feel "uncomfortable" at B&J's restaurant such that he was not allowed to work security anymore and the timing and basis for terminating Plaintiff, the record indisputably establishes that Plaintiff's termination was motivated, at least in part, by lawful considerations—namely his statement over the radio that he was not allowed inside B&J's. On June 26, 2016, when Plaintiff was called over the police radio channel by dispatch to respond to an incident at B&J's Restaurant, he responded by stating "I'm not allowed inside that establishment." Dkt. No. 26-2 ¶ 103. Even if Plaintiff was not welcome to work security at B&J's anymore by the owner, Terry Dowling, for discriminatory reasons and even if that decision somehow involved Alexander or Howard, the fact remains that Plaintiff made a statement over the radio—a public channel available to police officers and other government officers like the fire chief who approached Howard about one of his officers being banned from the restaurant—that reflected poorly on the police department. Plaintiff also admitted that he knew that he

---

[11] Because one of Howard's justifications for demoting Plaintiff involves statements made to him by Alexander about Plaintiff and Miller, to the extent that Alexander was involved in demoting Plaintiff, he is not entitled to qualified immunity for the same reasons as Howard.

was allowed on the premises of B&J's for work purposes and that his statement over the radio was based on his belief that he was not welcome at B&J's.   However, Plaintiff said over the public channel that he was "banned" from the restaurant.   This untrue statement reflected poorly on the police department because others who heard it would wonder why a police officer was banned from a popular restaurant in Darien.   Thus, a supervising officer could decide that such an action that reflects poorly on the department warrants termination, and that is what Howard did in this case.

Howard is entitled to qualified immunity for this final adverse action because the record indisputably shows that his decision to terminate Plaintiff was motivated, at least in part, by the call over the radio.   In other words, even if Howard had terminated Plaintiff for discriminatory reasons, part of his motivation was based on the call over the radio.   This is shown by the fact that he made the decision to terminate Plaintiff upon hearing about the call over the radio at Nautica Joe's restaurant the next day.   Moreover, it was one of the six infractions in the disciplinary forms listing the grounds for Plaintiff's termination.   Therefore, even if the other five reasons were in dispute and Howard had terminated Plaintiff in part for discriminatory reasons, the record indisputably shows that Howard was motivated, at least in part, by the lawful consideration of an untrue statement over the public channel of the police radio that

AO 72A
(Rev. 8/82)

reflected poorly on the police department. As such, Howard is entitled to qualified immunity for this adverse action.[12]

### C. Creswell

Finally, the Court determines that Creswell is entitled to qualified immunity. In this case, Creswell's involvement is limited to the following facts: Creswell was Plaintiff's direct supervisor on patrol; after Howard decided to terminate Plaintiff, Anthony Brown, at Howard's direction, directed Creswell to compile disciplinary justifications for terminating Plaintiff; and finally, Creswell terminated Plaintiff on August 3, 2016, after Plaintiff's 30-day grace period to find a new job had ended. Like Howard, Creswell is entitled to qualified immunity because, despite disputed facts about what he knew about Plaintiff's conduct on patrol when he was told that Plaintiff was being terminated and him being told to gather justifications for terminating Plaintiff, the record indisputably shows that he terminated Plaintiff, pursuant to Howard's direction, at least in part, because of Plaintiff's statement on the radio. Thus, even if Creswell terminated Plaintiff for discriminatory reasons, his decision was still motivated, at least in part, by a lawful consideration. As such, he is entitled to qualified immunity.

---

[12] Although Alexander had already left the police department and does not appear to be involved in the decision to ultimately terminate Plaintiff, to the extent that he was involved, he is entitled to qualified immunity for the same reasons as Howard—namely the lawful consideration of the statement over the radio.

### III. Intimate association

The Court now turns to Defendants' qualified immunity defense to Plaintiff's intimate association claim. Plaintiff claims that Defendants violated his First Amendment right to intimate association by interfering with his relationship with Miller through the various adverse actions that Plaintiff experienced. Defendants counter that at the time that Plaintiff experienced these adverse actions it was not clearly established in this circuit that the right to intimate association applied to an extramarital affair. The Court will first address the constitutional violation prong and then the clearly established prong.

### A. Constitutional Violation

As with the discrimination claims described in the section above, because the Court, reading the facts in the light most favorable to Plaintiff, denied Defendants' motion for summary judgment on Plaintiff's intimate association claim in its previous Order, it also finds that under Plaintiff's version of the facts, Plaintiff has established that a reasonable jury could find a violation of his First Amendment right to freedom of intimate association. Importantly, the Court found that Plaintiff's facts, if true, show that the adverse actions that he experienced were based in part on his relationship with Miller—such as the order about riding in the car with her or one of Howard's asserted

31

justifications for Plaintiff's demotion to patrol that he was trying to separate either Plaintiff or Miller out of investigations because of what Alexander had told him.

In light of the Court's findings in its previous Order and the brief recitation of the facts in the previous section, the Court need not discuss all of those facts again to show that Defendants interfered with Plaintiff and Miller's relationship under Plaintiff's version of the facts. Specifically, if Plaintiff's version of the facts is true, then he and Miller suffered multiple adverse actions that interfered with their relationship after that relationship became public. This conclusion is bolstered by Kidder's testimony which highlights the fact that Plaintiff believed at that time that his relationship with Miller was the reason for the difficulties he was facing at work with Howard and Alexander. Thus, the Court finds that the first prong of the analysis is met and turns to the clearly established prong.

## B. Clearly Established

### 1. Intimate Association and Extramarital Affairs

Defendants argue that they are entitled to qualified immunity from Plaintiff's intimate association claims because it is not clearly established in this circuit that an extramarital affair is a protected intimate association. Thus, a government official in Defendants' positions would not be on notice that interfering with

such an affair violated the First Amendment. In response, Plaintiff submits evidence that Miller and her husband divorced in 2016, and therefore, at least some of the adverse actions were committed against Plaintiff when he and Miller were in a normal dating relationship, not an affair.

In its prior Order, the Court stated that it would assume that Plaintiff and Miller's extramarital affair was a protected intimate association based on the facts that the Eleventh Circuit had held a dating relationship to be protected and had assumed for the sake of argument—although not deciding the issue—that an extramarital affair was protected under the First Amendment. Dkt. No. 45 at 54. However, here, the Court must apply the law for qualified immunity which requires that a right be clearly established to put officials on notice that their conduct is unlawful. Under that rule, it was not clearly established at the time of this case that an extramarital affair was a protected intimate association. In Starling v. Bd. Of Cty. Comm'rs, 602 F.3d 1257, 1261 (11th Cir. 2010), the Eleventh Circuit held that the county's interest in discouraging intimate association between supervisors and subordinates outweighed the plaintiff's interest in his workplace relationship. Id. In reaching that conclusion, the court stated that "we do not address whether the First Amendment protects intimate, extramarital association," and, therefore, it did not reach the question of "whether the district

33

court erred by concluding that the right to intimate, extramarital association was not clearly established under the First Amendment." Id.   Rather, the court merely assumed "*arguendo* that . . . [the plaintiff's] right to intimate, extramarital association . . . is fundamental" in ruling against the plaintiff on other grounds.   This case demonstrates that for the purposes of qualified immunity, the right to intimate association was not clearly established in this circuit at the time of this case.   See Anderson v. Creighton, 483 U.S. 635, 640 (1987) (holding that for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," or, in other words, that "in the light of pre-existing law the unlawfulness must be apparent"); Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010) ("[T]he preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue.").

Looking to the facts of this case, Plaintiff and Miller began their relationship (under Plaintiff's version of the facts) at some point toward the end of the summer in 2015 while Miller was still married.   Plaintiff submitted a second affidavit in which he swears that Miller filed for divorce on February 23, 2016, and that the divorce decree was granted on May 6, 2016.   Therefore, as a legal matter, because Miller was married until May 6, 2016, her

34

relationship with Plaintiff was an intimate, extramarital association until that point.[13] As such, the verbal reprimand and suspension that occurred on February 3, 2016, and the two-week suspension that occurred on May 3, 2016, happened while Plaintiff and Miller were engaged in an extramarital affair.[14] Because it was not clearly established that such an affair was a protected intimate association at that time, Alexander (and Howard to the extent he was involved) is entitled to qualified immunity for Plaintiff's intimate association claim with respect to those adverse actions.

But, Plaintiff's demotion and termination occurred after the divorce, which means that those adverse actions occurred while Plaintiff and Miller were merely in a dating relationship. Such relationships are protected intimate associations under the First Amendment. See Wilson v. Taylor, 733 F.2d 1539, 1544 (11th Cir. 1984), abrogated on other grounds as recognized in Scala v. City of Winter Park, 116 F.3d 1396, 1402 n.4 (11th Cir.1997) ("We conclude that dating is a type of association which must be protected by the first amendment's freedom of association."). As

---

[13] Plaintiff also states in his second affidavit that Miller's divorce that occurred on May 6, 2016, was "common knowledge for DPD personnel." Dkt. No. 48-5 ¶ 3.

[14] In his response to Defendants' Motion for Summary Judgment, Plaintiff argues that the two-week suspension happened after Miller's divorce was finalized, dkt. no. 51 at 20, 23, but in his first affidavit, Plaintiff swears that the two-week suspension occurred on May 3, 2016, dkt. no. 33-4 ¶ 15, which was before the final divorce decree on May 6, 2016, as stated in Plaintiff's second affidavit, dkt. no. 48-5 ¶ 3.

such, Defendants cannot assert that the right to intimate association was not clearly established for Plaintiff and Miller's relationship for those two adverse actions, to the extent that they were taken to interfere with Plaintiff and Miller's relationship.

### 2. **Foy** Analysis

As with the discrimination claims discussed above, the analysis in Foy also applies to Plaintiff's First Amendment intimate association claim under the clearly established analysis. See Stanley, 219 F.3d at 1295 (applying Foy analysis to First Amendment case). In other words, even if Defendants committed the adverse actions in this case to interfere with Plaintiff's relationship with Miller, so long as the record indisputably shows that they were motivated, at least in part, by lawful considerations, they are entitled to qualified immunity. Since the Defendants are already entitled to qualified immunity for the intimate association claims with respect to the February reprimand and suspension and the May two-week suspension, the Court will focus on the demotion to patrol and the termination.

As for the demotion, for the same reasons discussed in the prior section, Howard is not entitled to qualified immunity for this adverse action under Plaintiff's intimate association claim either. Because the record shows conflicting justifications for why Howard deciding to demote Plaintiff to patrol, the Court cannot

say that the record indisputably shows that the decision was motivated, at least in part, by lawful considerations.[15]  As for the termination, Howard is entitled to qualified immunity for the same reasons discussed in the prior section.   Even if Howard terminated Plaintiff to interfere with his relationship with Miller, the record indisputably shows that his decision was motivated, at least in part, by a lawful consideration—the statement over the radio.[16]  Likewise, Creswell is also entitled to qualified immunity on the same basis for terminating Plaintiff.

## CONCLUSION

To summarize, Defendants are entitled to qualified immunity in the following respects: (1) as to Plaintiff's claims for discrimination under § 1983 for violations of the Equal Protection Clause, Alexander and Howard are entitled to qualified immunity for the February reprimand and suspension and Plaintiff's termination but not the May two-week suspension or demotion to patrol; (2) as to Plaintiff's intimate association claims under the First Amendment, Alexander and Howard are entitled to qualified immunity for the February reprimand and suspension, the May two-week suspension, and Plaintiff's termination but not the demotion

---

[15] For the same reasons, to the extent that Alexander was involved in the decision to demote Plaintiff, he is also not entitled to qualified immunity for this adverse action.

[16] For the same reasons, to the extent that Alexander was involved with the decision to terminate Plaintiff, he is entitled to qualified immunity for that adverse action.

AO 72A
(Rev. 8/82)

to patrol; (3) Creswell is entitled to qualified immunity with respect to both claims against him in his individual capacity. This Order does not change the Court's prior order denying Defendant's motion for summary judgment on the merits and does not affect Plaintiff's claims under § 1981 or § 1985. Therefore, for these reasons, Defendants' Motion for Summary Judgment based on qualified immunity, dkt. no. 46, is **GRANTED in part and DENIED in part**.

**SO ORDERED**, this 16th day of April, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)